Gene Y. Kang, Esq.
Barry I. Levy, Esq. (to be admitted *pro hac vice*)
Max Gershenoff, Esq. (to be admitted *pro hac vice*)
Blythe C. Miller, Esq. (to be admitted *pro hac vice*)
RIVKIN RADLER LLP
25 Main Street, Suite 501
Hackensack, New Jersey 07601
(201) 287-2460
*Counsel for Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co.*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| GOVERNMENT EMPLOYEES INSURANCE CO., GEICO INDEMNITY CO., GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY CO., <br><br> Plaintiffs, <br><br> -against- <br><br> TODD KOPPEL, M.D., GARDEN STATE PAIN MANAGEMENT, P.A., RICHARD INACIO, D.C., SPINECARE CHIROPRACTIC REHAB CENTER, P.A., BRIAN BEAGIN, D.C., CLIFTON PAIN AND REHAB LLC, VINCENT SARACENO, D.C., NEWARK PAIN AND REHAB CENTER LLC, DAVID ALLEN KRESHOVER, D.C., and CAPITAL CHIROPRACTIC, P.C., <br><br> Defendants. | Case No.: _____( ) <br><br> **Plaintiffs Demand a Trial by Jury** |

## COMPLAINT

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.     This action seeks to recover more than $5,600,000.00 that the Defendants wrongfully have obtained from GEICO by submitting, and causing to be submitted, thousands of

fraudulent no-fault insurance charges for purported initial examinations, follow-up examinations, pain management injections, chiropractic services, and surgical services (collectively the "Fraudulent Services").

2.      The Fraudulent Services purportedly were provided to individuals ("Insureds") who claimed to have been involved in automobile accidents and were eligible for insurance coverage under GEICO no-fault insurance policies.

3.      In addition, GEICO seeks a declaration that

(i)      between at least 2013 and the present, Defendants Todd Koppel, M.D. and Garden State Pain Management, P.A. were not in compliance with all relevant laws and regulations governing healthcare practice because they paid illegal compensation in exchange for patient referrals, and unlawfully billed inflated amounts for medically unnecessary, and in some cases illusory, healthcare services;

(ii)      between at least 2013 and the present, Defendants Richard Inacio, D.C. and Spinecare Chiropractic Rehab Center, P.A. were not in compliance with all relevant laws and regulations governing healthcare practice because they received illegal compensation in exchange for patient referrals and billed for medically unnecessary healthcare services;

(iii)      between at least 2013 and the present, Defendants Brian Beagin, D.C. and Clifton Pain and Rehab LLC were not in compliance with all relevant laws and regulations governing healthcare practice because they received illegal compensation in exchange for patient referrals and billed for medically unnecessary healthcare services;

(iv)      between at least June 2014 and the present, Defendants Vincent Saraceno, D.C. and Newark Pain and Rehab Center LLC were not in compliance with all relevant laws and regulations governing healthcare practice because they received illegal compensation in exchange for patient referrals and billed for medically unnecessary healthcare services; and

(v)      between at least 2015 and the present, Defendants David Allen Kreshover, D.C. and Capital Chiropractic, P.C. were not in compliance with all relevant laws and regulations governing healthcare practice because they received illegal compensation in exchange for patient referrals and billed for medically unnecessary healthcare services.

4.      The Defendants fall into the following categories:

(i)     Defendant Todd Koppel, M.D. ("Koppel") is a physician licensed to practice medicine in New Jersey and New York, is the sole director, owner, and controller of Garden State Pain Management, P.A., and purported to perform many of the Fraudulent Services.

(ii)    Defendant Garden State Pain Management, P.A. ("Garden State Pain") is a New Jersey medical professional corporation through which the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

(iii)   Defendants Richard Inacio, D.C. ("Inacio"), Spinecare Chiropractic Rehab Center, P.A. ("Spinecare Chiropractic"), Brian Beagin, D.C. ("Beagin"), Clifton Pain and Rehab LLC ("Clifton Pain"), Vincent Saraceno, D.C. ("Saraceno"), Newark Pain and Rehab Center LLC ("Newark Pain"), David Allen Kreshover, D.C. ("Kreshover"), and Capital Chiropractic, P.C. ("Capital Chiropractic") (collectively the "Referral Defendants") are, respectively, chiropractors licensed to practice chiropractic in New Jersey and New York, and the chiropractic professional corporations and limited liability companies they owned. The Referral Defendants referred Insureds to Garden State Pain in exchange for unlawful compensation from Garden State Pain and Koppel, and Inacio, Saraceno, and Kreshover also purported to provide many of the Fraudulent Services.

5.      As discussed below, the Defendants at all relevant times have known that:

(i)     the Defendants were not in compliance with all relevant laws and regulations governing healthcare practice, and therefore never were eligible to receive no-fault insurance reimbursement in the first instance;

(ii)    the Fraudulent Services were not provided in compliance with all relevant laws and regulations governing healthcare practice in New Jersey and New York, and therefore were not eligible for no-fault insurance reimbursement in the first instance;

(iii)   the Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iv)    in many cases, the Fraudulent Services never were provided in the first instance; and

(v)     the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

6.      As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO through Garden State Pain, Spinecare Chiropractic, Clifton Pain, Newark Pain, and Capital Chiropractic.

7.      The charts annexed hereto as Exhibit "1" – "5" set forth a representative sample of the fraudulent claims that have been identified to date that the Defendants have submitted, or caused to be submitted, to GEICO.

8.      The Defendants' fraudulent scheme began as early as 2013 and has continued uninterrupted since that time. As a result of the Defendants' scheme, GEICO has incurred damages of more than $5,600,000.00.

**THE PARTIES**

**I.      Plaintiffs**

9.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. are Nebraska corporations with their principal places of business in Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New Jersey.

**II.      Defendants**

10.       Defendant Koppel resides in and is a citizen of New York. Koppel was licensed to practice medicine in New York in 1995, licensed to practice medicine in New Jersey in 1997, owned and controlled Garden State Pain, and purported to provide many of the Fraudulent Services on behalf of Garden State Pain.

11.      Koppel has a history of engaging in no-fault insurance fraud schemes.

12.      Specifically, on February 28, 2018, a New Jersey Grand Jury indicted Koppel on 20 charges relating to his stealing more than $500,000.00 from insurance companies in a medical

4

kickback fraud scheme, including Conspiracy in the First Degree, Money Laundering in the First Degree, Misconduct by a Corporate Official in the Second Degree, Theft by Deception in the Second Degree, four counts of Health Care Claims Fraud in the Second Degree, Attempted Theft by Deception in the Second Degree, five counts of Commercial Bribery in the Third Degree, and six counts of Criminal Running in the Third Degree.

13.     The indictment included credible allegations that Koppel paid cash kickbacks to at least five chiropractors in exchange for at least 790 patient referrals over the course of at least 10 years, from at least 2006 to 2016.

14.      While the indictment was ultimately dismissed in July 2019 due to an improper Grand Jury instruction, the court did not preclude the State from re-presenting the case.

15.     Due to this indictment, Koppel's authorization to treat injured workers in the New York State workers' compensation system was suspended from March 19, 2018 to August 20, 2019 by the New York State Workers' Compensation Board.

16.     In addition to his criminal charges, Koppel has been sued by insurers on at least two occasions in cases credibly alleging – among other things – that he paid kickbacks and otherwise facilitated unlawful referrals.

17.     Upon information and belief, Koppel's history of involvement in no-fault insurance fraud schemes – which can be obtained by prospective patients, employers, and referral sources via a simple internet search – made it difficult for him to find legitimate employment as a physician and contributed to his motive to participate in the fraudulent scheme described herein.

18.     Defendant Garden State Pain is a New Jersey medical professional corporation with its principal place of business in New Jersey. Garden State Pain was incorporated in New Jersey

on or about November 4, 2002, had Koppel as its sole director, and was used by Koppel as a vehicle to submit fraudulent billing for the Fraudulent Services to GEICO and other insurers.

19.     Garden State Pain was also registered as a Foreign Business Corporation with the New York State Department of State on April 7, 2011.

20.     Defendant Inacio resides in and is a citizen of New Jersey.  Inacio was licensed to practice chiropractic in New Jersey  in 1997, owned Spinecare Chiropractic, purported to provide many of the Fraudulent Services on behalf of Spinecare Chiropractic, and caused Insureds to be referred to Garden State Pain for the Fraudulent Services in exchange for illegal compensation from Garden State Pain and Koppel.

21.     Defendant Spinecare Chiropractic is a New Jersey chiropractic professional corporation with its principal place of business in New Jersey. Spinecare Chiropractic was incorporated in New Jersey on or about January 15, 1998, had Inacio as its sole director, was used by Inacio as a vehicle to submit fraudulent billing for the Fraudulent Services to GEICO and other insurers, and was used by Inacio as a vehicle to refer Insureds to Garden State Pain for the Fraudulent Services in exchange for illegal compensation from Garden State Pain and Koppel.

22.     Defendant Beagin resides in and is a citizen of New Jersey.  Beagin was licensed to practice chiropractic in New Jersey from 2002 to 2019, owned Clifton Pain, and caused Insureds to be referred to Garden State Pain for the Fraudulent Services in exchange for illegal compensation from Garden State Pain and Koppel.

23.     Beagin also has a history of engaging in no-fault insurance fraud schemes.

24.     Specifically, in 2016, Beagin pleaded guilty to Conspiracy and Health Care Claims Fraud in the Second Degree for his role in a kickback scheme involving medical imaging centers in New Jersey.

25.     Beagin also admitted to receiving kickbacks from Koppel and is named as "B.B." in Koppel's February 28, 2018 Indictment, which states "Koppel did use property derived from the criminal activity in an amount of at least $75,000 but less than $500,000 to generate cash to pay additional kickbacks to various medical practitioners, including but not necessarily limited to chiropractors whose initials are… B.B."

26.     Upon information and belief, Beagin's history of involvement in no-fault insurance fraud schemes – which can be obtained by prospective patients, employers, and referral sources via a simple internet search – made it difficult for him to find legitimate employment as a chiropractor and contributed to his motive to participate in the fraudulent scheme described herein.

27.     Defendant Clifton Pain is a New Jersey chiropractic limited liability company with its principal place of business in New Jersey. Clifton Pain was organized in New Jersey on or about February 17, 2010, was owned by Beagin and Saraceno, had Beagin and Saraceno as its sole members, was used by Beagin and Saraceno as a vehicle to submit fraudulent billing for the Fraudulent Services to GEICO and other insurers, and was used by Beagin and Saraceno as a vehicle to refer Insureds to Garden State Pain for the Fraudulent Services in exchange for illegal compensation from Garden State Pain and Koppel.

28.     Defendant Saraceno resides in and is a citizen of New Jersey. Saraceno was licensed to practice chiropractic in New Jersey in 2001, owned Newark Pain and Clifton Pain, purported to provide many of the Fraudulent Services on behalf of Newark Pain and Clifton Pain, and caused Insureds to be referred to Garden State Pain for the Fraudulent Services in exchange for illegal compensation from Garden State Pain and Koppel.

29.     Upon information and belief, Saraceno also admitted to receiving kickbacks from Koppel and is named as "V.S." in Koppel's February 28, 2018 Indictment, which states "Koppel

did use property derived from the criminal activity in an amount of at least $75,000 but less than $500,000 to generate cash to pay additional kickbacks to various medical practitioners, including but not necessarily limited to chiropractors whose initials are… V.S."

30. Upon information and belief, Saraceno's history of involvement in no-fault insurance fraud schemes made it difficult for him to find legitimate employment as a chiropractor and contributed to his motive to participate in the fraudulent scheme described herein.

31. Defendant Newark Pain is a New Jersey chiropractic limited liability company with its principal place of business in New Jersey. Newark Pain was organized in New Jersey on or about May 24, 2002, was owned by Saraceno, had Saraceno as its sole member, was used by Saraceno as a vehicle to submit fraudulent billing for the Fraudulent Services to GEICO and other insurers, and was used by Saraceno as a vehicle to refer Insureds to Garden State Pain for the Fraudulent Services in exchange for illegal compensation from Garden State Pain and Koppel.

32. Defendant Kreshover resides in and is a citizen of New York.  Kreshover was licensed to practice chiropractic in New York in 1998, owned Capital Chiropractic, purported to provide many of the Fraudulent Services on behalf of Capital Chiropractic, and caused Insureds to be referred to Garden State Pain for the Fraudulent Services in exchange for illegal compensation from Garden State Pain and Koppel.

33. Defendant Capital Chiropractic is a New York chiropractic professional corporation with its principal place of business in New York. Capital Chiropractic was incorporated in New York on or about August 31, 2005, was owned by Kreshover, was used by Kreshover as a vehicle to submit fraudulent billing for the Fraudulent Services to GEICO and other insurers, and was used by Kreshover as a vehicle to refer Insureds to Garden State Pain for the Fraudulent Services in exchange for illegal compensation from Garden State Pain and Koppel.

## JURISDICTION AND VENUE

34.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

35.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act) because they arise under the laws of the United States.

36.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

37.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the District of New Jersey is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

**I.     An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement**

38.     GEICO underwrites automobile insurance in New Jersey and New York.

**A.     The New Jersey No-Fault Laws**

39.     New Jersey has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries.  The statutory system is embodied within the Compulsory Insurance Law (N.J.S.A. 39:6B-1 to 3) and the Automobile Reparation Reform Act (N.J.S.A. 39:6A-1 et seq.)(collectively referred to as the "No Fault Laws"), which require automobile insurers to provide Personal Injury Protection Benefits ("PIP Benefits") to Insureds.

40.     Under the No Fault Laws, an Insured can assign his or her right to PIP Benefits to healthcare services providers in exchange for those services. Pursuant to a duly executed assignment, a healthcare services provider may submit claims directly to an automobile insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500 form").

**B.     No-Fault Reimbursement and Compliance With New Jersey Law Governing Healthcare Practice**

41.     In order for a healthcare services provider to be eligible to receive PIP Benefits, it must comply with all significant laws and regulations governing healthcare practice.

42.     Thus, a healthcare services provider is not entitled to receive PIP Benefits where it has failed to comply with all significant statutory and regulatory requirements governing healthcare practice, whether or not the underlying services were medically necessary.

43.     Moreover, in order for a specific healthcare service to be eligible for PIP reimbursement, the service itself must be provided in compliance with all significant laws and regulations governing healthcare practice.

44.     By extension, insurers such as GEICO are not obligated to make any payments of PIP Benefits to healthcare services providers that are not in compliance with all significant statutory and regulatory requirements governing healthcare practice.

45.     Furthermore, insurers such as GEICO are not obligated to make any payments of PIP Benefits for healthcare services that are not rendered in compliance with all significant statutory and regulatory requirements governing healthcare practice.

**C.     New Jersey Law Regarding the Payment or Receipt of Compensation in Exchange for Patient Referrals**

46.     Pursuant to N.J.A.C. 13:35-6.17, physicians are prohibited from paying or receiving compensation, either directly or indirectly, in exchange for patient referrals.

47.     Among other things, N.J.A.C. 13:35-6.17(c)(1) specifies that:

A licensee shall not, directly or indirectly, give to or receive from any licensed or unlicensed source a gift of more than nominal (negligible) value, or any fee, commission, rebate or bonus or other compensation however denominated, which a reasonable person would recognize as having been given or received in appreciation for or to promote conduct by a licensee including: purchasing a medical product, ordering or promoting the sale or lease of a device or appliance or other prescribed item, prescribing any type of item or product for patient use or making or receiving a referral to or from another for professional services. For example, a licensee who refers a patient to a health care service (such as a cardiac rehabilitation service or a provider of durable medical equipment or a provider of testing services) shall not accept from nor give to the health care service a fee directly or indirectly in connection with the referral, whether denominated as a referral or prescription fee or examination or supervision fee or space leasing in which to render the services (other than as permitted in (h) below), or by any other name … .

(Emphasis added).

48.     N.J.A.C. 13:35-6.17(c)(1)(ii) specifies that "[t]his section shall be construed broadly to effectuate its remedial intent."

49.     In keeping with the broad anti-kickback prohibitions in N.J.A.C. 13:35-6.17(c)(1), N.J.A.C. 13:35-6.17(h) provides, in pertinent part, that:

A Board licensee may lease space or medical equipment to or from another licensed health care professional to whom patients are referred, only where rent is a fixed fee set in advance and determined by the fair market value, or less, and is for a regular term and not for sporadic use of the space or equipment.

(Emphasis added).

50.     Similarly, pursuant to N.J.A.C. 13:44-E-2.6, chiropractors are prohibited from paying or receiving compensation, either directly or indirectly, in exchange for patient referrals.

51.     In keeping with the general proscription against the payment of compensation in exchange for patient referrals (see N.J.A.C. 13:35-6.17; N.J.A.C. 13:44E-2.6), and the specific provisions of N.J.A.C. 13:35-6.17 that are aimed at preventing illegal referral fees from being

disguised as ostensibly-legitimate "rent" payments (see N.J.A.C. 13:35-6.17(h)), N.J.A.C. 13:44E-3.9 provides – in pertinent part – that:

> A chiropractic physician requesting that another chiropractic physician or other practitioner perform any diagnostic tests shall … [n]ot refer a patient to another practitioner practicing at the same premises …, unless: … [t]hat other practitioner is a bona fide partner, fellow shareholder of a professional service corporation or other permitted practice structure, or a regularly salaried practitioner-employee of the chiropractic physician requesting the performance of a diagnostic test … .

52.  N.J.A.C. 13:44E-3.1 defines "practitioner" as "a licensee of a professional board authorized to render health care services, including, but not limited to, chiropractic physicians, medical doctors, podiatric physicians, physical therapists and registered professional nurses."

53.  N.J.A.C. 13:44E-3.1 defines "diagnostic test" to include "a professional service utilizing biomechanical, neurological, neurodiagnostic, radiological, vascular or any means, other than bioanalysis, intended to assist in establishing a diagnosis, for the purpose of recommending a course of treatment for the tested patient to be implemented by a chiropractic physician or other treating practitioner."

54.  Thus, pursuant to N.J.A.C. 13:44E-3.9, a chiropractor may not refer a patient to a physician practicing at the same premises as the chiropractor, for any types of professional services other than bioanalysis that are aimed at establishing a diagnosis for use in recommending a course of treatment to be implemented by a chiropractor, unless the physician actually is the chiropractor's bona fide partner, fellow shareholder in a professional entity, or regularly salaried employee.

55.  Physicians, medical practices, chiropractors, and chiropractic practices that pay or receive unlawful compensation in exchange for patient referrals are not eligible to collect PIP Benefits.

**D.** **No-Fault Reimbursement, Medical Necessity, and the New Jersey No-Fault Care Paths**

56.     Pursuant to N.J.S.A. 39:6A-4, an insurer such as GEICO is only required to pay PIP Benefits for reasonable, necessary, and appropriate treatment. Concomitantly, a healthcare services provider is only eligible to receive PIP Benefits for medically necessary services.

57.     Pursuant to N.J.S.A. 39:6A-2(m):

"Medically necessary" means that the treatment is consistent with the symptoms or diagnosis, and treatment of the injury:

    (1)     is not primarily for the convenience of the injured person or provider,

    (2)     is the most appropriate standard or level of service which is in accordance with standards of good practice and standard professional treatment protocols, as such protocols may be recognized or designated by the Commissioner of Banking and Insurance, in consultation with the Commissioner of Health and Senior Services or with a professional licensing or certifying board in the Division of Consumer Affairs in the Department of Law and Public Safety, or by a nationally recognized professional organization, and

    (3)     does not involve unnecessary diagnostic testing.

58.     Pursuant to the No-Fault Laws, the New Jersey Commissioner of Banking and Insurance (the "Commissioner") has designated specific care paths (the "Care Paths") as the standard course of medically necessary treatment for certain types of neck and back soft tissue injuries that commonly are sustained in automobile accidents. See N.J.A.C. 11:3-4.6.

59.     Specifically, the Commissioner has promulgated Care Paths for the following types of injuries:

    (i)     cervical spine strains, sprains, and contusions;

    (ii)     cervical herniated disks or radiculopathies;

    (iii)     thoracic spine strains, sprains, and contusions;

    (iv)     thoracic herniated disks or radiculopathies;

(v)      lumbar-sacral spine strains, sprains, and contusions; and

(vi)     lumbar-sacral herniated disks or radiculopathies.

60.     The Care Paths generally provide for an initial, four-week course of conservative treatment including chiropractic services, physical therapy, medication, and exercise.

61.     Should a healthcare services provider wish to provide additional treatment to an Insured beyond the initial four weeks of conservative treatment, the Care Paths generally require the provider to demonstrate at the four week mark, the eight week mark, and the 13 week mark that continued treatment is warranted based on the Insured's individual circumstances. See New Jersey Department of Banking and Insurance Comments, 30 N.J.R. 4401(a).

62.     The guidelines established by the Commissioner in the Care Paths are designed to avoid the continuation of treatment and therapy, week after week, over many months and years, without any observable improvement. See 30 N.J.R. 4401(a).

**E.     The Fee Schedule and Current Procedural Terminology Codes**

63.     New Jersey has established a medical fee schedule (the "Fee Schedule") that is applicable to claims for PIP Benefits.

64.     The No-Fault Laws specifically prohibit healthcare services providers from charging for services in amounts exceeding the amounts set forth in the Fee Schedule. See N.J.S.A. § 39:6A-4.6; N.J.A.C. 11:3-29.6.

65.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable regulations; (ii) the service described by the specific CPT code that

is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

66. The No-Fault Laws provide that the Fee Schedule shall be interpreted in accordance with the Medicare Claims Processing Manual ("MCPM"), the National Correct Coding Initiative ("NCCI") Policy Manual, and the American Medical Association's CPT Assistant. See N.J.A.C. 11:3-29.4.

**F.    The New Jersey Insurance Fraud Prevention Act**

67. New Jersey has a strong public policy against insurance fraud. This policy is manifested in a series of statutes, including the Insurance Fraud Prevention Act, ("IFPA") N.J.S.A. 17:33A-1 et seq. A healthcare services provider violates the IFPA if, among other things, it:

(i)     Presents or causes to be presented any written or oral statement as part of, or in support of or opposition to a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

(ii)    Prepares or makes any written or oral statement that is intended to be presented to any insurance company or any insurance claimant in connection with, or in support of or in opposition to any claims for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

(iii)   Conceals or knowingly fails to disclose the occurrence of an event which affects a person's initial or continued right or entitlement to (a) any insurance benefits or payment or (b) the amount of any benefit or payment to which the person is entitled.

See N.J.S.A. 17:33A-4.

68. A healthcare services provider also violates the IFPA if it either: (i) "knowingly assists, conspires with or urges any person or practitioner to violate any of provisions of this act"; or (ii) "knowingly benefits, directly or indirectly, from the proceeds derived from a violation of this act." Id.

69.     Violators of the IFPA are liable to the insurer for restitution, attorney's fees, and the reasonable costs of the insurer's investigation. See N.J.S.A. 17:33A-7(a).

70.     A person that engages in a pattern of fraudulent behavior under the IFPA is liable to the insurer for treble damages. See N.J.S.A. 17:33A-7(b).

71.     The IFPA defines a pattern as five or more "related violations". See N.J.S.A. 17:33A-3. Violations are related if they involve either the same victim, or same or similar actions on the part of the person or practitioner charged with violating the IFPA. See N.J.S.A.17:33A-3.

**G.     Pertinent New York Law Governing No-Fault Insurance Reimbursement**

72.     New York's no-fault insurance laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

73.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.), automobile insurers are required to provide PIP Benefits to Insureds.

74.     In New York, PIP Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services.

75.     In New York, an Insured can assign his/her right to PIP Benefits to healthcare goods and services providers in exchange for those services.

76.     In New York, pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

77.     In the alternative, in New York a healthcare services provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500 form").

78.     Pursuant to the New York no-fault insurance laws, healthcare services providers are not eligible to bill for or to collect PIP Benefits if they fail to meet <u>any</u> New York State or local licensing requirements necessary to provide the underlying services, or if they fail to meet the applicable licensing requirements in any other states in which such services are performed.

79.     For instance, the implementing regulation adopted by the New York Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York or meet <u>any</u> applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

80.     New York law prohibits licensed healthcare services providers, including chiropractors and physicians, from paying or accepting kickbacks in exchange for patient referrals. <u>See</u>, <u>e.g.</u>, New York Education Law §§ 6509-a; 6531.

81.     Therefore, under the New York no-fault insurance laws, a healthcare services provider is not eligible to receive PIP Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, or if it engages in illegal self-referrals.

82.     In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare services providers that fail to comply with licensing requirements are ineligible to collect PIP Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

83.     In New York, claims for PIP Benefits are governed by the New York Workers'
Compensation Fee Schedule (the "NY Fee Schedule").

84.     When a healthcare services provider submits a claim for PIP Benefits using the
current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that:
(i) the service described by the specific CPT code that is used was performed in a competent
manner in accordance with applicable laws and regulations; (ii) the service described by the
specific CPT code that is used was reasonable and medically necessary; and (iii) the service and
the attendant fee were not excessive.

85.     Pursuant to New York Insurance Law § 403, the NF-3 and HCFA-1500 forms
submitted by a healthcare services provider to GEICO, and to all other automobile insurers, must
be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other
> person files an application for insurance or statement of claim containing any materially
> false information, or conceals for the purpose of misleading, information concerning any
> fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     The Defendants' Fraudulent Scheme

### A.     The Payment and Receipt of Unlawful Compensation in Exchange for Patient Referrals

86.     Koppel did not make any significant efforts to advertise or market Garden State
Pain's services to the general public.

87.     In order to bill GEICO and other automobile insurers for initial examinations,
follow-up examinations, pain management injections, and surgical services, Garden State Pain and
Koppel needed to obtain patient referrals from other healthcare providers.

88.     At the same time, the Referral Defendants – as well as Garden State Pain's other
chiropractor referral sources – wanted to submit as much billing for chiropractic services as

possible to GEICO and other insurers, without regard for whether the underlying chiropractic services were medically necessary.

89.     However, to the extent that the Insureds in the claims set forth in Exhibits "1" – "5" suffered any injuries at all in their automobile accidents, they virtually always were garden-variety soft tissue injuries such as sprains or strains.

90.     Ordinary soft tissue injuries such as sprains or strains virtually always resolve after a short course of conservative treatment, or no treatment at all, which is why the Care Paths require healthcare services providers to demonstrate why continued treatment is necessary beyond the four-week, eight-week, and 13-week marks.

91.     As a result, the Referral Defendants knew that their ability to submit and obtain payment on large amounts of chiropractic billing to GEICO and other automobile insurers would be limited by the Care Paths and other relevant No-Fault Laws, inasmuch as they would not be able to demonstrate that the Insureds required additional chiropractic services beyond the first four or eight weeks of treatment, much less the 13-week mark.

92.     The Referral Defendants also knew that – pursuant to the Care Paths and No-Fault Laws – it would be much easier for them to obtain payment on large amounts of no-fault insurance billing for medically unnecessary chiropractic services if a licensed physician or physicians were to: (i) generate reports and diagnoses that purported to reflect injuries more serious than ordinary strains and sprains; and/or (ii) recommend the continued provision of chiropractic services beyond the first four, eight, or 13 weeks of treatment.

93.     Accordingly, the Referral Defendants entered into secret agreements with Koppel and Garden State Pain, whereby the chiropractor referral sources would refer Insureds to Garden State Pain for expensive and medically unnecessary examinations and interventional pain

management services, despite the Insureds' total lack of any genuine presenting problems that would warrant the examinations or interventional pain management services.

94.     In exchange for the medically unnecessary referrals, Koppel and Garden State Pain paid unlawful compensation to the Referral Defendants and to their other chiropractor referral sources.

95.     For example, on February 28, 2018, a New Jersey Grand Jury indicted Koppel on charges relating to his payment of more than $190,000.00 in kickbacks to five chiropractors in exchange for more than 790 patient referrals to Garden State Pain between 2006 and 2016.

96.     Pursuant to a March 5, 2018 news release from the New Jersey Office of the Attorney General, between 2006 and 2016 "Koppel billed various insurance companies more than $4,400,000.00 for medical treatments for patients referred to him by the five chiropractors," including Beagin, and upon information and belief Saraceno, while omitting the fact that the treatments were the result of an illegal kickback scheme when submitting the bills.

97.     Koppel received more than $500,000.00 in insurance payments from his submission of fraudulent billing, which were deposited in Garden State Pain's business accounts and later moved to his personal bank accounts.

98.     Koppel then used some of the ill-gotten proceeds to generate cash to pay additional kickbacks to Beagin, upon information and belief Saraceno, and others.

99.     Beagin and others, including upon information and belief Saraceno, admitted to receiving kickbacks from Koppel and have pleaded guilty to charges related to the prosecution of other medical kickback rings.

100.     Koppel was indicted on 20 different charges related to the fraudulent kickback scheme, including Conspiracy in the First Degree, Money Laundering in the First Degree,

Misconduct by a Corporate Official in the Second Degree, Theft by Deception in the Second Degree, four counts of Health Care Claims Fraud in the Second Degree, Attempted Theft by Deception in the Second Degree, five counts of Commercial Bribery in the Third Degree, and six counts of Criminal Running in the Third Degree.

101.    While the indictment was ultimately dismissed in July 2019 due to an improper Grand Jury Instruction, the court did not preclude the State from re-presenting the case to the Grand Jury.

102.    In keeping with the fact that Koppel paid kickbacks to the Referral Defendants in exchange for patient referrals, Koppel and Garden State Pain's false contentions that Insureds continued to suffer from high levels of pain and other symptoms as a result of their minor automobile accidents, and the subsequent return referrals by Koppel and Garden State Pain to the Referral Defendants for continued, medically unnecessary chiropractic services, in gross deviation from the ordinary Care Paths, and to some Newark Pain patients for physical therapy treatment, constituted unlawful compensation to the Referral Defendants for their initial referrals of Insureds to Garden State Pain.

103.    In keeping with the fact that Koppel and Garden State Pain's return referrals to the Referral Defendants were not predicated on medical necessity, and in fact constituted unlawful compensation to the Referral Defendants for their initial referrals of Insureds to Garden State Pain, Garden State Pain's own records indicated that the Referral Defendants' prior chiropractic care had not been effective in resolving the Insureds supposed complaints.

104.    For example:

(i)    On February 22, 2013, an Insured named LK was involved in an automobile accident. In keeping with the fact that the accident was minor and that the injuries sustained by LK, if any, were minor, a radiologic examination done that day indicated that LK had a normal cervical spine and that his adjacent soft tissues were

unremarkable. Even so, LK thereafter sought treatment from Saraceno, Beagin, and Clifton Pain, where he purportedly received chiropractic treatment between February 2013 and September 2013. In October 2013, Saraceno, Beagin, and Clifton Pain caused LK to be referred to Garden State Pain pursuant to the unlawful compensation that Koppel and Garden State Pain paid to Beagin, Saraceno, and Clifton Pain. Thereafter, on October 3, 2013, Koppel purported to examine LK on behalf of Garden State Pain. In his October 3, 2013 examination report, Koppel falsely contended that LK continued to suffer from high levels of pain in his neck and back as the result of his minor accident, despite the fact that – by that point – LK had received seven months of chiropractic services from Saraceno, Beagin, and Clifton Pain. Though the chiropractic treatment that Saraceno, Beagin, and Clifton Pain purportedly had provided supposedly had been ineffective in resolving LK's putative symptoms, Koppel nonetheless referred LK back to Clifton Pain for continued chiropractic treatment at the conclusion of the October 3, 2013 examination. This medically unnecessary return referral to Clifton Pain was additional, unlawful compensation for the initial, medically unnecessary referral to Garden State Pain.

(ii)     On September 23, 2013, an Insured named JR was involved in a minor automobile accident in a parking lot. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that all of the vehicles were drivable following the accident and were driven away from the scene of the accident. Even so, JR thereafter sought treatment from Inacio and Spinecare Chiropractic, where he purportedly received chiropractic treatment between September 2013 and March 2014. In March 2014, Inacio and Spinecare Chiropractic caused JR to be referred to Garden State Pain pursuant to the unlawful compensation that Koppel and Garden State Pain paid to Inacio and Spinecare Chiropractic. Thereafter, on March 25, 2014, Koppel purported to examine JR on behalf of Garden State Pain. In his March 25, 2014 examination report, Koppel falsely contended that JR continued to suffer from high levels of pain in his neck and back as the result of his minor accident, despite the fact that – by that point – JR had received six months of chiropractic services from Inacio and Spinecare Chiropractic. Though the chiropractic treatment that Inacio and Spinecare Chiropractic purportedly had provided supposedly had been ineffective in resolving JR's putative symptoms, Koppel nonetheless referred JR back to Spinecare Chiropractic for continued chiropractic treatment at the conclusion of the March 25, 2014 examination. This medically unnecessary return referral to Spinecare Chiropractic was additional, unlawful compensation for the initial, medically unnecessary referral to Garden State Pain.

(iii)    On March 2, 2014, an Insured named TM was involved in an automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that all of the vehicles were drivable following the accident. Even so, TM thereafter sought treatment from Saraceno and Newark Pain, where he purportedly received chiropractic treatment between March 2014 and October 2014. In October 2014, Saraceno and Newark Pain caused TM to be referred to

Garden State Pain pursuant to the unlawful compensation that Koppel and Garden State Pain paid to Saraceno and Newark Pain. Thereafter, on October 15, 2014, Koppel purported to examine TM on behalf of Garden State Pain. In his October 15, 2014 examination report, Koppel falsely contended that TM continued to suffer from high levels of pain in his neck and back as the result of his minor accident, despite the fact that – by that point – TM had received eight months of chiropractic services from Saraceno and Newark Pain. Though the chiropractic treatment that Saraceno and Newark Pain purportedly had provided supposedly had been ineffective in resolving TM's putative symptoms, Koppel nonetheless referred TM back to Newark Pain for physical therapy treatment at the conclusion of the October 15, 2014 examination. This medically unnecessary return referral to Newark Pain was additional, unlawful compensation for the initial, medically unnecessary referral to Garden State Pain.

(iv)     On October 14, 2014, an Insured named WC was involved in an rear-end automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that WC refused medical attention, that the airbags in WC's vehicle did not deploy, and that none of the vehicles was seriously damaged in the accident. What is more – and again, in keeping with the fact that the accident was minor, and that WC was not seriously injured in the accident – WC did not visit any hospital following the accident. Even so, WC thereafter sought treatment from Saraceno and Newark Pain, where he purportedly received chiropractic treatment between November 2014 and May 2015. In May 2015, Saraceno and Newark Pain caused WC to be referred to Garden State Pain pursuant to the unlawful compensation that Koppel and Garden State Pain paid to Saraceno and Newark Pain. Thereafter, on May 20, 2015, Koppel purported to examine WC on behalf of Garden State Pain. In his May 20, 2015 examination report, Koppel falsely contended that WC continued to suffer from high levels of pain in his neck and back as the result of his minor accident, despite the fact that – by that point – WC had received seven months of chiropractic services from Saraceno and Newark Pain. Though the chiropractic treatment that Saraceno and Newark Pain purportedly had provided supposedly had been ineffective in resolving WC's putative symptoms, Koppel nonetheless referred WC back to Newark Pain for physical therapy treatment at the conclusion of the May 20, 2015 examination. This medically unnecessary return referral to Newark Pain was additional, unlawful compensation for the initial, medically unnecessary referral to Garden State Pain.

(v)     On December 6, 2014, an Insured named JDS was involved in an automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that all of the vehicles were drivable following the accident and were driven away from the scene of the accident. What is more – and again, in keeping with the fact that the accident was minor, and that JDS was not seriously injured in the accident – JDS did not visit any hospital following the accident. Even so, JDS thereafter sought treatment from Inacio and Spinecare Chiropractic, where she purportedly received chiropractic treatment between January 2015 and March

2015. In March 2015, Inacio and Spinecare Chiropractic caused JDS to be referred to Garden State Pain pursuant to the unlawful compensation that Koppel and Garden State Pain paid to Inacio and Spinecare Chiropractic. Thereafter, on March 17, 2015, Koppel purported to examine JDS on behalf of Garden State Pain. In his March 17, 2015 examination report, Koppel falsely contended that JDS continued to suffer from high levels of pain in her neck and back as the result of her minor accident, despite the fact that – by that point – JDS had received two months of chiropractic services from Inacio and Spinecare Chiropractic. Though the chiropractic treatment that Inacio and Spinecare Chiropractic purportedly had provided supposedly had been ineffective in resolving JDS's putative symptoms, Koppel nonetheless referred JDS back to Spinecare Chiropractic for continued chiropractic treatment at the conclusion of the March 17, 2015 examination. This medically unnecessary return referral to Spinecare Chiropractic was additional, unlawful compensation for the initial, medically unnecessary referral to Garden State Pain.

(vi)   On February 25, 2015, an Insured named AW was involved in an automobile accident in a driveway. In keeping with the fact that the accident was minor, the contemporaneous police report indicated all of the vehicles were drivable following the accident. What is more – and again, in keeping with the fact that the accident was minor, and that AW was not seriously injured in the accident – AW was observed walking, talking, and standing at the scene of the accident and did not appear to be in any distress. Even so, AW thereafter sought treatment from Saraceno, Beagin, and Clifton Pain, where he purportedly received chiropractic treatment between March 2015 and May 2015. In May 2015, Saraceno, Beagin, and Clifton Pain caused AW to be referred to Garden State Pain pursuant to the unlawful compensation that Koppel and Garden State Pain paid to Beagin, Saraceno, and Clifton Pain. Thereafter, on May 19, 2015, Koppel purported to examine AW on behalf of Garden State Pain. In his May 19, 2015 examination report, Koppel falsely contended that AW continued to suffer from high levels of pain in his neck and back as the result of his minor accident, despite the fact that – by that point – AW had received three months of chiropractic services from Saraceno, Beagin, and Clifton Pain. Though the chiropractic treatment that Saraceno, Beagin, and Clifton Pain purportedly had provided supposedly had been ineffective in resolving AW's putative symptoms, Koppel nonetheless referred AW back to Clifton Pain for continued chiropractic treatment at the conclusion of the May 19, 2015 examination. This medically unnecessary return referral to Clifton Pain was additional, unlawful compensation for the initial, medically unnecessary referral to Garden State Pain.

(vii)   On June 18, 2015, an Insured named KA was involved in an automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that all of the vehicles were drivable following the accident, all vehicles were driven away from the scene of the accident, and the airbags did not deploy. Even so, KA thereafter sought treatment from Saraceno and Newark Pain, where she purportedly received chiropractic treatment between June 2015 and

October 2015. In October 2015, Saraceno and Newark Pain caused KA to be referred to Garden State Pain pursuant to the unlawful compensation that Koppel and Garden State Pain paid to Saraceno and Newark Pain. Thereafter, on October 6, 2015, Koppel purported to examine KA on behalf of Garden State Pain. In his October 6, 2015 examination report, Koppel falsely contended that KA continued to suffer from high levels of pain in her neck and back as the result of her minor accident, despite the fact that – by that point – KA had received five months of chiropractic services from Saraceno and Newark Pain. Though the chiropractic treatment that Saraceno and Newark Pain purportedly had provided supposedly had been ineffective in resolving KA's putative symptoms, Koppel nonetheless referred KA back to Newark Pain for continued chiropractic treatment at the conclusion of the October 6, 2015 examination. This medically unnecessary return referral to Newark Pain was additional, unlawful compensation for the initial, medically unnecessary referral to Garden State Pain.

(viii)    On June 18, 2015, an Insured named LD was involved in an automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that no one was injured in the accident, that everyone involved in the accident refused medical attention, and that all of the vehicles were drivable following the accident and were driven away from the scene of the accident. What is more – and again, in keeping with the fact that the accident was minor, and that LD was not seriously injured in the accident – LD did not visit any hospital the day of the accident. Even so, LD thereafter sought treatment from Inacio and Spinecare Chiropractic, where he purportedly received chiropractic treatment between June 2015 and September 2015. In September 2015, Inacio and Spinecare Chiropractic caused LD to be referred to Garden State Pain pursuant to the unlawful compensation that Koppel and Garden State Pain paid to Inacio and Spinecare Chiropractic. Thereafter, on September 23, 2015, Koppel purported to examine LD on behalf of Garden State Pain. In his September 23, 2015 examination report, Koppel falsely contended that LD continued to suffer from high levels of pain in his neck and back as the result of his minor accident, despite the fact that – by that point – LD had received four months of chiropractic services from Inacio and Spinecare Chiropractic. Though the chiropractic treatment that Inacio and Spinecare Chiropractic purportedly had provided supposedly had been ineffective in resolving LD's putative symptoms, Koppel nonetheless referred LD back to Spinecare Chiropractic for continued chiropractic treatment at the conclusion of the September 23, 2015 examination. This medically unnecessary return referral to Spinecare Chiropractic was additional, unlawful compensation for the initial, medically unnecessary referral to Garden State Pain.

(ix)    On September 15, 2015, an Insured named EB was involved in a   rear-end automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that all of the vehicles were drivable following the accident and were driven away from the scene of the accident. Even so, EB thereafter sought treatment from Inacio and Spinecare Chiropractic, where he purportedly received chiropractic treatment between September 2015 and

January 2016. In January 2016, Inacio and Spinecare Chiropractic caused EB to be referred to Garden State Pain pursuant to the unlawful compensation that Koppel and Garden State Pain paid to Inacio and Spinecare Chiropractic. Thereafter, on January 19, 2016, Koppel purported to examine EB on behalf of Garden State Pain. In his January 19, 2016 examination report, Koppel falsely contended that EB continued to suffer from high levels of pain in his neck and back as the result of his minor accident, despite the fact that – by that point – EB had received four months of chiropractic services from Inacio and Spinecare Chiropractic. Though the chiropractic treatment that Inacio and Spinecare Chiropractic purportedly had provided supposedly had been ineffective in resolving EB's putative symptoms, Koppel nonetheless referred EB back to Spinecare Chiropractic for continued chiropractic treatment at the conclusion of the January 19, 2016 examination. This medically unnecessary return referral to Spinecare Chiropractic was additional, unlawful compensation for the initial, medically unnecessary referral to Garden State Pain.

(x)     On November 15, 2015, an Insured named DF was involved in a rear-end automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that all of the vehicles were drivable following the accident and were driven away from the scene of the accident. What is more – and again, in keeping with the fact that the accident was minor, and that DF was not seriously injured in the accident – DF did not visit any hospital following the accident. Even so, DF thereafter sought treatment from Saraceno and Newark Pain, where she purportedly received chiropractic treatment between November 2015 and March 2016.  In March 2016, Saraceno and Newark Pain caused DF to be referred to Garden State Pain pursuant to the unlawful compensation that Koppel and Garden State Pain paid to Saraceno and Newark Pain. Thereafter, on March 23, 2016, Koppel purported to examine DF on behalf of Garden State Pain. In his March 23, 2016 examination report, Koppel falsely contended that DF continued to suffer from high levels of pain in her neck and back as the result of her minor accident, despite the fact that – by that point – DF had received four months of chiropractic services from Saraceno and Newark Pain. Though the chiropractic treatment that Saraceno and Newark Pain purportedly had provided supposedly had been ineffective in resolving DF's putative symptoms, Koppel nonetheless referred DF back to Newark Pain for physical therapy treatment at the conclusion of the March 23, 2016 examination. This medically unnecessary return referral to Newark Pain was additional, unlawful compensation for the initial, medically unnecessary referral to Garden State Pain.

(xi)    On January 21, 2016, an Insured named MR was involved in an automobile accident. In keeping with the fact that the accident was minor, and that MR was not seriously injured in the accident – MR did not visit any hospital following the accident. Even so, MR thereafter sought treatment from Saraceno, Beagin, and Clifton Pain, where he purportedly received chiropractic treatment between January 2016 and March 2016. In March 2016, Saraceno, Beagin, and Clifton Pain caused MR to be referred to Garden State Pain pursuant to the unlawful compensation that

Koppel and Garden State Pain paid to Beagin, Saraceno, and Clifton Pain. Thereafter, on March 31, 2016, Koppel purported to examine MR on behalf of Garden State Pain. In his March 31, 2016 examination report, Koppel falsely contended that MR continued to suffer from high levels of pain in his neck and back as the result of his minor accident, despite the fact that – by that point – MR had received three months of chiropractic services from Saraceno, Beagin, and Clifton Pain. Though the chiropractic treatment that Saraceno, Beagin, and Clifton Pain purportedly had provided supposedly had been ineffective in resolving MR's putative symptoms, Koppel nonetheless referred MR back to Clifton Pain for continued chiropractic treatment at the conclusion of the March 31, 2016 examination. This medically unnecessary return referral to Clifton Pain was additional, unlawful compensation for the initial, medically unnecessary referral to Garden State Pain.

(xii)   On March 29, 2016, an Insured named MC was involved in an automobile accident. In keeping with the fact that the accident was minor, and that MC was not seriously injured in the accident – MC did not visit any hospital following the accident. Even so, MC thereafter sought treatment from Saraceno and Newark Pain, where she purportedly received chiropractic treatment between April 2016 and July 2016. In July 2016, Saraceno and Newark Pain caused MC to be referred to Garden State Pain pursuant to the unlawful compensation that Koppel and Garden State Pain paid to Saraceno and Newark Pain. Thereafter, on July 6, 2016, Koppel purported to examine MC on behalf of Garden State Pain. In his July 6, 2016 examination report, Koppel falsely contended that MC continued to suffer from high levels of pain in her neck and back as the result of her minor accident, despite the fact that – by that point – MC had received three months of chiropractic services from Saraceno and Newark Pain. Though the chiropractic treatment that Saraceno and Newark Pain purportedly had provided supposedly had been ineffective in resolving MC's putative symptoms, Koppel nonetheless referred MC back to Newark Pain for continued chiropractic treatment at the conclusion of the July 6, 2016 examination. This medically unnecessary return referral to Newark Pain was additional, unlawful compensation for the initial, medically unnecessary referral to Garden State Pain.

(xiii)   On May 31, 2016, an Insured named AC was involved in a rear-end  automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that no one was injured in the accident, that everyone involved in the accident refused medical attention, that the airbags in AC's vehicle did not deploy, and that all of the vehicles were drivable following the accident and were driven away from the scene of the accident. What is more – and again, in keeping with the fact that the accident was minor, and that AC was not seriously injured in the accident – AC did not visit any hospital following the accident. Even so, AC thereafter sought treatment from Inacio and Spinecare Chiropractic, where he purportedly received chiropractic treatment between June 2016 and August 2016. In August 2016, Inacio and Spinecare Chiropractic caused AC to be referred to Garden State Pain pursuant to the unlawful compensation that Koppel and Garden State Pain paid to Inacio and Spinecare Chiropractic. Thereafter, on August

29, 2016, Koppel purported to examine AC on behalf of Garden State Pain. In his August 29, 2016 examination report, Koppel falsely contended that AC continued to suffer from high levels of pain in his neck and back as the result of his minor accident, despite the fact that – by that point – AC had received three months of chiropractic services from Inacio and Spinecare Chiropractic. Though the chiropractic treatment that Inacio and Spinecare Chiropractic purportedly had provided supposedly had been ineffective in resolving AC's putative symptoms, Koppel nonetheless referred AC back to Spinecare Chiropractic for continued chiropractic treatment at the conclusion of the August 29, 2016 examination. This medically unnecessary return referral to Spinecare Chiropractic was additional, unlawful compensation for the initial, medically unnecessary referral to Garden State Pain.

(xiv)   On June 22, 2016, an Insured named JE was involved in an automobile accident. The automobile accident was minor, and to the extent that JE was injured at all, his injuries were minor soft tissue injuries. Even so, JE thereafter sought treatment from Kreshover and Capital Chiropractic, where he purportedly received chiropractic treatment from June 2016 to December 2016. In December 2016, Kreshover and Capital Chiropractic caused JE to be referred to Garden State Pain pursuant to the unlawful compensation that Koppel and Garden State Pain paid to Kreshover and Capital Chiropractic. Thereafter, on December 15, 2016, Koppel purported to examine JE on behalf of Garden State Pain. In his December 15, 2016 examination report, Koppel falsely contended that JE continued to suffer from high levels of pain as the result of his minor accident, despite the fact that – by that point – JE had received six months of chiropractic services from Kreshover and Capital Chiropractic. Though the chiropractic treatment that Kreshover and Capital Chiropractic purportedly had provided supposedly had been ineffective in resolving JE's putative symptoms, Koppel nonetheless referred JE back to Capital Chiropractic for continued chiropractic treatment at the conclusion of the December 15, 2016 examination. This medically unnecessary return referral to Capital Chiropractic was additional, unlawful compensation for the initial, medically unnecessary referral to Garden State Pain.

(xv)   On July 15, 2016, an Insured named ESR was involved in an automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that no one was injured in the accident, that everyone involved in the accident refused medical attention, that the airbags in ESR's vehicle did not deploy, and that all of the vehicles were drivable following the accident and were driven away from the scene of the accident. What is more – and again, in keeping with the fact that the accident was minor, and that ESR was not seriously injured in the accident – ESR did not visit any hospital following the accident. Even so, ESR thereafter sought treatment from Saraceno, Beagin, and Clifton Pain, where she purportedly received chiropractic treatment between July 2016 and September 2016. In September 2016, Saraceno, Beagin, and Clifton Pain caused ESR to be referred to Garden State Pain pursuant to the unlawful compensation that Koppel and Garden State Pain paid to Beagin, Saraceno, and Clifton Pain. Thereafter, on

September 8, 2016, Koppel purported to examine ESR on behalf of Garden State Pain. In his September 8, 2016 examination report, Koppel falsely contended that ESR continued to suffer from high levels of pain in her neck and back as the result of her minor accident, despite the fact that – by that point – ESR had received two months of chiropractic services from Saraceno, Beagin, and Clifton Pain. Though the chiropractic treatment that Saraceno, Beagin, and Clifton Pain purportedly had provided supposedly had been ineffective in resolving ESR's putative symptoms, Koppel nonetheless referred ESR back to Clifton Pain for continued chiropractic treatment at the conclusion of the September 8, 2016 examination. This medically unnecessary return referral to Clifton Pain was additional, unlawful compensation for the initial, medically unnecessary referral to Garden State Pain.

(xvi)   On March 20, 2017, an Insured named RB was involved in a rear-end automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that no one was injured in the accident, that everyone involved in the accident refused medical attention, that the airbags in RB's vehicle did not deploy, and that all of the vehicles were drivable following the accident and were driven away from the scene of the accident.  To the extent that RB was injured at all in the accident, his injuries were minor soft tissue injuries. Even so, RB thereafter sought treatment from Kreshover and Capital Chiropractic, where he purportedly received chiropractic treatment from March 2017 to October 2017. In March 2017, Kreshover and Capital Chiropractic caused RB to be referred to Garden State Pain pursuant to the unlawful compensation that Koppel and Garden State Pain paid to Kreshover and Capital Chiropractic. Thereafter, on October 12, 2017, Koppel purported to examine RB on behalf of Garden State Pain. In his October 12, 2017 examination report, Koppel falsely contended that RB continued to suffer from high levels of pain as the result of his minor accident, despite the fact that – by that point – RB had received eight months of chiropractic services from Kreshover and Capital Chiropractic. Though the chiropractic treatment that Kreshover and Capital Chiropractic purportedly had provided supposedly had been ineffective in resolving RB's putative symptoms, Koppel nonetheless referred RB back to Capital Chiropractic for continued chiropractic treatment at the conclusion of the October 12, 2017 examination. This medically unnecessary return referral to Capital Chiropractic was additional, unlawful compensation for the initial, medically unnecessary referral to Garden State Pain.

(xvii)   On June 12, 2017, an Insured named YC was involved in an automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that YC was not injured in the accident, that that the airbags in YC's vehicle did not deploy, and that YC's vehicle was drivable following the accident and was driven away from the scene of the accident.  To the extent that YC was injured at all in the accident, their injuries were minor soft tissue injuries. Even so, YC thereafter sought treatment from Kreshover and Capital Chiropractic, where they purportedly received chiropractic treatment from July 2017 to November 2017. In November 2017, Kreshover and Capital Chiropractic caused YC to be referred to Garden State Pain pursuant to the unlawful compensation that

Koppel and Garden State Pain paid to Kreshover and Capital Chiropractic. Thereafter, on November 21, 2017, Koppel purported to examine YC on behalf of Garden State Pain. In his November 21, 2017 examination report, Koppel falsely contended that YC continued to suffer from high levels of pain as the result of their minor accident, despite the fact that – by that point – YC had received five months of chiropractic services from Kreshover and Capital Chiropractic. Though the chiropractic treatment that Kreshover and Capital Chiropractic purportedly had provided supposedly had been ineffective in resolving YC's putative symptoms, Koppel nonetheless referred YC back to Capital Chiropractic for continued chiropractic treatment at the conclusion of the November 21, 2017 examination. This medically unnecessary return referral to Capital Chiropractic was additional, unlawful compensation for the initial, medically unnecessary referral to Garden State Pain.

(xviii)   On June 23, 2017, an Insured named RH was involved in an automobile accident. The automobile accident was minor, and to the extent that RH was injured at all, his injuries were also minor. Even so, RH thereafter sought treatment from Kreshover and Capital Chiropractic, where he purportedly received chiropractic treatment from June 2017 to December 2017. In December 2017, Kreshover and Capital Chiropractic caused RH to be referred to Garden State Pain pursuant to the unlawful compensation that Koppel and Garden State Pain paid to Kreshover and Capital Chiropractic. Thereafter, on December 21, 2017, Koppel purported to examine RH on behalf of Garden State Pain. In his December 21, 2017 examination report, Koppel falsely contended that RH continued to suffer from high levels of pain as the result of his minor accident, despite the fact that – by that point – RH had received six months of chiropractic services from Kreshover and Capital Chiropractic. Though the chiropractic treatment that Kreshover and Capital Chiropractic purportedly had provided supposedly had been ineffective in resolving RH's putative symptoms, Koppel nonetheless referred RH back to Capital Chiropractic for continued chiropractic treatment at the conclusion of the December 21, 2017 examination. This medically unnecessary return referral to Capital Chiropractic was additional, unlawful compensation for the initial, medically unnecessary referral to Garden State Pain.

(xix)   On September 18, 2017, an Insured named SS was involved in an automobile accident. In keeping with the fact that the accident was minor, the airbags in SS's vehicle did not deploy. What is more – and again, in keeping with the fact that the accident was minor, and that SS was not seriously injured in the accident – SS did not visit any hospital following the accident.  Even so, SS thereafter sought treatment from Kreshover and Capital Chiropractic, where he purportedly received chiropractic treatment from October 2017 to March 2018. In March 2018, Kreshover and Capital Chiropractic caused SS to be referred to Garden State Pain pursuant to the unlawful compensation that Koppel and Garden State Pain paid to Kreshover and Capital Chiropractic. Thereafter, on March 1, 2018, Koppel purported to examine SS on behalf of Garden State Pain. In his March 1, 2018 examination report, Koppel falsely contended that SS continued to suffer from high

levels of pain as the result of his minor accident, despite the fact that – by that point – SS had received five months of chiropractic services from Kreshover and Capital Chiropractic. Though the chiropractic treatment that Kreshover and Capital Chiropractic purportedly had provided supposedly had been ineffective in resolving SS' putative symptoms, Koppel nonetheless referred SS back to Capital Chiropractic for continued chiropractic treatment at the conclusion of the March 1, 2018 examination. This medically unnecessary return referral to Capital Chiropractic was additional, unlawful compensation for the initial, medically unnecessary referral to Garden State Pain.

(xx)   On May 1, 2019, an Insured named DS was involved in an automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that the airbags in DS' vehicle did not deploy.  What is more – and again, in keeping with the fact that the accident was minor, and that DS was not seriously injured in the accident – DS did not visit any hospital the day of the accident. Even so, DS thereafter sought treatment from Saraceno, Beagin, and Clifton Pain, where she purportedly received chiropractic treatment in May 2019. In May 2019, Saraceno, Beagin, and Clifton Pain caused DS to be referred to Garden State Pain pursuant to the unlawful compensation that Koppel and Garden State Pain paid to Beagin, Saraceno, and Clifton Pain. Thereafter, on May 23, 2019, Koppel purported to examine DS on behalf of Garden State Pain. In his May 23, 2019 examination report, Koppel falsely contended that DS continued to suffer from high levels of pain in her neck and back as the result of her minor accident, despite the fact that – by that point – DS had received one month of chiropractic services from Saraceno, Beagin, and Clifton Pain. Though the chiropractic treatment that Saraceno, Beagin, and Clifton Pain purportedly had provided supposedly had been ineffective in resolving DS' putative symptoms, Koppel nonetheless referred DS back to Clifton Pain for continued chiropractic treatment at the conclusion of the May 23, 2019 examination. This medically unnecessary return referral to Clifton Pain was additional, unlawful compensation for the initial, medically unnecessary referral to Garden State Pain.

105.   These are only representative examples.  In the claims identified in Exhibits "1" – "5", the Referral Defendants – among other chiropractors – routinely referred Insureds to Garden State Pain in exchange for unlawful compensation from Koppel and Garden State Pain.

106.   There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

107.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

108.    It is improbable that two or more Insureds involved in any single motor vehicle accident would suffer substantially similar injuries or exhibit substantially similar symptomatology as the result of the accident.

109.    It is extremely improbable – to the point of impossibility – that two or more Insureds involved in any single motor vehicle accident not only would suffer from substantially similar injuries and symptomatology, but would have their injuries and symptomatology resolve at such an identical rate that they would fail to sufficiently respond to conservative chiropractic treatment at substantially similar times, require referrals to a pain management practice such as Garden State Pain at substantially similar times, and receive substantially similar "diagnoses" from Garden State Pain at substantially similar times.

110.    It is even more improbable – to the point of impossibility – that this would occur over and over again, with two or more Insureds repeatedly being referred by the Referral Defendants to Garden State Pain at substantially identical times, where they received substantially identical "diagnoses".

111.    Even so – and in keeping with the fact that Garden State Pain and Koppel provided unlawful compensation to the Referral Defendants in exchange for patient referrals – this is what happened between and among Garden State Pain and the Referral Defendants.

112.    For example:

(i)     On August 5, 2013, two Insureds – AE and JE – both were involved in the same automobile accident. Thereafter, AE and JE both sought treatment at Newark Pain. AE and JE were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. What is more, any injuries that AE

and JE did experience in the accident would have resolved – or at least resolved differently – over the course of eight months following their accident. It is improbable that AE and JE would both fail conservative treatment and require referrals to Garden State Pain at substantially the same time. It is even more improbable – to the point of impossibility – that both AE and JE would continue to exhibit substantially similar symptoms and receive substantially identical diagnoses at or around the same time eight months after their accident. Even so, pursuant to the unlawful compensation that Garden State Pain and Koppel paid to Saraceno and Newark Pain, Saraceno and Newark Pain caused both AE and JE to be referred to Garden State Pain in March 2014. Koppel then purported to examine both AE and JE on April 2, 2014, and provided them with substantially identical, phony "diagnoses".

(ii)     On November 19, 2014, two Insureds – SAH and SAH – both were involved in the same automobile accident. Thereafter, SAH and SAH both sought treatment at Clifton Pain. SAH and SAH were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. What is more, any injuries that SAH and SAH did experience in the accident would have resolved – or at least resolved differently – over the course of six months following their accident. It is improbable that SAH and SAH would both fail conservative treatment and require referrals to Garden State Pain at substantially the same time. It is even more improbable – to the point of impossibility – that both SAH and SAH would continue to exhibit substantially similar symptoms and receive substantially identical diagnoses at or around the same time eight months after their accident. Even so, pursuant to the unlawful compensation that Garden State Pain and Koppel paid to Beagin, Saraceno and Clifton Pain, Beagin, Saraceno and Clifton Pain caused both SAH and SAH to be referred to Garden State Pain in May 2015. Koppel then purported to examine both SAH and SAH on May 21, 2015, and provided them with substantially identical, phony "diagnoses".

(iii)    On May 13, 2015, two Insureds – FH and MW – both were involved in the same automobile accident. Thereafter, FH and MW both sought treatment at Capital Chiropractic. FH and MW were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. What is more, any injuries that FH and MW did experience in the accident would have resolved – or at least resolved differently – over the course of six months following their accident. It is improbable that FH and MW would both fail conservative treatment and require referrals to Garden State Pain at substantially the same time. It is even more improbable – to the point of impossibility – that both FH and MW would continue to exhibit substantially similar symptoms and receive substantially identical diagnoses at or around the same time six months after their accident. Even so, pursuant to the unlawful compensation that Garden State Pain and Koppel paid to Kreshover and Capital Chiropractic, Kreshover and Capital Chiropractic caused both FH and MW to be referred to Garden State Pain in November 2015. Koppel then purported to examine both FH and MW on November 10, 2015, and provided them with substantially identical, phony "diagnoses".

(iv)   On August 29, 2015, two Insureds – FH and AL – both were involved in the same automobile accident. Thereafter, FH and AL both sought treatment at Capital Chiropractic. FH and AL were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. What is more, any injuries that FH and AL did experience in the accident would have resolved – or at least resolved differently – over the course of six months following their accident. It is improbable that FH and AL would both fail conservative treatment and require referrals to Garden State Pain at substantially the same time. It is even more improbable – to the point of impossibility – that both FH and AL would continue to exhibit substantially similar symptoms and receive substantially identical diagnoses at or around the same time six months after their accident. Even so, pursuant to the unlawful compensation that Garden State Pain and Koppel paid to Kreshover and Capital Chiropractic, Kreshover and Capital Chiropractic caused both FH and AL to be referred to Garden State Pain in February 2016. Koppel then purported to examine both FH and AL on March 1, 2016, and provided them with substantially identical, phony "diagnoses".

(v)   On September 12, 2015, two Insureds – ED and IRA – both were involved in the same automobile accident. Thereafter, ED and IRA both sought treatment at Spinecare Chiropractic. ED and IRA were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. What is more, any injuries that ED and IRA did experience in the accident would have resolved – or at least resolved differently – over the course of four months following their accident. It is improbable that ED and IRA would both fail conservative treatment and require referrals to Garden State Pain at substantially the same time. It is even more improbable – to the point of impossibility – that both ED and IRA would continue to exhibit substantially similar symptoms and receive substantially identical diagnoses at or around the same time four months after their accident. Even so, pursuant to the unlawful compensation that Garden State Pain and Koppel paid to Inacio and Spinecare Chiropractic, Inacio and Spinecare Chiropractic caused both ED and IRA to be referred to Garden State Pain in January 2016. Koppel then purported to examine both ED and IRA on January 5, 2016, and provided them with substantially identical, phony "diagnoses".

(vi)   On November 15, 2015, two Insureds – BG and DF –were involved in the same automobile accident. Thereafter BG and DF sought treatment at Newark Pain. BG and DF were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. What is more, any injuries that BG and DF did experience in the accident would have resolved – or at least resolved differently – over the course of four months following their accident. It is improbable that BG and DF would all fail conservative treatment and require referrals to Garden State Pain at substantially the same time. It is even more improbable – to the point of impossibility – that BG and DF would continue to exhibit substantially similar symptoms and receive substantially identical diagnoses at or around the same time four months after their accident. Even so, pursuant to

the unlawful compensation that Garden State Pain and Koppel paid to Saraceno and Newark Pain, Saraceno and Newark Pain caused BG and DF to be to Garden State Pain in March 2016. Koppel then purported to examine both BG and DF on March 23, 2016, and provided them with substantially identical, phony "diagnoses".

(vii) On March 16, 2016, two Insureds – MH and SM – both were involved in the same automobile accident. Thereafter, MH and SM both sought treatment at Newark Pain. MH and SM were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. What is more, any injuries that MH and SM did experience in the accident would have resolved – or at least resolved differently – over the course of four months following their accident. It is improbable that MH and SM would both fail conservative treatment and require referrals to Garden State Pain at substantially the same time. It is even more improbable – to the point of impossibility – that both MH and SM would continue to exhibit substantially similar symptoms and receive substantially identical diagnoses at or around the same time four months after their accident. Even so, pursuant to the unlawful compensation that Garden State Pain and Koppel paid to Saraceno and Newark Pain, Saraceno and Newark Pain caused both MH and SM to be referred to Garden State Pain in July 2016. Koppel then purported to examine both MH and SM on July 20, 2016, and provided them with substantially identical, phony "diagnoses".

(viii) On February 18, 2017, two Insureds – MG and CG – both were involved in the same automobile accident. Thereafter, MG and CG both sought treatment at Spinecare Chiropractic. MG and CG were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. What is more, any injuries that MG and CG did experience in the accident would have resolved – or at least resolved differently – over the course of five months following their accident. It is improbable that MG and CG would both fail conservative treatment and require referrals to Garden State Pain at substantially the same time. It is even more improbable – to the point of impossibility – that both MG and CG would continue to exhibit substantially similar symptoms and receive substantially identical diagnoses at or around the same time five months after their accident. Even so, pursuant to the unlawful compensation that Garden State Pain and Koppel paid to Inacio and Spinecare Chiropractic, Inacio and Spinecare Chiropractic caused both MG and CG to be referred to Garden State Pain in August 2017. Koppel then purported to examine both MG and CG on August 8, 2017, and provided them with substantially identical, phony "diagnoses".

(ix) On May 16, 2018, two Insureds – SC and MR – both were involved in the same automobile accident. Thereafter, SC and MR both sought treatment at Clifton Pain. SC and MR were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. What is more, any injuries that SC and MR did experience in the accident would have resolved – or at least resolved differently – over the course of four months following their accident. It is improbable that SC and MR would both fail conservative treatment and require

referrals to Garden State Pain at substantially the same time. It is even more improbable – to the point of impossibility – that both SC and MR would continue to exhibit substantially similar symptoms and receive substantially identical diagnoses at or around the same time one month after their accident. Even so, pursuant to the unlawful compensation that Garden State Pain and Koppel paid to Beagin, Saraceno and Clifton Pain, Beagin, Saraceno and Clifton Pain caused both SC and MR to be referred to Garden State Pain in September 2018. Koppel then purported to examine both SC and MR on September 13, 2018, and provided them with substantially identical, phony "diagnoses".

(x)     On May 1, 2019, two Insureds – YCB and DS – both were involved in the same automobile accident. Thereafter, YCB and DS both sought treatment at Clifton Pain. YCB and DS were different ages, in different physical condition, and experienced the impact from different positions in the vehicle. What is more, any injuries that YCB and DS did experience in the accident would have resolved – or at least resolved differently – over the course of one month following their accident. It is improbable that YCB and DS would both fail conservative treatment and require referrals to Garden State Pain at substantially the same time. It is even more improbable – to the point of impossibility – that both YCB and DS would continue to exhibit substantially similar symptoms and receive substantially identical diagnoses at or around the same time one month after their accident. Even so, pursuant to the unlawful compensation that Garden State Pain and Koppel paid to Beagin, Saraceno and Clifton Pain, Beagin, Saraceno and Clifton Pain caused both YCB and DS to be referred to Garden State Pain in May 2019. Koppel then purported to examine both YCB and DS on May 23, 2019, and provided them with substantially identical, phony "diagnoses".

113.    These are only representative examples. In the claims identified in Exhibits "1" – "5", Garden State Pain and Koppel often issued substantially identical, phony "diagnoses", to two or more Insureds who had been involved in a single accident, on the same or proximate dates long after their accidents, pursuant to medically unnecessary referrals from the Referral Defendants, as well as Garden State Pain's other chiropractor referral sources.

**B.      The Defendants' Fraudulent Treatment and Billing Protocol**

114.    Virtually all of the Insureds in the claims identified in Exhibits "1" – "5"  whom the Defendants purported to treat were involved in relatively minor accidents, to the extent that they were involved in any actual accidents at all.

115.    To the extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain, strain, or similar soft tissue injury diagnosis.

116.    Furthermore, in many cases, contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

117.    Concomitantly, almost none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

118.    Even so, the Defendants purported to subject virtually every Insured to a medically unnecessary course of "treatment" that was provided pursuant to a pre-determined, fraudulent protocol designed to maximize the billing that the Garden State Pain Defendants and Referral Defendants could submit or cause to be submitted to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to it.

119.    The Defendants purported to provide their pre-determined fraudulent treatment protocol to Insureds without regard for the Insureds' individual symptoms or presentment, or – in most cases – the total absence of any actual medical problems arising from any actual automobile accidents.

120.    Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

121.    No legitimate physician, chiropractor, or other licensed healthcare provider or professional entity would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices.

122.    The Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because the Defendants sought to profit from the fraudulent billing submitted to GEICO and other insurers.

**1.    Koppel and Garden State Pain's Fraudulent Charges for Initial Examinations**

123.    Pursuant to the patient referrals that they purchased through unlawful compensation to the Referral Defendants and their other chiropractor referral sources, Koppel and Garden State Pain purported to provide virtually every Insured in the claims identified in Exhibit "1" with an initial examination.

124.    Typically, Koppel purported to perform the initial examinations.

125.    As set forth in Exhibit "1", Koppel and Garden State Pain then billed most of the initial examinations through Garden State Pain to GEICO under CPT codes 99204, 99243, or 99244, resulting in charges of between $148.70 and $575.00 for each initial examination that they purported to provide.

126.    All of Koppel and Garden State Pain's billing for their purported initial examinations was fraudulent because it misrepresented Garden State Pain's eligibility to collect PIP Benefits in the first instance.

127.    In fact, Garden State Pain never was eligible to collect PIP Benefits in the claims for initial examinations that are identified in Exhibit "1", because it engaged in the fraudulent and unlawful scheme described herein.

128.     Moreover, and as set forth below, Koppel and Garden State Pain's charges for the initial examinations identified in Exhibit "1" were fraudulent in that they misrepresented the nature, extent, and reimbursable amount of the initial examinations.

      a.    **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

129.     Pursuant to the American Medical Association's CPT Assistant, which is incorporated by reference into the Fee Schedule, the use of CPT codes 99244 and 99204 to bill for an initial patient examination typically requires that the patient present with problems of moderate to high severity.

130.     The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT codes 99244 and 99204 to bill for an initial patient examination.

131.     For example, the CPT Assistant provides the following clinical examples of presenting problems that support the use of CPT code 99244 to bill for an initial patient examination:

    (i)    Office consultation with 38-year-old female, with inflammatory bowel disease, who now presents with right lower quadrant pain and suspected intra-abdominal abscess. (MC and Rectal Surgery)

    (ii)    Initial office consultation for discussion of treatment options for a 40-year-old female with a two-centimeter adenocarcinoma of the breast. (Radiation Oncology)

    (iii)    Initial office consultation with 72-year-old male with esophageal carcinoma, symptoms of dysphagia and reflux. (Thoracic Surgery)

132.     Similarly, the CPT Assistant provides the following clinical examples of presenting problems that support the use of CPT codes 99204 to bill for an initial patient examination:

    (i)    Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)    Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)   Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv)    Initial office visit for 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v)     Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi)    Initial office evaluation of 70-year-old female with polyarthralgia. (Rheumatology)

(vii)   Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

133.    Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT codes 99244 and 99204 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

134.    Pursuant to the CPT Assistant, the use of CPT code 99243 to bill for an initial patient examination typically requires that the patient present with problems of moderate severity.

135.    The CPT Assistant also provides various clinical examples of the types of presenting problems that qualify as moderately severe, and thereby justify the use of CPT code 99243 to bill for an initial patient examination.

136.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99243 to bill for an initial patient examination:

(i)     Initial office consultation for a 65-year-old female with persistent bronchitis. (Infectious Disease)

(ii)    Initial office consultation for a 65-year-old man with chronic low-back pain radiating to the leg. (Neurosurgery)

137.     Thus, pursuant to the CPT Assistant, the moderately severe presenting problems that could support the use of CPT code 99243 to bill for an initial patient examination typically chronic and relatively serious problems.

138.     By contrast, to the extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were low or minimal severity soft tissue injuries such as ordinary sprains and strains.

139.     To the extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain or strain diagnosis.

140.     Furthermore, in many cases, contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

141.     Even so, in the claims for initial examinations identified in Exhibit "1", Koppel and Garden State Pain routinely billed for their putative initial examinations using CPT codes 99204, 99243, and 99244, and thereby falsely represented that the Insureds presented with problems of moderate or moderate to high severity.

142.     For example:

(i)      On May 9, 2013, an Insured named JKD was involved in an automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that no one was injured in the accident and that everyone involved in the accident refused medical attention.  What is more – and again, in keeping with the fact that the accident was minor, and that JKD was not seriously injured in the accident – JKD did not visit any hospital the day of the accident. To the extent that JKD experienced any health problems at all as the result of her minor accident,

they were of low or minimal severity. Even so, following a purported initial examination of JKD by Koppel on behalf of Garden State Pain on May 29, 2013 – pursuant to a referral that was purchased through the unlawful compensation that Garden State Pain and Koppel paid to Saraceno and Newark Pain – Koppel and Garden State Pain billed GEICO for the initial examination using CPT code 99244, and falsely represented that the examination involved presenting problems of moderate to high severity.

(ii)     On September 12, 2013, an Insured named RT was involved in an automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that no one was injured in the accident, that everyone involved in the accident refused medical attention, that the airbags in RT's vehicle did not deploy, and that RT's vehicle drivable following the accident and was driven away from the scene of the accident. What is more – and again, in keeping with the fact that the accident was minor, and that RT was not seriously injured in the accident – RT did not visit any hospital following the accident. To the extent that RT experienced any health problems at all as the result of his minor accident, they were of low or minimal severity. Even so, following a purported initial examination of RT by Koppel on behalf of Garden State Pain on January 22, 2014 – pursuant to a referral that was purchased through the unlawful compensation that Garden State Pain and Koppel paid to Saraceno and Newark Pain – Koppel and Garden State Pain billed GEICO for the initial examination using CPT code 99243, and falsely represented that the examination involved presenting problems of moderate severity.

(iii)    On January 14, 2014, an Insured named TG was involved in a rear-end automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that no one was injured in the accident, and that everyone involved in the accident refused medical attention. What is more – and again, in keeping with the fact that the accident was minor, and that TG was not seriously injured in the accident – TG did not visit any hospital following the accident. To the extent that TG experienced any health problems at all as the result of her minor accident, they were of low or minimal severity. Even so, following a purported initial examination of TG by Koppel on behalf of Garden State Pain on April 15, 2014 – pursuant to a referral that was purchased through the unlawful compensation that Garden State Pain and Koppel paid to Beagin, Saraceno and Clifton Pain – Koppel and Garden State Pain billed GEICO for the initial examination using CPT code 99244, and falsely represented that the examination involved presenting problems of moderate to high severity.

(iv)     On September 8, 2014, an Insured named EG was involved in an automobile accident. In keeping with the fact that the accident was minor and that EG was not seriously injured in the accident,  EG was observed walking around the scene after the accident. To the extent that EG experienced any health problems at all as the result of his minor accident, they were of low or minimal severity. Even so, following a purported initial examination of EG by Koppel on behalf of Garden

State Pain on January 20, 2015 – pursuant to a referral that was purchased through the unlawful compensation that Garden State Pain and Koppel paid to Inacio and Spinecare Chiropractic – Koppel and Garden State Pain billed GEICO for the initial examination using CPT code 99244, and falsely represented that the examination involved presenting problems of moderate to high severity.

(v)     On October 3, 2014, an Insured named CSN was involved in an automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that no one was injured in the accident,  and that everyone involved in the accident refused medical attention. What is more – and again, in keeping with the fact that the accident was minor, and that CSN was not seriously injured in the accident – CSN did not visit any hospital following the accident. To the extent that CSN experienced any health problems at all as the result of his minor accident, they were of low or minimal severity. Even so, following a purported initial examination of CSN by Koppel on behalf of Garden State Pain on February 25, 2015 – pursuant to a referral that was purchased through the unlawful compensation that Garden State Pain and Koppel paid to Saraceno and Newark Pain – Koppel and Garden State Pain billed GEICO for the initial examination using CPT code 99244, and falsely represented that the examination involved presenting problems of moderate to high severity.

(vi)    On January 21, 2015, an Insured named JJ was involved in an automobile accident. In keeping with the fact that the accident was minor, and that JJ was not seriously injured in the accident, JJ did not visit any hospital following the accident. To the extent that JJ experienced any health problems at all as the result of his minor accident, they were of low or minimal severity. Even so, following a purported initial examination of JJ by Koppel on behalf of Garden State Pain on July 29, 2015 – pursuant to a referral that was purchased through the unlawful compensation that Garden State Pain and Koppel paid to Saraceno and Newark Pain – Koppel and Garden State Pain billed GEICO for the initial examination using CPT code 99244, and falsely represented that the examination involved presenting problems of moderate to high severity.

(vii)   On June 18, 2015, an Insured named LD was involved in an automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that no one was injured in the accident, that everyone involved in the accident refused medical attention, and that all of the vehicles were drivable following the accident and were driven away from the scene of the accident. What is more – and again, in keeping with the fact that the accident was minor, and that LD was not seriously injured in the accident – LD did not visit any hospital the day of the accident. To the extent that LD experienced any health problems at all as the result of his minor accident, they were of low or minimal severity. Even so, following a purported initial examination of LD by Koppel on behalf of Garden State Pain on September 23, 2015 – pursuant to a referral that was purchased through the unlawful compensation that Garden State Pain and Koppel paid to Inacio and Spinecare Chiropractic – Koppel and Garden State Pain billed GEICO

for the initial examination using CPT code 99244, and falsely represented that the examination involved presenting problems of moderate to high severity.

(viii)   On July 21, 2015, an Insured named DG was involved in rear-end automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that the airbags in DG's vehicle did not deploy and that all of the vehicles were drivable following the accident and were driven away from the scene of the accident. What is more – and again, in keeping with the fact that the accident was minor, and that DG was not seriously injured in the accident – DG did not visit any hospital following the accident. To the extent that DG experienced any health problems at all as the result of his minor accident, they were of low or minimal severity. Even so, following a purported initial examination of DG by Koppel on behalf of Garden State Pain on December 3, 2015 – pursuant to a referral that was purchased through the unlawful compensation that Garden State Pain and Koppel paid to Beagin, Saraceno and Clifton Pain – Koppel and Garden State Pain billed GEICO for the initial examination using CPT code 99244, and falsely represented that the examination involved presenting problems of moderate to high severity.

(ix)   On August 29, 2015, an Insured named AL was involved in an automobile accident. To the extent AL was injured at all, their injuries were minor, soft tissue injuries. To the extent that AL experienced any health problems at all as the result of her minor accident, they were of low or minimal severity. Even so, following a purported initial examination of AL by Koppel on behalf of Garden State Pain on March 1, 2016 – pursuant to a referral that was purchased through the unlawful compensation that Koppel and Garden State Pain paid to Kreshover and Capital Chiropractic – Koppel and Garden State Pain billed GEICO for the initial examination using CPT code 99243, and falsely represented that the examination involved presenting problems of moderate severity.

(x)   On May 31, 2016, an Insured named AC was involved in an automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that no one was injured in the accident, that everyone involved in the accident refused medical attention, that the airbags in AC's vehicle did not deploy, and that all of the vehicles were drivable following the accident and were driven away from the scene of the accident. What is more – and again, in keeping with the fact that the accident was minor, and that AC was not seriously injured in the accident – AC did not visit any hospital following the accident. To the extent that AC experienced any health problems at all as the result of his minor accident, they were of low or minimal severity. Even so, following a purported initial examination of AC by Koppel on behalf of Garden State Pain on August 29, 2016 – pursuant to a referral that was purchased through the unlawful compensation that Garden State Pain and Koppel paid to Inacio and Spinecare Chiropractic – Koppel and Garden State Pain billed GEICO for the initial examination using CPT code 99244, and falsely represented that the examination involved presenting problems of moderate to high severity.

(xi)     On July 13, 2016, an Insured named KM was involved in a rear end automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that the airbags in KM's vehicle did not deploy, and that all of the vehicles were drivable following the accident and were driven away from the scene of the accident. To the extent that KM experienced any health problems at all as the result of his minor accident, they were of low or minimal severity. Even so, following a purported initial examination of KM by Koppel on behalf of Garden State Pain on November 8, 2016 – pursuant to a referral that was purchased through the unlawful compensation that Garden State Pain and Koppel paid to Inacio and Spinecare Chiropractic – Koppel and Garden State Pain billed GEICO for the initial examination using CPT code 99244, and falsely represented that the examination involved presenting problems of moderate to high severity.

(xii)    On July 29, 2016, an Insured named MS was involved in an automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that the airbags in MS's vehicle did not deploy. What is more – and again, in keeping with the fact that the accident was minor, and that MS was not seriously injured in the accident – a CT taken of MS' cervical spine the day of the accident showed no evidence of injury. To the extent that MS experienced any health problems at all as the result of his minor accident, they were of low or minimal severity. Even so, following a purported initial examination of MS by Koppel on behalf of Garden State Pain on February 2, 2017 – pursuant to a referral that was purchased through the unlawful compensation that Garden State Pain and Koppel paid to Beagin, Saraceno and Clifton Pain – Koppel and Garden State Pain billed GEICO for the initial examination using CPT code 99204, and falsely represented that the examination involved presenting problems of moderate to high severity.

(xiii)   On May 15, 2017 , an Insured named II was involved in a minor, rear-end automobile accident. To the extent that II experienced any injuries at all in their minor accident, the injuries were minor soft tissue injuries that had resolved within five months of the accident. Even so, following a purported initial examination on behalf of Garden State Pain on October 26, 2017 – pursuant to a referral that was purchased through the unlawful compensation that Koppel and Garden State Pain paid to Kreshover and Capital Chiropractic – Koppel and Garden State Pain billed GEICO for the initial examination using CPT code 99244, and falsely represented that the examination involved presenting problems of moderate to high severity.

(xiv)    On June 12, 2017, an Insured named YC was involved in an automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that YC was not injured in the accident, that that the airbags in YC's vehicle did not deploy, and that YC's vehicle was drivable following the accident and was driven away from the scene of the accident.  To the extent that YC was injured at all in the accident, their injuries were minor soft tissue injuries. To the extent that YC experienced any health problems at all as the result of their

minor accident, they were of low or minimal severity. Even so, following a purported initial examination of YC by Koppel on behalf of Garden State Pain on November 21, 2017 – pursuant to a referral that was purchased through the unlawful compensation that Koppel and Garden State Pain paid to Kreshover and Capital Chiropractic – Koppel and Garden State Pain billed GEICO for the initial examination using CPT code 99243, and falsely represented that the examination involved presenting problems of moderate severity.

(xv) On June 23, 2017, an Insured named RH was involved in an automobile accident. To the extent RH was injured at all, their injuries were minor, soft tissue injuries. To the extent that RH experienced any health problems at all as the result of his minor accident, they were of low or minimal severity. Even so, following a purported initial examination of RH by Koppel on behalf of Garden State Pain on December 21, 2017 – pursuant to a referral that was purchased through the unlawful compensation that Koppel and Garden State Pain paid to Kreshover and Capital Chiropractic – Koppel and Garden State Pain billed GEICO for the initial examination using CPT code 99243, and falsely represented that the examination involved presenting problems of moderate severity.

(xvi) On July 27, 2017, an Insured named AR was involved in an automobile accident. To the extent AR was injured at all, their injuries were minor, soft tissue injuries. To the extent that AR experienced any health problems at all as the result of her minor accident, they were of low or minimal severity. Even so, following a purported initial examination of AR by Koppel on behalf of Garden State Pain on January 18, 2018 – pursuant to a referral that was purchased through the unlawful compensation that Koppel and Garden State Pain paid to Kreshover and Capital Chiropractic – Koppel and Garden State Pain billed GEICO for the initial examination using CPT code 99243, and falsely represented that the examination involved presenting problems of moderate severity.

(xvii) On August 29, 2017, an Insured named CM was involved in an automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that no one was injured in the accident, that everyone involved in the accident refused medical attention, that the airbags in CM's vehicle did not deploy, and that all of the vehicles were drivable following the accident and were driven away from the scene of the accident.. To the extent that CM experienced any health problems at all as the result of her minor accident, they were of low or minimal severity. Even so, following a purported initial examination of CM by Koppel on behalf of Garden State Pain on September 5, 2017 – pursuant to a referral that was purchased through the unlawful compensation that Garden State Pain and Koppel paid to Beagin, Saraceno and Clifton Pain – Koppel and Garden State Pain billed GEICO for the initial examination using CPT code 99244, and falsely represented that the examination involved presenting problems of moderate to high severity.

(xviii)  On December 5, 2017, an Insured named RR was involved in an automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that no one was injured in the accident and that everyone involved in the accident refused medical attention. What is more – and again, in keeping with the fact that the accident was minor, and that RR was not seriously injured in the accident – RR did not visit any hospital following the accident. To the extent that RR experienced any health problems at all as the result of his minor accident, they were of low or minimal severity. Even so, following a purported initial examination of RR by Koppel on behalf of Garden State Pain on April 19, 2018 – pursuant to a referral that was purchased through the unlawful compensation that Garden State Pain and Koppel paid to Saraceno and Newark Pain – Koppel and Garden State Pain billed GEICO for the initial examination using CPT code 99244, and falsely represented that the examination involved presenting problems of moderate to high severity.

(xix)  On May 1, 2019, an Insured named YCB was involved in an automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that the airbags in YCB's vehicle did not deploy. What is more – and again, in keeping with the fact that the accident was minor, and that YCB was not seriously injured in the accident – YCB did not visit any hospital the day of the accident. To the extent that YCB experienced any health problems at all as the result of her minor accident, they were of low or minimal severity. Even so, following a purported initial examination of YCB by Koppel on behalf of Garden State Pain on May 23, 2019 – pursuant to a referral that was purchased through the unlawful compensation that Garden State Pain and Koppel paid to Beagin, Saraceno and Clifton Pain – Koppel and Garden State Pain billed GEICO for the initial examination using CPT code 99244, and falsely represented that the examination involved presenting problems of moderate to high severity.

(xx)  On June 27, 2019, an Insured named LEV was involved in a rear-end automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that no one was injured in the accident, that everyone involved in the accident refused medical attention, that the airbags in LEV's vehicle did not deploy, and that all of the vehicles were drivable following the accident and were driven away from the scene of the accident. What is more – and again, in keeping with the fact that the accident was minor, and that LEV was not seriously injured in the accident – LEV did not visit any hospital following the accident. To the extent that LEV experienced any health problems at all as the result of her minor accident, they were of low or minimal severity. Even so, following a purported initial examination of LEV by Koppel on behalf of Garden State Pain on December 10, 2019 – pursuant to a referral that was purchased through the unlawful compensation that Garden State Pain and Koppel paid to Inacio and Spinecare Chiropractic – Koppel and Garden State Pain billed GEICO for the initial examination using CPT code 99243, and falsely represented that the examination involved presenting problems of moderate severity.

143.    These are only representative examples. In the claims for initial examinations identified in Exhibit "1", Koppel and Garden State Pain routinely falsely represented that the Insureds presented with problems of moderate or moderate to high severity, when in fact the Insureds' problems were low- or minimal severity soft tissue injuries such as sprains and strains, to the extent that they had any presenting problems at all at the time of the examinations.

144.    In the claims for initial examinations identified in Exhibit "1", Koppel and Garden State Pain routinely falsely represented that the Insureds presented with problems of moderate or moderate to high severity in order to create a false basis for their charges for the examinations under CPT codes 99204, 99243, 99244, because examinations billable under CPT codes 99204, 99243, and 99244 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity.

145.    In the claims for initial examinations identified in Exhibit "1", Koppel and Garden State Pain also routinely falsely represented that the Insureds presented with problems of moderate or moderate to high severity in order to create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds, including follow-up examinations, pain management injections, chiropractic services, and surgical services.

146.    Moreover, in the majority of the claims for initial examinations identified in Exhibit "1", Koppel and Garden State Pain routinely falsely represented that the Insureds presented with problems of moderate or moderate to high severity in order to create a false basis for continued, medically unnecessary chiropractic treatment by the Referral Defendants and Garden State Pain's other chiropractor referral sources, so as to provide additional unlawful compensation to the Referral Defendants and Garden State Pain's other chiropractor referral sources in exchange for their initial, medically unnecessary patient referrals to Garden State Pain.

**b.      Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

147.    Pursuant to the Fee Schedule, the use of CPT code 99204 to bill for an initial examination represents that the physician who performed the examination spent at least 45 minutes of face-to-face time with the patient or the patient's family.

148.    Pursuant to the Fee Schedule, the use of CPT code 99243 to bill for an initial examination represents that the physician who performed the examination spent at least 40 minutes of face-to-face time with the patient or the patient's family.

149.    Pursuant to the Fee Schedule, the use of CPT code 99244 to bill for an initial examination represents that the physician who performed the examination spent at least 60 minutes of face-to-face time with the patient or the patient's family.

150.    As set forth in Exhibit "1", Koppel and Garden State Pain submitted the majority of their billing for initial examinations under CPT codes 99204, 99243, and 99244, and thereby represented that Koppel spent 40 minutes to 60 minutes of face-to-face time with the Insureds or the Insureds' families during the examinations.

151.    In fact, in the claims for initial examinations identified in Exhibit "1", Koppel never spent 40 minutes of face-to-face time with the Insureds or their families when conducting the examinations, much less 60 minutes.

152.    Rather, in the claims for initial examinations identified in Exhibit "1", the initial examinations did not entail more than 10-15 minutes of face-to-face time between Koppel and the Insureds or their families, to the extent that the examinations actually were performed in the first instance.

153.    For instance, and in keeping with the fact that the initial examinations allegedly provided through Garden State Pain did not entail more than 10-15 minutes of face-to-face time

with the Insureds or their families, Koppel used a template form in purporting to conduct the initial examinations.

154.    The template form that Koppel used in purporting to conduct the initial examinations set forth a very limited range of examination parameters.

155.    The only face-to-face time between Koppel and the Insureds that was reflected in the limited range of examination parameters consisted of brief patient interviews and limited examinations of the Insureds' musculoskeletal systems.

156.    These brief interviews and limited examinations did not require Koppel to spend more than 10-15 minutes of face-to-face time with the Insureds or their families.

157.    In the claims for initial examinations identified in Exhibit "1", Koppel and Garden State Pain routinely falsely represented that the examinations involved between 40-60 minutes of face-to-face time with the Insureds or their families in order to create a false basis for their charges under CPT codes 99204, 99243, and 99244, because examinations billable under CPT codes 99204, 99243, and 99244 are reimbursable at a higher rate than examinations that require less time to perform.

### c.    Misrepresentations Regarding "Comprehensive" Patient Histories

158.    Pursuant to the Fee Schedule, the use of CPT codes 99204 or 99244 to bill for an initial patient examination represents that the physician who performed the examination took a "comprehensive" patient history.

159.    Pursuant to the American Medical Association's CPT Assistant (the "CPT Assistant"), which is incorporated by reference into the Fee Schedule, a patient history does not qualify as "comprehensive" unless the physician has conducted a "complete" review of the patient's systems.

160.    Pursuant to the CPT Assistant, a physician has not conducted a "complete" review of a patient's systems unless the physician has documented a review of the systems directly related to the history of the patient's present illness, as well as at least 10 other organ systems.

161.    The CPT Assistant recognizes the following organ systems with respect to a review of systems:

(i)     constitutional symptoms (e.g., fever, weight loss);

(ii)    eyes;

(iii)   ears, nose, mouth, throat;

(iv)    cardiovascular;

(v)     respiratory;

(vi)    gastrointestinal;

(vii)   genitourinary;

(viii)  musculoskeletal;

(ix)    integumentary (skin and/or breast);

(x)     neurological;

(xi)    psychiatric;

(xii)   endocrine;

(xiii)  hematologic/lymphatic; and

(xiv)   allergic/immunologic.

162.    Though Koppel and Garden State Pain billed for many of their putative initial examinations in the claims identified in Exhibit "1" under CPT codes 99204 and 99244, and thereby represented that they took "comprehensive" histories of the Insureds during the

examinations, Koppel never documented a review of 10 organ systems unrelated to the history of the Insureds' present illnesses.

163.    Rather, to the extent that Koppel and Garden State Pain documented any review of the Insureds' systems at all in the claims identified in Exhibit "1", the documentation was contained in their basic, cursory initial examination forms.

164.    To the extent that the Koppel and Garden State Pain's basic, cursory initial examination forms contained any documentation at all regarding any review of the Insureds' systems, the documentation was limited to – at most – a partial review of the Insureds' musculoskeletal systems.

165.    Pursuant to the CPT Assistant, a patient history also does not qualify as "comprehensive" unless the physician has taken a "complete" past, family, and social history from the patient.

166.    Pursuant to the CPT Assistant, a physician has not taken a "complete" past, family, and social history from the patient unless the physician has documented:

(i)     at least one specific item with respect to the patient's past history – e.g., the patient's past experiences with illnesses, operations, injuries, and treatments;

(ii)    at least one specific item with respect to the patient's family history – e.g., a review of medical events in the patient's family, including diseases which may be hereditary or place the patient at risk; and

(iii)   at least one specific item with respect to the patient's social history – e.g., an age-appropriate review of past and current activities.

167.    Though Koppel and Garden State Pain billed for many of their putative initial examinations in the claims identified in Exhibit "1" under CPT codes 99204 and 99244, and thereby represented that they took "comprehensive" histories of the Insureds during the

examinations, Koppel never documented any information with respect to the Insureds' family histories.

168.   For example:

(i)   On March 12, 2013, Koppel purported to provide an initial examination to an Insured named RG. Though Garden State Pain and Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99204, and thereby falsely represented that Koppel had taken a comprehensive patient history during the examination, Koppel did not: (i) conduct a complete review of RG's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of RG's illnesses; or (ii) take a complete past, family, and social history from RG, inasmuch as he did not document any information with respect to RG's family history.

(ii)   On November 19, 2013, Koppel purported to provide an initial examination to an Insured named MB. Though Garden State Pain and Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99204, and thereby falsely represented that Koppel had taken a comprehensive patient history during the examination, Koppel did not: (i) conduct a complete review of MB's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of MB's illnesses; or (ii) take a complete past, family, and social history from MB, inasmuch as he did not document any information with respect to MB's family history.

(iii)   On April 10, 2014, Koppel purported to provide an initial examination to an Insured named NR. Though Garden State Pain and Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99204, and thereby falsely represented that Koppel had taken a comprehensive patient history during the examination, Koppel did not: (i) conduct a complete review of NR's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of NR's illnesses; or (ii) take a complete past, family, and social history from NR, inasmuch as he did not document any information with respect to NR's family history.

(iv)   On August 21, 2014, Koppel purported to provide an initial examination to an Insured named CFE. Though Garden State Pain and Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99204, and thereby falsely represented that Koppel had taken a comprehensive patient history during the examination, Koppel did not: (i) conduct a complete review of CFE's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of CFE's illnesses; or (ii) take a complete past, family, and social history from CFE, inasmuch as he did not document any information with respect to CFE's family history.

(v)     On May 27, 2015, Koppel purported to provide an initial examination to an Insured named CM. Though Garden State Pain and Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99204, and thereby falsely represented that Koppel had taken a comprehensive patient history during the examination, Koppel did not: (i) conduct a complete review of CM's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of CM's illnesses; or (ii) take a complete past, family, and social history from CM, inasmuch as he did not document any information with respect to CM's family history.

(vi)    On June 1, 2015, Koppel purported to provide an initial examination to an Insured named BT. Though Garden State Pain and Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99244, and thereby falsely represented that Koppel had taken a comprehensive patient history during the examination, Koppel did not: (i) conduct a complete review of BT's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of BT's illnesses; or (ii) take a complete past, family, and social history from BT, inasmuch as he did not document any information with respect to BT's family history.

(vii)   On October 22, 2015, Koppel purported to provide an initial examination to an Insured named CA. Though Garden State Pain and Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99204, and thereby falsely represented that Koppel had taken a comprehensive patient history during the examination, Koppel did not: (i) conduct a complete review of CA's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of CA's illnesses; or (ii) take a complete past, family, and social history from CA, inasmuch as he did not document any information with respect to CA's family history.

(viii)  On December 3, 2015, Koppel purported to provide an initial examination to an Insured named JS. Though Garden State Pain and Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99244, and thereby falsely represented that Koppel had taken a comprehensive patient history during the examination, Koppel did not: (i) conduct a complete review of JS's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of JS's illnesses; or (ii) take a complete past, family, and social history from JS, inasmuch as he did not document any information with respect to JS's family history.

(ix)    On February 16, 2106, Koppel purported to provide an initial examination to an Insured named AS. Though Garden State Pain and Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99244, and thereby falsely represented that Koppel had taken a comprehensive patient history during the examination, Koppel did not: (i) conduct a complete review of AS's systems during the examination, inasmuch as he did not document a review of 10

organ systems unrelated to the history of AS's illnesses; or (ii) take a complete past, family, and social history from AS, inasmuch as he did not document any information with respect to AS's family history.

(x)     On May 31, 2016, Koppel purported to provide an initial examination to an Insured named EP. Though Garden State Pain and Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99204, and thereby falsely represented that Koppel had taken a comprehensive patient history during the examination, Koppel did not: (i) conduct a complete review of EP's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of EP's illnesses; or (ii) take a complete past, family, and social history from EP, inasmuch as he did not document any information with respect to EP's family history.

(xi)    On August 31, 2016, Koppel purported to provide an initial examination to an Insured named IS. Though Garden State Pain and Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99244, and thereby falsely represented that Koppel had taken a comprehensive patient history during the examination, Koppel did not: (i) conduct a complete review of IS's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of IS's illnesses; or (ii) take a complete past, family, and social history from IS, inasmuch as he did not document any information with respect to IS's family history.

(xii)   On December 1, 2016, Koppel purported to provide an initial examination to an Insured named DB. Though Garden State Pain and Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99204, and thereby falsely represented that Koppel had taken a comprehensive patient history during the examination, Koppel did not: (i) conduct a complete review of DB's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of DB's illnesses; or (ii) take a complete past, family, and social history from DB, inasmuch as he did not document any information with respect to DB's family history.

(xiii)  On February 22, 2017, Koppel purported to provide an initial examination to an Insured named EF. Though Garden State Pain and Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99204, and thereby falsely represented that Koppel had taken a comprehensive patient history during the examination, Koppel did not: (i) conduct a complete review of EF's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of EF's illnesses; or (ii) take a complete past, family, and social history from EF, inasmuch as he did not document any information with respect to EF's family history.

(xiv)   On April 4, 2017, Koppel purported to provide an initial examination to an Insured named EL. Though Garden State Pain and Koppel then billed the putative

examination through Garden State Pain to GEICO under CPT code 99244, and thereby falsely represented that Koppel had taken a comprehensive patient history during the examination, Koppel did not: (i) conduct a complete review of EL's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of EL's illnesses; or (ii) take a complete past, family, and social history from EL, inasmuch as he did not document any information with respect to EL's family history.

(xv)    On October 10, 2017, Koppel purported to provide an initial examination to an Insured named ZS. Though Garden State Pain and Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99244, and thereby falsely represented that Koppel had taken a comprehensive patient history during the examination, Koppel did not: (i) conduct a complete review of ZS's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of ZS's illnesses; or (ii) take a complete past, family, and social history from ZS, inasmuch as he did not document any information with respect to ZS's family history.

(xvi)   On January 24, 2018, Koppel purported to provide an initial examination to an Insured named JJ. Though Garden State Pain and Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99244, and thereby falsely represented that Koppel had taken a comprehensive patient history during the examination, Koppel did not: (i) conduct a complete review of JJ's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of JJ's illnesses; or (ii) take a complete past, family, and social history from JJ, inasmuch as he did not document any information with respect to JJ's family history.

(xvii)  On August 8, 2018, Koppel purported to provide an initial examination to an Insured named RA. Though Garden State Pain and Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99204, and thereby falsely represented that Koppel had taken a comprehensive patient history during the examination, Koppel did not: (i) conduct a complete review of RA's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of RA's illnesses; or (ii) take a complete past, family, and social history from RA, inasmuch as he did not document any information with respect to RA's family history.

(xviii) On September 13, 2018, Koppel purported to provide an initial examination to an Insured named SC. Though Garden State Pain and Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99204, and thereby falsely represented that Koppel had taken a comprehensive patient history during the examination, Koppel did not: (i) conduct a complete review of SC's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of SC's illnesses; or (ii) take a complete past,

family, and social history from SC, inasmuch as he did not document any information with respect to SC's family history.

(xix)    On March 27, 2019, Koppel purported to provide an initial examination to an Insured named AS. Though Garden State Pain and Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99244, and thereby falsely represented that Koppel had taken a comprehensive patient history during the examination, Koppel did not: (i) conduct a complete review of AS's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of AS's illnesses; or (ii) take a complete past, family, and social history from AS, inasmuch as he did not document any information with respect to AS's family history.

(xx)    On November 7, 2019, Koppel purported to provide an initial examination to an Insured named DA. Though Garden State Pain and Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99244, and thereby falsely represented that Koppel had taken a comprehensive patient history during the examination, Koppel did not: (i) conduct a complete review of DA's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of DA's illnesses; or (ii) take a complete past, family, and social history from DA, inasmuch as he did not document any information with respect to DA's family history.

169.    These are only representative examples. In many of the claims for initial examinations identified in Exhibit "1", Koppel and Garden State Pain falsely represented that they took "comprehensive" patient histories, and that their putative examinations therefore were billable under CPT codes 99204 and 99244, because examinations that are billable under CPT codes 99204 and 99244 are reimbursable at higher rates than examinations that do not require "comprehensive" patient histories.

        **d.**    **Misrepresentations Regarding "Comprehensive" Physical Examinations**

170.    Moreover, pursuant to the Fee Schedule, the use of CPT codes 99204 or 99244 to bill for an initial patient examination represents that the physician who conducted the examination conducted a "comprehensive" physical examination.

171.    According to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the healthcare provider either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

172.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a general examination of multiple patient organ systems unless the physician has documented findings with respect to at least eight organ systems.

173.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)     at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)     examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)  coordination, deep tendon reflexes, and sensation; and

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

174.    In the claims for initial examinations identified in Exhibit "1", when Koppel and Garden State Pain billed for the initial patient examinations under CPT codes 99204 and 99244, they falsely represented that they provided a "comprehensive" patient examination to the Insureds they purported to treat during the initial examinations.

175.    In fact, with respect to the claims for initial examinations identified in Exhibit "1", Koppel never conducted a general examination of multiple patient organ systems, or conducted a complete examination of a single patient organ system.

176.    For instance, in each of the claims for initial examinations under CPT codes 99204 and 99244 identified in Exhibit "1", Koppel never conducted any general examination of multiple patient organ systems, inasmuch as he did not document findings with respect to at least eight organ systems.

177.    Furthermore, although Koppel and Garden State Pain often purported to provide a more in-depth examination of the Insureds' musculoskeletal systems during the initial examinations in the claims identified in Exhibit "1", the musculoskeletal examinations did not qualify as "complete", because Koppel failed to document:

(i)    at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iii)    palpation of lymph nodes in neck, axillae, groin, and/or other location; and

(iv)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity.

178.     Rather, to the extent that Koppel and Garden State Pain conducted any initial examinations at all with respect to the claims identified in Exhibit "1", the examinations consisted of a perfunctory check of the Insureds' musculoskeletal systems that was insufficient to qualify as a complete examination of the Insureds' musculoskeletal systems.

179.     For example:

(i)     On May 9, 2013, Koppel purported to provide an initial examination to an Insured named MV. Though Garden State Pain, Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99244, and thereby falsely represented that Koppel had conducted a comprehensive patient examination during the examination, Koppel did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(ii)     On October 22, 2013, Koppel purported to provide an initial examination to an Insured named BP. Though Garden State Pain, Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99204, and thereby falsely represented that Koppel had conducted a comprehensive patient examination during the examination, Koppel did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(iii)     On March 6, 2014, Koppel purported to provide an initial examination to an Insured named SP. Though Garden State Pain, Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99204, and thereby falsely represented that Koppel had conducted a comprehensive patient examination during the examination, Koppel did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(iv)     On July 7, 2014, Koppel purported to provide an initial examination to an Insured named AB. Though Garden State Pain, Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99294, and thereby falsely represented that Koppel had conducted a comprehensive patient examination during the examination, Koppel did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(v)     On January 8, 2015, Koppel purported to provide an initial examination to an Insured named SD. Though Garden State Pain, Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99244, and thereby falsely represented that Koppel had conducted a comprehensive patient examination during the examination, Koppel did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(vi)    On June 4, 2015, Koppel purported to provide an initial examination to an Insured named AR. Though Garden State Pain, Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99244, and thereby falsely represented that Koppel had conducted a comprehensive patient examination during the examination, Koppel did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(vii)   On December 2, 2015, Koppel purported to provide an initial examination to an Insured named DRE. Though Garden State Pain, Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99204, and thereby falsely represented that Koppel had conducted a comprehensive patient examination during the examination, Koppel did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(viii)  On March 14, 2016, Koppel purported to provide an initial examination to an Insured named DD. Though Garden State Pain, Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99244, and thereby falsely represented that Koppel had conducted a comprehensive patient examination during the examination, Koppel did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(ix)    On June 21, 2016, Koppel purported to provide an initial examination to an Insured named MC. Though Garden State Pain, Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99204, and thereby falsely represented that Koppel had conducted a comprehensive patient examination during the examination, Koppel did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(x)     On September 9, 2016, Koppel purported to provide an initial examination to an Insured named IC. Though Garden State Pain, Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99244, and thereby falsely represented that Koppel had conducted a comprehensive patient examination during the examination, Koppel did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(xi)    On April 17, 2017, Koppel purported to provide an initial examination to an Insured named MC. Though Garden State Pain, Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99244, and thereby falsely represented that Koppel had conducted a comprehensive patient examination during the examination, Koppel did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(xii)   On June 8, 2017, Koppel purported to provide an initial examination to an Insured named GR. Though Garden State Pain, Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99204, and thereby falsely represented that Koppel had conducted a comprehensive patient examination during the examination, Koppel did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(xiii)  On October 31, 2017, Koppel purported to provide an initial examination to an Insured named MF. Though Garden State Pain, Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99244, and thereby falsely represented that Koppel had conducted a comprehensive patient examination during the examination, Koppel did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(xiv)   On December 7, 2017, Koppel purported to provide an initial examination to an Insured named NT. Though Garden State Pain, Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99204, and thereby falsely represented that Koppel had conducted a comprehensive patient examination during the examination, Koppel did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(xv) On February 7, 2018, Koppel purported to provide an initial examination to an Insured named LJ. Though Garden State Pain, Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99204, and thereby falsely represented that Koppel had conducted a comprehensive patient examination during the examination, Koppel did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(xvi) On May 9, 2018, Koppel purported to provide an initial examination to an Insured named JF. Though Garden State Pain, Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99244, and thereby falsely represented that Koppel had conducted a comprehensive patient examination during the examination, Koppel did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(xvii) On September 21, 2018, Koppel purported to provide an initial examination to an Insured named PM. Though Garden State Pain, Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99204, and thereby falsely represented that Koppel had conducted a comprehensive patient examination during the examination, Koppel did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(xviii) On March 19, 2019, Koppel purported to provide an initial examination to an Insured named AC. Though Garden State Pain, Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99204, and thereby falsely represented that Koppel had conducted a comprehensive patient examination during the examination, Koppel did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(xix) On August 8, 2019, Koppel purported to provide an initial examination to an Insured named MN. Though Garden State Pain, Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99244, and thereby falsely represented that Koppel had conducted a comprehensive patient examination during the examination, Koppel did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(xx) On November 15, 2019, Koppel purported to provide an initial examination to an Insured named GPM. Though Garden State Pain, Koppel then billed the putative examination through Garden State Pain to GEICO under CPT code 99204, and thereby falsely represented that Koppel had conducted a comprehensive patient examination during the examination, Koppel did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

180.    These are only representative examples. In many of the claims for initial examinations identified in Exhibit "1", Koppel and Garden State Pain falsely represented that they provided "comprehensive" patient examinations, and that their putative examinations therefore were billable under CPT codes 99204 and 99244, because examinations that are billable under CPT codes 99204 and 99244 are reimbursable at higher rates than examinations that do not require "comprehensive" patient examinations.

### e.    Misrepresentations Regarding the Extent of Medical Decision-Making

181.    Moreover, pursuant to the Fee Schedule and CPT Assistant, the use of CPT codes 99204 or 99244 to bill for an initial examination represents that the physician who performed the examination engaged in "moderately complex" medical decision-making.

182.    Pursuant to the Fee Schedule, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

183.    Although – as set forth in Exhibit "1" – Koppel and Garden State Pain routinely billed for their initial examinations under CPT codes 99204 and 99244, and thereby represented

that their initial examinations involved medical decision-making of "moderate complexity", in actuality the initial examinations did not involve any medical decision-making at all.

184.    First, in virtually every case, the initial examinations did not involve the retrieval, review, or analysis of any meaningful amount of medical records, diagnostic tests, or other information. When the Insureds presented to Koppel and Garden State Pain for the putative initial examinations, they did not arrive with any medical records except, occasionally, basic radiology or electrodiagnostic testing reports. Furthermore, prior to the initial examinations, Koppel and Garden State Pain neither requested any medical records from any other providers, nor conducted any diagnostic tests.

185.    Second, in the claims for initial examinations identified in Exhibit "1",  there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

186.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by Koppel and Garden State Pain.

187.    In almost every instance, any diagnostic procedures and "treatments" that Koppel and Garden State Pain actually provided were limited to a series of medically unnecessary interventional pain management procedures, none of which was health- or life-threatening if properly administered.

188.    Third, in virtually every case, Koppel and Garden State Pain did not consider any significant number of diagnoses or treatment options for the Insureds during the purported initial examinations.

189.    Specifically, in almost every instance, during the initial examinations the Insureds did not report any medical problems that legitimately could be traced to an underlying automobile accident.

190.    Even so, at the conclusion of many of the putative initial examinations in the claims identified in Exhibit "1", Koppel and Garden State Pain prepared initial examination reports in which they provided phony back, neck, and/or extremity soft tissue injury "diagnoses" to virtually every Insured.

191.    Then, based upon these phony "diagnoses", Koppel and Garden State Pain directed many Insureds to report to Garden State Pain on a continuing basis for medically unnecessary follow-up examination and interventional pain management procedures, including pain management injections and surgical procedures, regardless of their true circumstances or presentment.

192.    What is more, based upon these phony "diagnoses", Koppel and Garden State Pain directed many Insureds to report back to the Referral Defendants or Garden State Pain's other chiropractor referral sources for continued chiropractic treatment, regardless of their true circumstances or presentment. Koppel and Garden State Pain directed many Insureds to report back to the Referral Defendants or Garden State Pain's other chiropractor referral sources for continued chiropractic treatment despite the fact that – in most cases – the Insureds already had received months of chiropractic treatment that had not been successful in resolving their purported symptoms.

193.    In keeping with the fact that the putative "diagnoses" were phony, the diagnoses frequently were contravened by contemporaneous police reports and hospital records (to the limited extent that the Insureds visited the hospital at all following their minor accidents), which

indicated that the Insureds either had not been injured in the underlying accidents, or did not suffer from the injuries that Koppel and Garden State Pain falsely purported to diagnose at the conclusion of their phony initial examinations.

194.    To the extent that the Insureds in the claims identified in Exhibit "1" suffered any injuries at all in their minor automobile accidents, the injuries were garden-variety soft tissue injuries such as sprains and strains.

195.    Ordinary strains and sprains virtually always resolve after a short course of conservative treatment, or no treatment at all, which is why the Care Paths generally require healthcare services providers to demonstrate why continued treatment is necessary beyond the four-week, eight-week, and 13-week marks.

196.    Even so, and in keeping with the fact that their putative "diagnoses" were phony, and involved no genuine medical decision-making whatsoever, Koppel and Garden State Pain routinely falsely purported to diagnose continuing back, neck, and/or extremity pain in the Insureds long after the minor underlying automobile accidents occurred, and long after any soft tissue injury pain attendant to the automobile accidents would have resolved.

197.    Koppel and Garden State Pain issued these phony "diagnoses" not only to create a false basis for their own Fraudulent Services, including medically unnecessary follow-up examinations, pain management injections, and surgical services, but also to create a false basis for continued, medically unnecessary chiropractic services by their referral sources, including the Referral Defendants, or medically unnecessary physical therapy services for some Newark Pain Insureds.

198.    For example:

(i)    On February 22, 2013, an Insured named LK was involved in an automobile accident. In keeping with the fact that the accident was minor and that injuries

sustained by LK, if any, were minor, a radiologic examination done that day indicated that LK had a normal cervical spine and that his adjacent soft tissues were unremarkable. To the extent that LK experienced any injuries at all in his minor accident, the injuries were minor soft tissue injuries that had resolved within eight months of the accident. Even so, following a purported initial examination on behalf of Garden State Pain on October 3, 2013 – more than eight months after LK minor accident – Koppel falsely purported to diagnose LK with serious neck and back pain as the result of the minor accident. Then, Koppel referred LK back to Beagin, Saraceno, and Clifton Pain for continued, medically unnecessary chiropractic treatment, as compensation for their initial referral to Garden State Pain.

(ii)    On September 23, 2013, an Insured named JR was involved in a minor automobile accident in a parking lot. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that all of the vehicles were drivable following the accident and were driven away from the scene of the accident. To the extent that JR experienced any injuries at all in his minor accident, the injuries were minor soft tissue injuries that had resolved within six months of the accident. Even so, following a purported initial examination on behalf of Garden State Pain on March 25, 2014 – more than six months after JR minor accident – Koppel falsely purported to diagnose JR with serious neck and back pain as the result of the minor accident. Then, Koppel referred JR back to Inacio and Spinecare Chiropractic for continued, medically unnecessary chiropractic treatment, as compensation for their initial referral to Garden State Pain.

(iii)   On January 9, 2014, an Insured named JJ was involved in a rear-end automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that no one was injured in the accident, that everyone involved in the accident refused medical attention, that the airbags in JJ's vehicle did not deploy, and that all of the vehicles were drivable following the accident and were driven away from the scene of the accident. What is more – and again, in keeping with the fact that the accident was minor, and that JJ was not seriously injured in the accident – JJ did not visit any hospital following the accident. To the extent that JJ experienced any injuries at all in his minor accident, the injuries were minor soft tissue injuries that had resolved within a month and a half of the accident. Even so, following a purported initial examination on behalf of Garden State Pain on February 18, 2014 – a month and a half after JJ's minor accident – Koppel falsely purported to diagnose JJ with serious neck and back pain as the result of the minor accident. Then, Koppel referred JJ back to Beagin, Saraceno, and Clifton Pain for continued, medically unnecessary chiropractic treatment, as compensation for their initial referral to Garden State Pain.

(iv)    On January 14, 2014, an Insured named TG was involved in a rear-end automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that no one was injured in the accident, and that everyone involved in the accident refused medical attention. What is more – and again, in

keeping with the fact that the accident was minor, and that TG was not seriously injured in the accident – TG did not visit any hospital following the accident. To the extent that TG experienced any injuries at all in her minor accident, the injuries were minor soft tissue injuries that had resolved within three months of the accident. Even so, following a purported initial examination on behalf of Garden State Pain on April 15, 2014 – more than three months after TG's minor accident – Koppel falsely purported to diagnose TG with serious neck and back pain as the result of the minor accident. Then, Koppel referred TG back to Beagin, Saraceno, and Clifton Pain for continued, medically unnecessary chiropractic treatment, as compensation for their initial referral to Garden State Pain.

(v)     On August 27, 2014, an Insured named TR was involved in a rear-end automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that the airbags in TR's vehicle did not deploy, and that all of the vehicles were drivable following the accident and were driven away from the scene of the accident. What is more – and again, in keeping with the fact that the accident was minor, and that TR was not seriously injured in the accident – TR did not visit any hospital the day of the accident. To the extent that TR experienced any injuries at all in her minor accident, the injuries were minor soft tissue injuries that had resolved within four months of the accident. Even so, following a purported initial examination on behalf of Garden State Pain on December 16, 2014 – more than four months after TR's minor accident – Koppel falsely purported to diagnose TR with serious neck and back pain as the result of the minor accident. Then, Koppel referred TR back to Inacio and Spinecare Chiropractic for continued, medically unnecessary chiropractic treatment, as compensation for their initial referral to Garden State Pain.

(vi)    On October 14, 2014, an Insured named WC was involved in an rear-end automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that WC refused medical attention, that the airbags in WC's vehicle did not deploy, and that none of the vehicles were damaged in the accident. What is more – and again, in keeping with the fact that the accident was minor, and that WC was not seriously injured in the accident – WC did not visit any hospital following the accident. To the extent that WC experienced any injuries at all in his minor accident, the injuries were minor soft tissue injuries that had resolved within seven months of the accident. Even so, following a purported initial examination on behalf of Garden State Pain on May 20, 2015 – more than five months after WC's minor accident – Koppel falsely purported to diagnose WC with serious neck and back pain as the result of the minor accident. Then, Koppel referred WC back to Saraceno and Newark Pain for medically unnecessary physical therapy treatment, as compensation for their initial referral to Garden State Pain.

(vii)   On March 6, 2015 , an Insured named TR was involved in a minor automobile accident. In keeping with the fact that the accident was minor, TR's airbag did not deploy.  To the extent that TR experienced any injuries at all in his minor accident,

the injuries were minor soft tissue injuries that had resolved within eight months of the accident. Even so, following a purported initial examination on behalf of Garden State Pain on October 27, 2015 – eight months after TR's minor accident – Koppel falsely purported to diagnose TR with serious neck and back pain as the result of the minor accident. Then, Koppel referred TR back to Kreshover and Capital Chiropractic for continued, medically unnecessary chiropractic treatment, as compensation for their initial referral to Garden State Pain.

(viii)   On May 1, 2015 , an Insured named EG was involved in a minor automobile accident. To the extent that EG experienced any injuries at all in his minor accident, the injuries were minor soft tissue injuries that had resolved within six months of the accident. Even so, following a purported initial examination on behalf of Garden State Pain on November 10, 2015 – over six months after EG's minor accident – Koppel falsely purported to diagnose EG with serious neck and back pain as the result of the minor accident. Then, Koppel referred EG back to Kreshover and Capital Chiropractic for continued, medically unnecessary chiropractic treatment, as compensation for their initial referral to Garden State Pain.

(ix)   On September 15, 2015, an Insured named EB was involved in a  rear-end automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that all of the vehicles were drivable following the accident and were driven away from the scene of the accident. To the extent that EB experienced any injuries at all in his minor accident, the injuries were minor soft tissue injuries that had resolved within four months of the accident. Even so, following a purported initial examination on behalf of Garden State Pain on January 19, 2016 – more than four months after EB minor accident – Koppel falsely purported to diagnose EB with serious neck and back pain as the result of the minor accident. Then, Koppel referred EB back to Inacio and Spinecare Chiropractic for continued, medically unnecessary chiropractic treatment, as compensation for their initial referral to Garden State Pain.

(x)   On November 15, 2015, an Insured named DF was involved in a rear-end automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that all of the vehicles were drivable following the accident and were driven away from the scene of the accident. What is more – and again, in keeping with the fact that the accident was minor, and that DF was not seriously injured in the accident – DF did not visit any hospital following the accident. To the extent that DF experienced any injuries at all in her minor accident, the injuries were minor soft tissue injuries that had resolved within five months of the accident. Even so, following a purported initial examination on behalf of Garden State Pain on March 23, 2016 – more than five months after DF minor accident – Koppel falsely purported to diagnose DF with serious neck and back pain as the result of the minor accident. Then, Koppel referred DF back to Saraceno and Newark Pain for medically unnecessary physical therapy treatment, as compensation for their initial referral to Garden State Pain.

(xi)     On November 15, 2015, an Insured named BG was involved in an automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that BG was uninjured in the accident, that BG refused medical attention, that the airbags in BG's vehicle did not deploy, and that all of the vehicles were drivable following the accident and were driven away from the scene of the accident. What is more – and again, in keeping with the fact that the accident was minor, and that BG was not seriously injured in the accident – BG did not visit any hospital following the accident. To the extent that BG experienced any injuries at all in his minor accident, the injuries were minor soft tissue injuries that had resolved within five months of the accident. Even so, following a purported initial examination on behalf of Garden State Pain on March 23, 2016 – more than five months after BG's minor accident – Koppel falsely purported to diagnose BG with serious neck and back pain as the result of the minor accident. Then, Koppel referred BG back to Saraceno and Newark Pain for medically unnecessary physical therapy treatment, as compensation for their initial referral to Garden State Pain.

(xii)    On December 29, 2015, an Insured named AG was involved in an automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated the airbags in AG's vehicle did not deploy.  What is more – and again, in keeping with the fact that the accident was minor, and that AG was not seriously injured in the accident – a nurse noted that AG was moving all extremities well and was ambulatory following the accident. To the extent that AG experienced any injuries at all in their minor accident, the injuries were minor soft tissue injuries that had resolved within nine months of the accident. Even so, following a purported initial examination on behalf of Garden State Pain on September 13, 2016 – more than nine months after AG's minor accident – Koppel falsely purported to diagnose AG with serious neck and back pain as the result of the minor accident. Then, Koppel referred AG back to Beagin, Saraceno, and Clifton Pain for continued, medically unnecessary chiropractic treatment, as compensation for their initial referral to Garden State Pain.

(xiii)   On January 21, 2016 , an Insured named WM was involved in a minor automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that WM's airbags did not go off, that both vehicles were drivable following the accident and were driven from the scene of the accident, and that WM refused medical attention. To the extent that WM experienced any injuries at all in his minor accident, the injuries were minor soft tissue injuries that had resolved within five months of the accident. Even so, following a purported initial examination on behalf of Garden State Pain on June 26, 2016 – more than five months after WM's minor accident – Koppel falsely purported to diagnose WM with serious neck and back pain as the result of the minor accident. Then, Koppel referred WM back to Kreshover and Capital Chiropractic for continued, medically unnecessary chiropractic treatment, as compensation for their initial referral to Garden State Pain.

(xiv)   On February 19, 2016, an Insured named MV was involved in an automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated MV refused to allow EMS to transport him to the hospital at the scene. What is more – and again, in keeping with the fact that the accident was minor, and that MV was not seriously injured in the accident – scans taken of MV following the accident showed nothing wrong with his head or hips. To the extent that MV experienced any injuries at all in his minor accident, the injuries were minor soft tissue injuries that had resolved within four months of the accident. Even so, following a purported initial examination on behalf of Garden State Pain on June 14, 2016 – more than four months after MV's minor accident – Koppel falsely purported to diagnose MV with serious neck and back pain as the result of the minor accident. Then, Koppel referred MV back to Inacio and Spinecare Chiropractic for continued, medically unnecessary chiropractic treatment, as compensation for their initial referral to Garden State Pain.

(xv)   On March 23, 2016, an Insured named LS was involved in a rear-end automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that no one was injured in the accident, that everyone involved in the accident refused medical attention, that the airbags in LS's vehicle did not deploy, and that all of the vehicles were drivable following the accident and were driven away from the scene of the accident. What is more – and again, in keeping with the fact that the accident was minor, and that LS was not seriously injured in the accident – LS did not visit any hospital for five days following the accident. To the extent that LS experienced any injuries at all in her minor accident, the injuries were minor soft tissue injuries that had resolved within four months of the accident. Even so, following a purported initial examination on behalf of Garden State Pain on July 26, 2016 – more than four months after LS's minor accident – Koppel falsely purported to diagnose LS with serious neck and back pain as the result of the minor accident. Then, Koppel referred LS back to Beagin, Saraceno, and Clifton Pain for continued, medically unnecessary chiropractic treatment, as compensation for their initial referral to Garden State Pain.

(xvi)   On March 29, 2016, an Insured named MC was involved in an automobile accident. In keeping with the fact that the accident was minor, and that MC was not seriously injured in the accident – MC did not visit any hospital following the accident. To the extent that MC experienced any injuries at all in her minor accident, the injuries were minor soft tissue injuries that had resolved within five months of the accident. Even so, following a purported initial examination on behalf of Garden State Pain on July 6, 2016 – more than three months after MC's minor accident – Koppel falsely purported to diagnose MC with serious neck and back pain as the result of the minor accident. Then, Koppel referred MC back to Saraceno and Newark Pain for medically unnecessary physical therapy treatment, as compensation for their initial referral to Garden State Pain.

(xvii)   On May 28, 2016, an Insured named CT was involved in a minor automobile accident. To the extent that CT experienced any injuries at all in the minor accident,

the injuries were minor soft tissue injuries that had resolved within five months of the accident.  Even so, following a purported follow-up examination on behalf of Garden State Pain on November 15, 2016 – over five months after CT's minor accident – Koppel falsely purported to diagnose CT with continuing, serious back pain as the result of the minor accident.   Then, Koppel referred CT back to Kreshover and Capital Chiropractic for continued, medically unnecessary chiropractic treatment, as compensation for their initial referral to Garden State Pain.

(xviii) On June 22, 2016 , an Insured named JE was involved in a minor automobile accident. To the extent that JE experienced any injuries at all in his minor accident, the injuries were minor soft tissue injuries that had resolved within six months of the accident. Even so, following a purported initial examination on behalf of Garden State Pain on December 15, 2016 – six months after JE's minor accident – Koppel falsely purported to diagnose JE with serious neck and back pain as the result of the minor accident. Then, Koppel referred JE back to Kreshover and Capital Chiropractic for continued, medically unnecessary chiropractic treatment, as compensation for their initial referral to Garden State Pain.

(xix) On August 20, 2016, an Insured named RH was involved in a rear-end automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that no one was injured in the accident, that everyone involved in the accident refused medical attention, that the airbags in RH's vehicle did not deploy, and that all of the vehicles were drivable following the accident and were driven away from the scene of the accident. What is more – and again, in keeping with the fact that the accident was minor, and that RH was not seriously injured in the accident – RH did not visit any hospital following the accident. To the extent that RH experienced any injuries at all in her minor accident, the injuries were minor soft tissue injuries that had resolved within seven months of the accident. Even so, following a purported initial examination on behalf of Garden State Pain on February 28, 2017 – more than seven months after RH's minor accident – Koppel falsely purported to diagnose RH with serious neck and back pain as the result of the minor accident. Then, Koppel referred RH back to Inacio and Spinecare Chiropractic for continued, medically unnecessary chiropractic treatment, as compensation for their initial referral to Garden State Pain.

(xx) On May 15, 2017 , an Insured named II was involved in a minor, rear-end automobile accident. To the extent that II experienced any injuries at all in their minor accident, the injuries were minor soft tissue injuries that had resolved within five months of the accident. Even so, following a purported initial examination on behalf of Garden State Pain on October 26, 2017 – over five months after II's minor accident – Koppel falsely purported to diagnose II with serious neck and back pain as the result of the minor accident. Then, Koppel referred II back to Kreshover and Capital Chiropractic for continued, medically unnecessary chiropractic treatment, as compensation for their initial referral to Garden State Pain.

199.    These are only representative examples. In the claims for initial examinations identified in Exhibit "1", Koppel and Garden State Pain routinely falsely purported to diagnose continuing back, neck, and/or extremity pain in the Insureds long after the minor underlying automobile accidents occurred, so as to create a false basis for their own Fraudulent Services and the Fraudulent Services that the Referral Defendants and their other referral sources purported to provide.

200.    As set forth above, there are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

201.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

202.    As set forth above, in the claims identified in Exhibit "1", virtually all of the Insureds whom Koppel and Garden State pain purported to treat were involved in relatively minor, "fender-bender" or other low-impact types of accidents, to the extent that they were involved in any actual accidents at all.

203.    It is extremely improbable that any two Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "1" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

204.    It is even more improbable – to the point of impossibility – that this would occur over and over again, oftentimes with two different Insureds involved in the same minor accident receiving substantially identical "diagnoses", on the exact same date, many months after their accident.

205.    Even so, in keeping with the fact that the Koppel and Garden State Pain's

"diagnoses" were phony, and in keeping with the fact that their putative initial examinations

involved no actual medical decision-making at all, Koppel and Garden State Pain frequently issued

substantially identical "diagnoses", on the same date, to more than one Insured involved in a single

accident, and recommended a substantially identical course of medically unnecessary "treatment"

to the Insureds.

206.    For example:

(i)     On August 4, 2013, two Insureds – AE and JE – were involved in the same minor
automobile accident. Thereafter, AE and JE presented to Garden State Pain for
initial examinations on April 2, 2014. AE and JE were different ages, in different
physical conditions, located in different positions in the vehicle, and experienced
the minor impact from different positions in the vehicle. What is more, any injuries
AE and JE actually did experience in their minor accident would have resolved over
the course of the eight months that had elapsed following the accident. Even so, at
the conclusion of the purported initial examinations, Koppel and Garden State Pain
provided AE and JE with substantially identical back and neck injury "diagnoses",
and recommended a substantially identical course of medically unnecessary
interventional pain management treatment to both of them.

(ii)    On January 15, 2014, two Insureds – CE and LN – were involved in the same minor
automobile accident. Thereafter, CE and LN presented to Garden State Pain for
initial examinations on June 5, 2015. CE and LN were different ages, in different
physical conditions, located in different positions in the vehicle, and experienced
the minor impact from different positions in the vehicle. What is more, any injuries
CE and LN actually did experience in their minor accident would have resolved
over the course of the five months that had elapsed following the accident. Even
so, at the conclusion of the purported initial examinations, Koppel and Garden State
Pain provided CE and LN with substantially identical back and neck injury
"diagnoses", and recommended a substantially identical course of medically
unnecessary interventional pain management treatment to both of them.

(iii)   On April 1, 2014, two Insureds – RG and MP – were involved in the same minor
automobile accident. Thereafter, RG and MP presented to Garden State Pain for
initial examinations on October 21, 2014. RG and MP were different ages, in
different physical conditions, located in different positions in the vehicle, and
experienced the minor impact from different positions in the vehicle. What is more,
any injuries RG and MP actually did experience in their minor accident would have
resolved over the course of the seven months that had elapsed following the
accident. Even so, at the conclusion of the purported initial examinations, Koppel

and Garden State Pain provided RG and MP with substantially identical back and neck injury "diagnoses", and recommended a substantially identical course of medically unnecessary interventional pain management treatment to both of them.

(iv)     On October 28, 2014, two Insureds – CRO and MU – were involved in the same minor automobile accident. Thereafter, CRO and MU presented to Garden State Pain for initial examinations on December 24, 2014. CRO and MU were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. What is more, any injuries CRO and MU actually did experience in their minor accident would have resolved over the course of the two months that had elapsed following the accident. Even so, at the conclusion of the purported initial examinations, Koppel and Garden State Pain provided CRO and MU with substantially identical back and neck injury "diagnoses", and recommended a substantially identical course of medically unnecessary interventional pain management treatment to both of them.

(v)     On March 8, 2015, two Insureds – SR and JV – were involved in the same minor automobile accident. Thereafter, SR and JV presented to Garden State Pain for initial examinations on June 16, 2015. SR and JV were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. What is more, any injuries SR and JV actually did experience in their minor accident would have resolved over the course of the four months that had elapsed following the accident. Even so, at the conclusion of the purported initial examinations, Koppel and Garden State Pain provided SR and JV with substantially identical back and neck injury "diagnoses", and recommended a substantially identical course of medically unnecessary interventional pain management treatment to both of them.

(vi)     On May 6, 2015, two Insureds – GB and EBC – were involved in the same minor automobile accident. Thereafter, GB and EBC presented to Garden State Pain for initial examinations on August 28, 2015. GB and EBC were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. What is more, any injuries GB and EBC actually did experience in their minor accident would have resolved over the course of the four months that had elapsed following the accident. Even so, at the conclusion of the purported initial examinations, Koppel and Garden State Pain provided GB and EBC with substantially identical back and neck injury "diagnoses", and recommended a substantially identical course of medically unnecessary interventional pain management treatment to both of them.

(vii)     On May 13, 2015, two Insureds – FH and MW – were involved in the same minor automobile accident. Thereafter, FH and MW presented to Garden State Pain for initial examinations on November 10, 2015. FH and MW were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. What is more,

any injuries FH and MW actually did experience in their minor accident would have resolved over the course of the six months that had elapsed following the accident. Even so, at the conclusion of the purported initial examinations, Koppel and Garden State Pain provided FH and MW with substantially identical back and neck injury "diagnoses", and recommended a substantially identical course of medically unnecessary interventional pain management treatment to both of them.

(viii)   On September 12, 2015, two Insureds – ED and IRA – were involved in the same minor automobile accident. Thereafter, ED and IRA presented to Garden State Pain for initial examinations on January 5, 2016. ED and IRA were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. What is more, any injuries ED and IRA actually did experience in their minor accident would have resolved over the course of the four months that had elapsed following the accident. Even so, at the conclusion of the purported initial examinations, Koppel and Garden State Pain provided ED and IRA with substantially identical back and neck injury "diagnoses", and recommended a substantially identical course of medically unnecessary interventional pain management treatment to both of them.

(ix)   On January 23, 2016, two Insureds – EG and CM – were involved in the same minor automobile accident. Thereafter, EG and CM presented to Garden State Pain for initial examinations on April 26, 2016. EG and CM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. What is more, any injuries EG and CM actually did experience in their minor accident would have resolved over the course of the three months that had elapsed following the accident. Even so, at the conclusion of the purported initial examinations, Koppel and Garden State Pain provided EG and CM with substantially identical back and neck injury "diagnoses", and recommended a substantially identical course of medically unnecessary interventional pain management treatment to both of them.

(x)   On March 16, 2016, two Insureds – MH and SM – were involved in the same minor automobile accident. Thereafter, MH and SM presented to Garden State Pain for initial examinations on July 20, 2016. MH and SM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. What is more, any injuries MH and SM actually did experience in their minor accident would have resolved over the course of the four months that had elapsed following the accident. Even so, at the conclusion of the purported initial examinations, Koppel and Garden State Pain provided MH and SM with substantially identical back and neck injury "diagnoses", and recommended a substantially identical course of medically unnecessary interventional pain management treatment to both of them.

(xi)   On March 22, 2016, two Insureds – SAR and WAR – were involved in the same minor automobile accident. Thereafter, SAR and WAR presented to Garden State Pain for initial examinations on August 9, 2016. SAR and WAR were different

ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. What is more, any injuries SAR and WAR actually did experience in their minor accident would have resolved over the course of the five months that had elapsed following the accident. Even so, at the conclusion of the purported initial examinations, Koppel and Garden State Pain provided SAR and WAR with substantially identical back and neck injury "diagnoses", and recommended a substantially identical course of medically unnecessary interventional pain management treatment to both of them.

(xii)  On July 7, 2016, two Insureds – EH and EHD – were involved in the same minor automobile accident. Thereafter, EH and EHD presented to Garden State Pain for initial examinations on February 12, 2018. EH and EHD were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. What is more, any injuries EH and EHD actually did experience in their minor accident would have resolved over the course of the 20 months that had elapsed following the accident. Even so, at the conclusion of the purported initial examinations, Koppel and Garden State Pain provided EH and EHD with substantially identical back and neck injury "diagnoses", and recommended a substantially identical course of medically unnecessary interventional pain management treatment to both of them.

(xiii)  On November 23, 2016, two Insureds – YA and JE – were involved in the same minor automobile accident. Thereafter, YA and JE presented to Garden State Pain for initial examinations on February 7, 2017. YA and JE were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. What is more, any injuries YA and JE actually did experience in their minor accident would have resolved over the course of the three months that had elapsed following the accident. Even so, at the conclusion of the purported initial examinations, Koppel and Garden State Pain provided YA and JE with substantially identical back and neck injury "diagnoses", and recommended a substantially identical course of medically unnecessary interventional pain management treatment to both of them.

(xiv)  On January 20, 2017, two Insureds – RBR and RGO – were involved in the same minor automobile accident. Thereafter, RBR and RGO presented to Garden State Pain for initial examinations on May 15, 2017. RBR and RGO were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. What is more, any injuries RBR and RGO actually did experience in their minor accident would have resolved over the course of the four months that had elapsed following the accident. Even so, at the conclusion of the purported initial examinations, Koppel and Garden State Pain provided RBR and RGO with substantially identical back and neck injury "diagnoses", and recommended a substantially identical course of medically unnecessary interventional pain management treatment to both of them.

(xv)     On March 23, 2017, two Insureds – LM and VP – were involved in the same minor automobile accident. Thereafter, LM and VP presented to Garden State Pain for initial examinations on July 17, 2017. LM and VP were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. What is more, any injuries LM and VP actually did experience in their minor accident would have resolved over the course of the four months that had elapsed following the accident. Even so, at the conclusion of the purported initial examinations, Koppel and Garden State Pain provided LM and VP with substantially identical back and neck injury "diagnoses", and recommended a substantially identical course of medically unnecessary interventional pain management treatment to both of them.

(xvi)    On April 11, 2017, three Insureds – LM, AO, and MO – were involved in the same minor automobile accident. Thereafter, LM, AO, and MO presented to Garden State Pain for initial examinations on September 14, 2017. LM, AO, and MO were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. What is more, any injuries LM, AO, and MO actually did experience in their minor accident would have resolved over the course of the five months that had elapsed following the accident. Even so, at the conclusion of the purported initial examinations, Koppel and Garden State Pain provided LM, AO, and MO with substantially identical back and neck injury "diagnoses", and recommended a substantially identical course of medically unnecessary interventional pain management treatment to both of them.

(xvii)   On July 14, 2017, two Insureds – GL and HLR– were involved in the same minor automobile accident. Thereafter, GL and HLR presented to Garden State Pain for initial examinations on February 22, 2018. GL and HLR were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. What is more, any injuries GL and HLR actually did experience in their minor accident would have resolved over the course of the seven months that had elapsed following the accident. Even so, at the conclusion of the purported initial examinations, Koppel and Garden State Pain provided GL and HLR with substantially identical back and neck injury "diagnoses", and recommended a substantially identical course of medically unnecessary interventional pain management treatment to both of them.

(xviii)  On October 7, 2017, two Insureds – KL and DM – were involved in the same minor automobile accident. Thereafter, KL and DM presented to Garden State Pain for initial examinations on March 14, 2018. KL and DM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. What is more, any injuries KL and DM actually did experience in their minor accident would have resolved over the course of the six months that had elapsed following the accident. Even so, at the conclusion of the purported initial examinations, Koppel and Garden State Pain provided KL and DM with substantially identical back and neck injury

"diagnoses", and recommended a substantially identical course of medically unnecessary interventional pain management treatment to both of them.

(xix)   On May 16, 2018, two Insureds – SC and MR – were involved in the same minor automobile accident. Thereafter, SC and MR presented to Garden State Pain for initial examinations on September 13, 2018. SC and MR were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. What is more, any injuries SC and MR actually did experience in their minor accident would have resolved over the course of the four months that had elapsed following the accident. Even so, at the conclusion of the purported initial examinations, Koppel and Garden State Pain provided SC and MR with substantially identical back and neck injury "diagnoses", and recommended a substantially identical course of medically unnecessary interventional pain management treatment to both of them.

(xx)   On May 1, 2019, two Insureds – YCB and DS – were involved in the same minor automobile accident. Thereafter, YCB and DS presented to Garden State Pain for initial examinations on May 23, 2019. YCB and DS were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. What is more, any injuries YCB and DS actually did experience in their minor accident would have resolved over the course of the month that had elapsed following the accident. Even so, at the conclusion of the purported initial examinations, Koppel and Garden State Pain provided YCB and DS with substantially identical back and neck injury "diagnoses", and recommended a substantially identical course of medically unnecessary interventional pain management treatment to both of them.

207.   These are only representative examples. In the claims for initial examinations that are identified in Exhibit "1", Koppel and Garden State Pain routinely provided substantially identical, phony back and neck injury "diagnoses" to two or more Insureds involved in a single accident, often long after the accidents occurred, despite the fact that the Insureds were differently situated.

208.   Koppel and Garden State Pain were able to engage in this conduct because – as set forth above – in exchange for unlawful compensation from Koppel and Garden State Pain, the Referral Defendants and Garden State Pain's other chiropractor referral sources often simultaneously would refer two or more Insureds who had been involved in a single accident to Garden State Pain.

209.    This, despite the fact that it is improbable – to the point of impossibility – that two or more Insureds involved in any single motor vehicle accident not only would suffer from substantially similar injuries and symptomatology, but would have their injuries and symptomatology resolve at such an identical rate that they would fail to sufficiently respond to conservative chiropractic treatment at substantially similar times, require referrals to a pain management practice such as Garden State Pain at substantially similar times, and receive substantially similar "diagnoses" from Garden State Pain at substantially similar times.

210.    The CPT Assistant provides various clinical examples of the types of circumstances in which a healthcare services provider would be required to engage in the "moderately complex" medical decision-making necessary to support billing for a patient examination under CPT code 99204. Specifically:

(i)     Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)    Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)   Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv)    Initial office visit for 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v)     Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi)    Initial office evaluation of 70-year-old female with polyarthralgia. (Rheumatology)

(i)     Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

211.    Similarly, the CPT Assistant provides various clinical examples of the types of circumstances in which a healthcare services provider would be required to engage in the

"moderately complex" medical decision-making necessary to support billing for a patient examination under CPT code 99244. Specifically:

(i)     Office consultation with 38-year-old female, with inflammatory bowel disease, who now presents with right lower quadrant pain and suspected intra-abdominal abscess. (Colon and Rectal Surgery)

(ii)    Initial office consultation for discussion of treatment options for a 40-year-old female with a two-centimeter adenocarcinoma of the breast. (Radiation Oncology)

(iii)   Initial office consultation with 72-year-old male with esophageal carcinoma, symptoms of dysphagia and reflux. (Thoracic Surgery)

212.    Accordingly, pursuant to the CPT Assistant, the presenting problems that could require moderately complex medical decision-making, and therefore support the use of CPT codes 99204 or 99244 to bill for an initial patient examination, typically are problems that pose a threat to the patient's life or a serious threat to their health.

213.    By contrast, to the extent that the Insureds in the claims identified in Exhibit "1", had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were low or minimal severity soft tissue injuries such as sprains and strains.

214.    The diagnosis and treatment of these Insureds' minor soft tissue injuries – to the extent that they actually had any injuries at all at the time of the putative initial examinations – did not require any moderately complex medical decision-making.

215.    In the claims for initial examinations identified in Exhibit "1", Koppel and Garden State Pain routinely falsely represented that the initial examinations involved "moderately complex" medical decision-making in order to provide a false basis to bill for the initial examinations under CPT codes 99204 and 99244, because CPT codes 99204 and 99244 are reimbursable at a higher rate than examinations that do not require any complex medical decision-making at all.

### f.   Misrepresentations Regarding the Reimbursable Amount for the Initial Examinations in New Jersey

216.   As set forth above, the No-Fault Laws specifically prohibit healthcare services providers from charging for services in amounts exceeding the amounts set forth in the Fee Schedule. See N.J.S.A. § 39:6A-4.6; N.J.A.C. 11:3-29.6.

217.   Not only did Koppel and Garden State Pain routinely falsely represent that their putative initial examinations were provided in compliance with New Jersey law, and involved presenting problems of moderate to high severity, either 45 or 60 minutes of face-to-face time with the Insureds or their families, comprehensive patient histories, comprehensive physical examinations, and actual, moderately complex medical decision-making, but they also routinely misrepresented the reimbursable amount for the initial examinations.

218.   Specifically, and as set forth in Exhibit "1", Koppel and Garden State Pain frequently billed for their putative initial examinations under CPT codes 99204 or 99244.

219.   Assuming that all other conditions of coverage are satisfied, the Fee Schedule permitted lawfully licensed healthcare providers in the northern New Jersey area to submit a maximum charge of $193.64 for each initial examination performed under CPT code 99204, and a maximum charge of $200.30 for each initial examination performed under CPT code 99244.

220.   Even so, and as set forth above, in the claims for initial examinations identified in Exhibit "1", Koppel and Garden State Pain routinely falsely represented that they were entitled to be paid between $525.00 and $575.00 for the initial examinations that they billed to GEICO under CPT codes 99204 and 99244 in New Jersey.

221.   For instance:

(i)   On or about November 20, 2013, Koppel and Garden State Pain billed GEICO $575.00 under CPT code 99244 for an initial examination that Koppel purported to perform on an Insured named EN on October 16, 2013;

(ii)     On or about May 10, 2014, Koppel and Garden State Pain billed GEICO $575.00 under CPT code 99244 for an initial examination that Koppel purported to perform on an Insured named NL on April 3, 2014;

(iii)    On or about June 8, 2015, Koppel and Garden State Pain billed GEICO $525.00 under CPT code 99204 for an initial examination that Koppel purported to perform on an Insured named SP on April 30, 2015;

(iv)     On or about September 4, 2015, Koppel and Garden State Pain billed GEICO $575.00 under CPT code 99244 for an initial examination that Koppel purported to perform on an Insured named EM on July 29, 2015;

(v)      On or about January 4, 2016, Koppel and Garden State Pain billed GEICO $575.00 under CPT code 99244 for an initial examination that Koppel purported to perform on an Insured named JS on December 3, 2015;

(vi)     On or about April 18, 2016, Koppel and Garden State Pain billed GEICO $575.00 under CPT code 99244 for an initial examination that Koppel purported to perform on an Insured named PP on March 14, 2016;

(vii)    On or about August 8, 2016 , Koppel and Garden State Pain billed GEICO $575.00 under CPT code 99244 for an initial examination that Koppel purported to perform on an Insured named VS on July 13, 2016;

(viii)   On or about December 12, 2016, Koppel and Garden State Pain billed GEICO $575.00 under CPT code 99244 for an initial examination that Koppel purported to perform on an Insured named TW on November 7, 2016;

(ix)     On or about February 6, 2017, Koppel and Garden State Pain billed GEICO $575.00 under CPT code 99244 for an initial examination that Koppel purported to perform on an Insured named JV on January 20, 2017;

(x)      On or about May 18, 2017, Koppel and Garden State Pain billed GEICO $525.00 under CPT code 99204 for an initial examination that Koppel purported to perform on an Insured named EM on April 25, 2017;

(xi)     On or about July 24, 2017, Koppel and Garden State Pain billed GEICO $575.00 under CPT code 99244 for an initial examination that Koppel purported to perform on an Insured named KH on June 27, 2017;

(xii)    On or about September 5, 2017, Koppel and Garden State Pain billed GEICO $525.00 under CPT code 99204 for an initial examination that Koppel purported to perform on an Insured named VM on August 8, 2017;

(xiii)  On or about November 24, 2017, Koppel and Garden State Pain billed GEICO $575.00 under CPT code 99244 for an initial examination that Koppel purported to perform on an Insured named VAO on October 24, 2017;

(xiv)  On or about February 26, 2018, Koppel and Garden State Pain billed GEICO $575.00 under CPT code 99244 for an initial examination that Koppel purported to perform on an Insured named NGS on January 23, 2018;

(xv)  On or about April 12, 2018, Koppel and Garden State Pain billed GEICO $575.00 under CPT code 99244 for an initial examination that Koppel purported to perform on an Insured named AS on March 6, 2018;

(xvi)  On or about September 4, 2018, Koppel and Garden State Pain billed GEICO $575.00 under CPT code 99244 for an initial examination that Koppel purported to perform on an Insured named MG on August 7, 2018;

(xvii)  On or about October 8, 2018, Koppel and Garden State Pain billed GEICO $525.00 under CPT code 99204 for an initial examination that Koppel purported to perform on an Insured named MR on September 13, 2018;

(xviii)  On or about January 21, 2019, Koppel and Garden State Pain billed GEICO $525.00 under CPT code 99204 for an initial examination that Koppel purported to perform on an Insured named JP on December 14, 2018;

(xix)  On or about September 9, 2019, Koppel and Garden State Pain billed GEICO $575.00 under CPT code 99244 for an initial examination that Koppel purported to perform on an Insured named LF on July 9, 2019;

(xx)  On or about December 30, 2019, Koppel and Garden State Pain billed GEICO $575.00 under CPT code 99244 for an initial examination that Koppel purported to perform on an Insured named CM on November 13, 2019.

222.  These are only representative examples. As set forth in Exhibit "1", nearly all of the charges that Koppel and Garden State Pain submitted through Garden State Pain in New Jersey for their putative initial examinations under CPT codes 99244 and 99204 falsely represented that they were entitled to recover amounts that grossly exceeded the reimbursable amounts set forth in the Fee Schedule.

223.  Each and every one of the inflated charges for putative initial consultations identified in Exhibit "1" constituted a separate violation of N.J.S.A. § 39:6A-4.6(c).

224.    In the claims identified in Exhibit "1", Koppel and Garden State Pain routinely falsely represented that they were entitled to recover between $525.00 and $575.00 under CPT codes 99204 and 99244 for their purported initial examinations in order to maximize the fraudulent billing that they could submit to GEICO.

## 2.    Koppel and Garden State Pain's Fraudulent Charges for Follow-Up Examinations

225.    In addition to their fraudulent initial examinations, Koppel and Garden State Pain typically purported to subject the Insureds in the claims identified in Exhibit "1" to at least one, but often multiple, fraudulent follow-up examination(s) during the course of their fraudulent treatment and billing protocol.

226.    As set forth in Exhibit "1", Koppel and Garden State Pain typically billed the putative follow-up examinations through Garden State Pain to GEICO under CPT code 99213, resulting in charges of between $64.07 to $165.00 for each such follow-up examination they purported to provide.

227.    All of Koppel and Garden State Pain's billing for their purported follow-up examinations was fraudulent because it misrepresented Garden State Pain's eligibility to collect PIP Benefits in the first instance.

228.    In fact, Garden State Pain never was eligible to collect PIP Benefits in the claims for follow examinations that are identified in Exhibit "1", because of the fraudulent and unlawful scheme described herein.

229.    Like their charges for their purported initial examinations, Koppel and Garden State Pain's charges for the follow-up examinations identified in Exhibit "1" also were fraudulent in that they misrepresented the nature, extent, and reimbursable amount of the follow-up examinations.

### a.     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems

230.     Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically requires that the patient present with problems of low to moderate severity.

231.     The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as problems of low to moderate severity, and thereby justify the use of CPT code 99213 to bill for a follow-up patient examination.

232.     For instance, the CPT Assistant provides the following clinical examples of presenting problems that might qualify as problems of low to moderate severity, and therefore support the use of CPT code 99213 to bill for a follow-up patient examination:

(i)      Follow-up visit with 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii)     Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii)    Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv)     Routine, follow-up office evaluation at a three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)      Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)     Quarterly follow-up office visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)    Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

233.     Accordingly, pursuant to the CPT Assistant, even the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some real threat to the patient's health.

234.     By contrast, and as set forth above, to the extent that the Insureds in the claims identified in Exhibit "1" suffered any injuries at all in their automobile accidents, the injuries were minor soft tissue injuries such as sprains and strains.

235.     In keeping with the fact that the Insureds in the claims identified in Exhibit "1" almost never suffered any injuries more serious than ordinary soft tissue injuries such as sprains and strains, to the extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain, strain, or similar soft tissue injury diagnosis.

236.     Furthermore, in many cases, contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

237.     As set forth above, strains and sprains virtually always resolve after a short course of conservative treatment, or no treatment at all, which is why the Care Paths generally require healthcare services providers to demonstrate why continued treatment is necessary beyond the four-week, eight-week, and 13-week marks.

238.     By the time the Insureds in the claims identified in Exhibit "1" presented to Koppel and Garden State Pain for the putative follow-up examinations, pursuant to the unlawful referrals they received from the Referral Defendants and their other chiropractor referral sources, the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or their presenting problems were minimal.

239.     Even so, in the claims for follow-up examinations identified in Exhibit "1", Koppel and Garden State Pain routinely billed for their putative follow-up examinations under CPT code

99213, and thereby falsely represented that the Insureds continued to suffer from presenting problems of low to moderate severity.

240. For example:

(i)     On August 28, 2013, an Insured named MB was involved in a minor automobile accident. To the extent that MB experienced any health problems at all as the result of their minor accident, they were of low or minimal severity at the outset, and had completely resolved within 10 months of the minor accident. Even so, following a purported follow-up examination of MB by Koppel at Garden State Pain on July 10, 2014 – 10 months after the minor accident – Koppel and Garden State Pain billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that MB presented with problems of low to moderate severity.

(ii)    On October 9, 2013, an Insured named HS was involved in a minor automobile accident. To the extent that HS experienced any health problems at all as the result of his minor accident, they were of low or minimal severity at the outset, and had completely resolved within seven months of the minor accident. Even so, following a purported follow-up examination of HS by Koppel at Garden State Pain on May 15, 2014 – over seven months after the minor accident – Koppel and Garden State Pain billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that HS presented with problems of low to moderate severity.

(iii)   On February 6, 2014, an Insured named JGR was involved in a minor automobile accident. To the extent that JGR experienced any health problems at all as the result of her minor accident, they were of low or minimal severity at the outset, and had completely resolved within seven months of the minor accident. Even so, following a purported follow-up examination of JGR by Koppel at Garden State Pain on September 18, 2014 – over seven months after the minor accident – Koppel and Garden State Pain billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that JGR presented with problems of low to moderate severity.

(iv)    On December 4, 2014, an Insured named IC was involved in a minor automobile accident. To the extent that IC experienced any health problems at all as the result of her minor accident, they were of low or minimal severity at the outset, and had completely resolved within eight months of the minor accident. Even so, following a purported follow-up examination of IC by Koppel at Garden State Pain on July 23, 2015 – eight months after the minor accident – Koppel and Garden State Pain billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that IC presented with problems of low to moderate severity.

(v)     On March 6, 2015, an Insured named TR was involved in a minor automobile accident. To the extent that TR experienced any health problems at all as the result

of his minor accident, they were of low or minimal severity at the outset, and had completely resolved within nine months of the minor accident. Even so, following a purported follow-up examination of TR by Koppel at Garden State Pain on December 16, 2015 – over nine months after the minor accident – Koppel and Garden State Pain billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that TR presented with problems of low to moderate severity.

(vi)     On September 1, 2015, an Insured named VDS was involved in a minor automobile accident.  To the extent that VDS experienced any health problems at all as the result of his minor accident, they were of low or minimal severity at the outset, and had completely resolved within seven months of the minor accident. Even so, following a purported follow-up examination of VDS by Koppel at Garden State Pain on April 5, 2016 – over seven months after the minor accident – Koppel and Garden State Pain billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that VDS presented with problems of low to moderate severity.

(vii)    On January 9, 2016, an Insured named MG was involved in a minor automobile accident.  To the extent that MG experienced any health problems at all as the result of his minor accident, they were of low or minimal severity at the outset, and had completely resolved within five months of the minor accident. Even so, following a purported follow-up examination of MG by Koppel at Garden State Pain on May 23, 2016 – five months after the minor accident – Koppel and Garden State Pain billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that MG presented with problems of low to moderate severity.

(viii)   On October 7, 2016, an Insured named LB was involved in a minor automobile accident.  To the extent that LB experienced any health problems at all as the result of her minor accident, they were of low or minimal severity at the outset, and had completely resolved within eight months of the minor accident. Even so, following a purported follow-up examination of LB by Koppel at Garden State Pain on June 13, 2017 – over eight months after the minor accident – Koppel and Garden State Pain billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that LB presented with problems of low to moderate severity.

(ix)     On December 31, 2016, an Insured named GO was involved in a minor automobile accident.  To the extent that GO experienced any health problems at all as the result of her minor accident, they were of low or minimal severity at the outset, and had completely resolved within eight months of the minor accident. Even so, following a purported follow-up examination of GO by Koppel at Garden State Pain on August 23, 2017 – eight months after the minor accident – Koppel and Garden State Pain billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that GO presented with problems of low to moderate severity.

(x)     On February 1, 2017, an Insured named TE was involved in a minor automobile accident.  To the extent that TE experienced any health problems at all as the result of her minor accident, they were of low or minimal severity at the outset, and had completely resolved within nine months of the minor accident. Even so, following a purported follow-up examination of TE by Koppel at Garden State Pain on November 9, 2017 – over nine months after the minor accident – Koppel and Garden State Pain billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that TE presented with problems of low to moderate severity.

(xi)    On April 16, 2017, an Insured named FR was involved in a minor automobile accident.  To the extent that FR experienced any health problems at all as the result of his minor accident, they were of low or minimal severity at the outset, and had completely resolved within six months of the minor accident. Even so, following a purported follow-up examination of FR by Koppel at Garden State Pain on October 11, 2017 – over six months after the minor accident – Koppel and Garden State Pain billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that FR presented with problems of low to moderate severity.

(xii)   On September 18, 2017, an Insured named ST was involved in a minor automobile accident.  To the extent that ST experienced any health problems at all as the result of her minor accident, they were of low or minimal severity at the outset, and had completely resolved within eight months of the minor accident. Even so, following a purported follow-up examination of ST by Koppel at Garden State Pain on May 1, 2018 – eight months after the minor accident – Koppel and Garden State Pain billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that ST presented with problems of low to moderate severity.

(xiii)  On May 2, 2018, an Insured named MG was involved in a minor automobile accident.  To the extent that MG experienced any health problems at all as the result of his minor accident, they were of low or minimal severity at the outset, and had completely resolved within four months of the minor accident. Even so, following a purported follow-up examination of MG by Koppel at Garden State Pain on September 18, 2018 – over four months after the minor accident – Koppel and Garden State Pain billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that MG presented with problems of low to moderate severity.

(xiv)   On August 3, 2018, an Insured named RL was involved in a minor automobile accident.  To the extent that RL experienced any health problems at all as the result of his minor accident, they were of low or minimal severity at the outset, and had completely resolved within nine months of the minor accident. Even so, following a purported follow-up examination of RL by Koppel at Garden State Pain on May 28, 2019 – nine months after the minor accident – Koppel and Garden State Pain

billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that RL presented with problems of low to moderate severity.

(xv)   On November 16, 2018, an Insured named KR was involved in a minor automobile accident.  To the extent that KR experienced any health problems at all as the result of her minor accident, they were of low or minimal severity at the outset, and had completely resolved within four months of the minor accident. Even so, following a purported follow-up examination of KR by Koppel at Garden State Pain on March 19, 2019 – four months after the minor accident – Koppel and Garden State Pain billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that KR presented with problems of low to moderate severity.

(xvi)  On December 11, 2018, an Insured named GS was involved in a minor automobile accident.  To the extent that GS experienced any health problems at all as the result of her minor accident, they were of low or minimal severity at the outset, and had completely resolved within three months of the minor accident. Even so, following a purported follow-up examination of GS by Koppel at Garden State Pain on March 21, 2019 – over three months after the minor accident – Koppel and Garden State Pain billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that GS presented with problems of low to moderate severity.

(xvii)  On April 5, 2019, an Insured named AL was involved in a minor automobile accident.  To the extent that AL experienced any health problems at all as the result of his minor accident, they were of low or minimal severity at the outset, and had completely resolved within six months of the minor accident. Even so, following a purported follow-up examination of AL by Koppel at Garden State Pain on October 1, 2019 – six months after the minor accident – Koppel and Garden State Pain billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that AL presented with problems of low to moderate severity.

(xviii) On May 12, 2019, an Insured named KL was involved in a minor automobile accident.  To the extent that KL experienced any health problems at all as the result of his minor accident, they were of low or minimal severity at the outset, and had completely resolved within six months of the minor accident. Even so, following a purported follow-up examination of KL by Koppel at Garden State Pain on November 7, 2019 – six months after the minor accident – Koppel and Garden State Pain billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that KL presented with problems of low to moderate severity.

(xix)  On June 19, 2019, an Insured named ES was involved in a minor automobile accident.  To the extent that ES experienced any health problems at all as the result of her minor accident, they were of low or minimal severity at the outset, and had completely resolved within five months of the minor accident. Even so, following a purported follow-up examination of ES by Koppel at Garden State Pain on

November 5, 2019 – five months after the minor accident – Koppel and Garden State Pain billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that ES presented with problems of low to moderate severity.

(xx) On August 20, 2019, an Insured named ALF was involved in a minor automobile accident.  To the extent that ALF experienced any health problems at all as the result of her minor accident, they were of low or minimal severity at the outset, and had completely resolved within three months of the minor accident. Even so, following a purported follow-up examination of ALF by Koppel at Garden State Pain on December 3, 2019 – over three months after the minor accident – Koppel and Garden State Pain billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that ALF presented with problems of low to moderate severity.

241. These are only representative examples. In the majority of the claims for follow-up examinations identified in Exhibit "1", Garden State Pain and Koppel falsely represented that the Insureds presented with problems of low to moderate severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents at the time of the follow-up examinations, or else their presenting problems were minimal.

242. In the claims for follow-up examinations identified in Exhibit "1", Koppel and Garden State Pain routinely falsely represented that the Insureds presented with problems of at least low to moderate severity, in order to create a false basis for their charges for the examinations under CPT code 99213, because follow-up examinations billable under CPT code 99213 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

243. In the claims for follow-up examinations identified in Exhibit "1", Koppel and Garden State Pain also routinely falsely represented that the Insureds presented with problems of low to moderate severity in order to create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds, including additional follow-up examinations, pain management injections, chiropractic services, and surgical services.

### b.  Misrepresentations Regarding the Amount of Time Spent on the Follow-Up Examinations

244.    What is more, in every claim for follow-up examinations identified in Exhibit "1" that were billed under CPT codes 99213, Koppel and Garden State Pain misrepresented the amount of time that was spent on the follow-up examinations.

245.    Pursuant to the Fee Schedule, the use of CPT code 99213 to bill for a follow-up examination represents that the physician who performed the examination spent at least 15 minutes of face-to-face time with the patient or the patient's family.

246.    As set forth in Exhibit "1", Koppel and Garden State Pain submitted the majority of their billing for initial examinations under CPT code 99213, and thereby represented that Koppel spent 15 minutes of face-to-face time with the Insureds or the Insureds' families during the examinations.

247.    In fact, in the claims for follow-up examinations identified in Exhibit "1", Koppel never spent 15 minutes of face-to-face time with the Insureds or their families when conducting the examinations.

248.    Rather, in the claims for follow-up examinations identified in Exhibit "1", the follow-up examinations did not entail more than 5-10 minutes of face-to-face time between the examining physicians and the Insureds or their families, to the extent that the examinations actually were performed in the first instance.

249.    For instance, and in keeping with the fact that the follow-up examinations allegedly provided through Garden State Pain did not entail more than 5-10 minutes of face-to-face time with the Insureds or their families, Koppel and Garden State Pain used template forms in purporting to conduct the follow-up examinations.

250.    The template forms that Koppel and Garden State Pain used in purporting to conduct the follow-up examinations set forth a very limited range of examination parameters.

251.    The only face-to-face time between the examining physicians and the Insureds that was reflected in the limited range of examination parameters consisted of brief patient interviews and very brief examinations of the Insureds' musculoskeletal systems.

252.    These brief interviews and examinations did not require Koppel to spend more than 5-10 minutes of face-to-face time with the Insureds or their families.

253.    In the claims for follow-up examinations identified in Exhibit "1", Koppel and Garden State Pain falsely represented that the examinations involved at least 15 minutes of face-to-face time with the Insureds or their families in order to create a false basis for their charges under CPT code  99213, because examinations billable under CPT code 99213 are reimbursable at a higher rate than examinations that require less time to perform.

**c.    Misrepresentations Regarding the Results of the Follow-Up Examinations**

254.    Furthermore, pursuant to the Fee Schedule, when Koppel and Garden State Pain billed for their putative follow-up examinations under CPT code 99213, they represented that Koppel performed at least two of the following three components::  (i) took an "expanded problem focused" patient history; (ii) conducted an "expanded problem focused physical examination"; and (iii) engaged in medical decision-making of "low complexity".

255.    In actuality, however, in the claims for follow-up examinations identified in Exhibit "1", the Defendants did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

256.    Rather, following each of their purported follow-up examinations, Koppel and Garden State Pain simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial

examinations; (ii) in many cases, referred the Insureds back to the Referral Defendants or their other chiropractor referral sources for continued, medically unnecessary chiropractic services, pursuant to the Defendants' illegal kickback scheme; and (iii) in many cases, recommended that the Insureds receive medically unnecessary interventional pain management procedures and anesthesia services.

257.    As set forth above,  the vast majority of soft tissue injuries such as sprains and strains resolve after a short course of conservative treatment, or no treatment at all, which is why the Care Paths generally require healthcare services providers to demonstrate at regular intervals why continued treatment is necessary beyond the four-week mark.

258.    Even so, following the putative follow-up examinations identified in Exhibit "1", Koppel and Garden State Pain routinely falsely purported to diagnose continuing back pain, neck pain, or other pain symptoms in the Insureds long after the minor underlying automobile accidents occurred, and long after any back pain, neck pain, and headache attendant to the minor automobile accidents would have resolved.

259.    In the claims for follow-up examinations identified in Exhibit "1", Koppel and Garden State Pain routinely falsely represented that the Insureds continued to suffer pain as the result of minor soft tissue injuries long after the underlying accidents occurred, because these phony diagnoses provided a false basis for Koppel and Garden State Pain to provide medically unnecessary interventional pain management procedures and surgical procedures to the Insureds.

260.    Moreover, in many cases, at the conclusion of their putative follow-up examinations, Koppel and Garden State Pain referred Insureds back to the Referral Defendants and their other chiropractor referral sources for continued, medically unnecessary chiropractic treatment despite the fact that the Insureds had been receiving chiropractic treatment for many

months, and it had not resolved their purported symptoms. The only reason Koppel and Garden

State Pain did this was to unlawfully compensate the Referral Defendants and their other

chiropractor referral sources for their initial referrals to Garden State Pain.

261.    For example:

(i)     On October 15, 2012, an Insured named EA was involved in an automobile
accident. In keeping with the fact that the accident was minor, the contemporaneous
police report indicated that the airbag in EA's car did not deploy following the
accident.   To the extent that EA experienced any injuries at all in her minor
accident, the injuries were minor soft tissue injuries that had resolved within nine
months of the accident. Even so, following a purported follow-up examination on
behalf of Garden State Pain on July 25, 2013 – nine months after EA's minor
accident – Koppel falsely purported to diagnose EA with continuing, serious back
pain as the result of the minor accident. Then – and despite the fact that EA had
already received many months of chiropractic services that supposedly had not
resolved her purported symptoms – Koppel once again referred EA back to Beagin,
Saraceno, and Clifton Pain for continued, medically unnecessary chiropractic
treatment, as compensation for their initial referral to Garden State Pain.

(ii)    On January 19, 2014, an Insured named JR was involved in a minor automobile
accident. To the extent that JR experienced any injuries at all in the minor accident,
the injuries were minor soft tissue injuries that had resolved within five months of
the accident.  Even so, following a purported follow-up examination on behalf of
Garden State Pain on June 11, 2014 – five months after JR's minor accident –
Koppel falsely purported to diagnose JR with continuing, serious back pain as the
result of the minor accident.  Then – and despite the fact that JR had already
received many months of chiropractic services that supposedly had not resolved his
purported symptoms – Koppel once again referred JR back to Saraceno and Newark
Pain for continued, medically unnecessary chiropractic treatment, as compensation
for their initial referral to Garden State Pain.

(iii)   On December 6, 2014, an Insured named JDS was involved in an automobile
accident. In keeping with the fact that the accident was minor, the contemporaneous
police report indicated that all of the vehicles were drivable following the accident
and were driven away from the scene of the accident. What is more – and again, in
keeping with the fact that the accident was minor, and that JDS was not seriously
injured in the accident – JDS did not visit any hospital following the accident. To
the extent that JDS experienced any injuries at all in her minor accident, the injuries
were minor soft tissue injuries that had resolved within five months of the accident.
Even so, following a purported follow-up examination on behalf of Garden State
Pain on April 21, 2015 –five months after JDS's minor accident – Koppel falsely
purported to diagnose JDS with continuing, serious back pain as the result of the
minor accident. Then – and despite the fact that JDS had already received many

months of chiropractic services that supposedly had not resolved her purported symptoms – Koppel once again referred JDS back to Inacio and Spinecare Chiropractic for continued, medically unnecessary chiropractic treatment, as compensation for their initial referral to Garden State Pain.

(iv)     On February 25, 2015, an Insured named AW was involved in an automobile accident in a driveway. In keeping with the fact that the accident was minor, the contemporaneous police report indicated all of the vehicles were drivable following the accident. What is more – and again, in keeping with the fact that the accident was minor, and that AW was not seriously injured in the accident – AW was observed walking, talking, and standing at the scene of the accident and did not appear to be in distress. To the extent that AW experienced any injuries at all in his minor accident, the injuries were minor soft tissue injuries that had resolved within six months of the accident. Even so, following a purported follow-up examination on behalf of Garden State Pain on August 25, 2015 –six months after AW's minor accident – Koppel falsely purported to diagnose AW with continuing, serious back pain as the result of the minor accident. Then – and despite the fact that AW had already received many months of chiropractic services that supposedly had not resolved his purported symptoms – Koppel once again referred AW back to Beagin, Saraceno, and Clifton Pain for continued, medically unnecessary chiropractic treatment, as compensation for their initial referral to Garden State Pain.

(v)     On March 3, 2015, an Insured named BG was involved in a minor automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that everyone involved in the accident refused medical attention. What is more, BG did not visit any hospital immediately following the accident. To the extent that BG experienced any injuries at all in the minor accident, the injuries were minor soft tissue injuries that had resolved within 19 months of the accident.  Even so, following a purported follow-up examination on behalf of Garden State Pain on September 28, 2016 – 19 months after BG's minor accident – Koppel falsely purported to diagnose BG with continuing, serious back pain as the result of the minor accident.  Then – and despite the fact that BG had already received many months of chiropractic services that supposedly had not resolved his purported symptoms – Koppel once again referred BG back to Saraceno and Newark Pain for continued, medically unnecessary chiropractic treatment, as compensation for their initial referral to Garden State Pain.

(vi)     On June 18, 2015, an Insured named LD was involved in an automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that no one was injured in the accident, that everyone involved in the accident refused medical attention, and that all of the vehicles were drivable following the accident and were driven away from the scene of the accident. What is more – and again, in keeping with the fact that the accident was minor, and that LD was not seriously injured in the accident – LD did not visit any hospital the day of  the accident. To the extent that LD experienced any injuries at all in his minor accident, the injuries were minor soft tissue injuries that had resolved within 10

months of the accident. Even so, following a purported follow-up examination on behalf of Garden State Pain on April 5, 2016 – 10 months after LD's minor accident – Koppel falsely purported to diagnose LD with continuing, serious back pain as the result of the minor accident. Then – and despite the fact that LD had already received many months of chiropractic services that supposedly had not resolved his purported symptoms – Koppel once again referred LD back to Inacio and Spinecare Chiropractic for continued, medically unnecessary chiropractic treatment, as compensation for their initial referral to Garden State Pain.

(vii)   On January 10, 2016, an Insured named JD was involved in a minor automobile accident. To the extent that JD experienced any injuries at all in the minor accident, the injuries were minor soft tissue injuries that had resolved within seven months of the accident. Even so, following a purported follow-up examination on behalf of Garden State Pain on August 3, 2016 – seven months after JD's minor accident – Koppel falsely purported to diagnose JD with continuing, serious back pain as the result of the minor accident. Then – and despite the fact that JD had already received many months of chiropractic services that supposedly had not resolved his purported symptoms – Koppel once again referred JD back to Saraceno and Newark Pain for continued, medically unnecessary chiropractic treatment, as compensation for their initial referral to Garden State Pain.

(viii)  On January 21, 2016, an Insured named MR was involved in an automobile accident. In keeping with the fact that the accident was minor, and that MR was not seriously injured in the accident – MR did not visit any hospital following the accident. To the extent that MR experienced any injuries at all in his minor accident, the injuries were minor soft tissue injuries that had resolved within three months of the accident. Even so, following a purported follow-up examination on behalf of Garden State Pain on April 28, 2016 – three months after MR's minor accident – Koppel falsely purported to diagnose MR with continuing, serious back pain as the result of the minor accident. Then – and despite the fact that MR had already received many months of chiropractic services that supposedly had not resolved his purported symptoms – Koppel once again referred MR back to Beagin, Saraceno, and Clifton Pain for continued, medically unnecessary chiropractic treatment, as compensation for their initial referral to Garden State Pain.

(ix)    On February 14, 2016, an Insured named EC was involved in a minor automobile accident. To the extent that EC experienced any injuries at all in the minor accident, the injuries were minor soft tissue injuries that had resolved within 18 months of the accident. Even so, following a purported follow-up examination on behalf of Garden State Pain on August 31, 2017 – 18 months after EC's minor accident – Koppel falsely purported to diagnose EC with continuing, serious back pain as the result of the minor accident. Then – and despite the fact that EC had already received many months of chiropractic services that supposedly had not resolved his purported symptoms – Koppel once again referred EC back to Kreshover and Capital Chiropractic for continued, medically unnecessary chiropractic treatment, as compensation for their initial referral to Garden State Pain.

(x)    On May 14, 2016, an Insured named MNC was involved in a minor automobile accident. To the extent that MNC experienced any injuries at all in the minor accident, the injuries were minor soft tissue injuries that had resolved within seven months of the accident.  Even so, following a purported follow-up examination on behalf of Garden State Pain on December 14, 2016 – seven months after MNC's minor accident – Koppel falsely purported to diagnose MNC with continuing, serious back pain as the result of the minor accident.  Then – and despite the fact that MNC had already received many months of chiropractic services that supposedly had not resolved her purported symptoms – Koppel once again referred MNC back to Saraceno and Newark Pain for medically unnecessary physical therapy treatment, as compensation for their initial referral to Garden State Pain.

(xi)    On May 28, 2016, an Insured named CT was involved in a minor automobile accident. To the extent that CT experienced any injuries at all in the minor accident, the injuries were minor soft tissue injuries that had resolved within five months of the accident.  Even so, following a purported follow-up examination on behalf of Garden State Pain on November 15, 2016 – over five months after CT's minor accident – Koppel falsely purported to diagnose CT with continuing, serious back pain as the result of the minor accident.  Then – and despite the fact that CT had already received many months of chiropractic services that supposedly had not resolved his purported symptoms – Koppel once again referred CT back to Kreshover and Capital Chiropractic for continued, medically unnecessary chiropractic treatment, as compensation for their initial referral to Garden State Pain.

(xii)    On July 13, 2016, an Insured named KM was involved in a rear end automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that the airbags in KM's vehicle did not deploy, and that all of the vehicles were drivable following the accident and were driven away from the scene of the accident. To the extent that KM experienced any injuries at all in his minor accident, the injuries were minor soft tissue injuries that had resolved within five months of the accident. Even so, following a purported follow-up examination on behalf of Garden State Pain on December 6, 2016 –five months after KM's minor accident – Koppel falsely purported to diagnose KM with continuing, serious back pain as the result of the minor accident. Then – and despite the fact that KM had already received many months of chiropractic services that supposedly had not resolved his purported symptoms – Koppel once again referred KM back to Inacio and Spinecare Chiropractic for continued, medically unnecessary chiropractic treatment, as compensation for their initial referral to Garden State Pain.

(xiii)    On July 15, 2016, an Insured named ESR was involved in an automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report indicated that no one was injured in the accident, that everyone involved in the accident refused medical attention, that the airbags in ESR's vehicle did not deploy, and that all of the vehicles were drivable following the accident and were

driven away from the scene of the accident. What is more – and again, in keeping with the fact that the accident was minor, and that ESR was not seriously injured in the accident – ESR did not visit any hospital following the accident. To the extent that ESR experienced any injuries at all in her minor accident, the injuries were minor soft tissue injuries that had resolved within four months of the accident. Even so, following a purported follow-up examination on behalf of Garden State Pain on November 10, 2016 –four months after ESR's minor accident – Koppel falsely purported to diagnose ESR with continuing, serious back pain as the result of the minor accident. Then – and despite the fact that ESR had already received many months of chiropractic services that supposedly had not resolved her purported symptoms – Koppel once again referred ESR back to Beagin, Saraceno and Clifton Pain for continued, medically unnecessary chiropractic treatment, as compensation for their initial referral to Garden State Pain.

(xiv)   On September 19, 2016, an Insured named JG was involved in a minor automobile accident.  To the extent that JG experienced any injuries at all in the minor accident, the injuries were minor soft tissue injuries that had resolved within eight months of the accident.  Even so, following a purported follow-up examination on behalf of Garden State Pain on May 23, 2017 – eight months after JG's minor accident – Koppel falsely purported to diagnose JG with continuing, serious back pain as the result of the minor accident.  Then – and despite the fact that JG had already received many months of chiropractic services that supposedly had not resolved his purported symptoms – Koppel once again referred JG back to Inacio and Spinecare Chiropractic for continued, medically unnecessary chiropractic treatment, as compensation for their initial referral to Garden State Pain.

(xv)   On October 13, 2016, an Insured named DL was involved in a minor automobile accident. In keeping with the fact that the accident was minor, DL was not transported to the hospital from the scene of the accident.  To the extent that DL experienced any injuries at all in the minor accident, the injuries were minor soft tissue injuries that had resolved within four months of the accident.  Even so, following a purported follow-up examination on behalf of Garden State Pain on February 14, 2017 – four months after DL's minor accident – Koppel falsely purported to diagnose DL with continuing, serious back pain as the result of the minor accident.  Then – and despite the fact that DL had already received many months of chiropractic services that supposedly had not resolved his purported symptoms – Koppel once again referred DL back to Kreshover and Capital Chiropractic for continued, medically unnecessary chiropractic treatment, as compensation for their initial referral to Garden State Pain.

(xvi)   On November 19, 2016, an Insured named EYA was involved in a minor automobile accident. To the extent that EYA experienced any injuries at all in the minor accident, the injuries were minor soft tissue injuries that had resolved within 16 months of the accident.  Even so, following a purported follow-up examination on behalf of Garden State Pain on March 15, 2018 – 16 months after EYA's minor accident – Koppel falsely purported to diagnose EYA with continuing, serious back

pain as the result of the minor accident.  Then – and despite the fact that EYA had already received many months of chiropractic services that supposedly had not resolved his purported symptoms – Koppel once again referred EYA back to Kreshover and Capital Chiropractic for continued, medically unnecessary chiropractic treatment, as compensation for their initial referral to Garden State Pain.

(xvii)   On May 15, 2017, an Insured named KI was involved in a minor automobile accident. To the extent that KI experienced any injuries at all in the minor accident, the injuries were minor soft tissue injuries that had resolved within seven months of the accident.  Even so, following a purported follow-up examination on behalf of Garden State Pain on December 7, 2017 – seven months after KI's minor accident – Koppel falsely purported to diagnose KI with continuing, serious back pain as the result of the minor accident.  Then – and despite the fact that KI had already received many months of chiropractic services that supposedly had not resolved his purported symptoms – Koppel once again referred KI back to Kreshover and Capital Chiropractic for continued, medically unnecessary chiropractic treatment, as compensation for their initial referral to Garden State Pain.

(xviii)   On May 30, 2017, an Insured named GT was involved in a minor automobile accident.  To the extent that GT experienced any injuries at all in the minor accident, the injuries were minor soft tissue injuries that had resolved within three months of the accident.  Even so, following a purported follow-up examination on behalf of Garden State Pain on September 19, 2017 – more than three months after GT's minor accident – Koppel falsely purported to diagnose GT with continuing, serious back pain as the result of the minor accident.  Then – and despite the fact that GT had already received many months of chiropractic services that supposedly had not resolved her purported symptoms – Koppel once again referred GT back to Inacio and Spinecare for continued, medically unnecessary chiropractic treatment, as compensation for their initial referral to Garden State Pain.

(xix)   On November 2, 2018, an Insured named WP was involved in a minor automobile accident. To the extent that WP experienced any injuries at all in the minor accident, the injuries were minor soft tissue injuries that had resolved within five months of the accident.  Even so, following a purported follow-up examination on behalf of Garden State Pain on April 2, 2019 – five months after WP's minor accident – Koppel falsely purported to diagnose WP with continuing, serious back pain as the result of the minor accident.  Then – and despite the fact that WP had already received many months of chiropractic services that supposedly had not resolved his purported symptoms – Koppel once again referred WP back to Saraceno and Newark Pain for medically unnecessary physical therapy treatment, as compensation for their initial referral to Garden State Pain.

(xx)   On May 1, 2019, an Insured named YCB was involved in an automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police

report indicated that the airbags in YCB's vehicle did not deploy. What is more – and again, in keeping with the fact that the accident was minor, and that YCB was not seriously injured in the accident – YCB did not visit any hospital the day of the accident. To the extent that YCB experienced any injuries at all in her minor accident, the injuries were minor soft tissue injuries that had resolved within one month of the accident. Even so, following a purported follow-up examination on behalf of Garden State Pain on June 7, 2019 –one month after YCB's minor accident – Koppel falsely purported to diagnose YCB with continuing, serious back pain as the result of the minor accident. Then – and despite the fact that YCB had already received many months of chiropractic services that supposedly had not resolved her purported symptoms – Koppel once again referred YCB back to Beagin, Saraceno, and Clifton Pain for continued, medically unnecessary chiropractic treatment, as compensation for their initial referral to Garden State Pain.

262.    These are only representative examples. In the claims for follow-up examinations that are identified in Exhibit "1", the Koppel and Garden State Pain routinely referred Insureds back to the Referral Defendants or their other chiropractor referral sources at the conclusion of the follow-up examinations, despite the fact that the Insureds already had received many months of chiropractic treatment that had not resolved their purported symptoms, and despite the fact that the Insureds' accidents were so minor that they had not, and could not have, required long-term chiropractic treatment in gross deviation from the ordinary Care Paths.

263.    Koppel and Garden State Pain routinely referred Insureds back to the Referral Defendants or their other chiropractor referral sources at the conclusion of the follow-up examinations as unlawful compensation for the Referral Defendants' and their other chiropractor referral sources' initial referrals to Garden State Pain, not because the Insureds actually required long-term, continuing chiropractic treatment.

       **d.**    **Misrepresentations Regarding the Reimbursable Amount for the Follow-Up Examinations in New Jersey**

264.    As set forth above, the No-Fault Laws specifically prohibit healthcare services providers from charging for services in amounts exceeding the amounts set forth in the Fee

Schedule. See N.J.S.A. § 39:6A-4.6; N.J.A.C. 11:3-29.6.

265.    Not only did Koppel and Garden State Pain routinely falsely represent that they provided legitimate, medically necessary follow-up examinations in the first instance, but they also routinely misrepresented the reimbursable amount for the follow-up examinations.

266.    Specifically, and as set forth in Exhibit "1", and above, Koppel and Garden State Pain usually billed for their putative follow-up examinations under CPT code 99213.

267.    Assuming that all other conditions of coverage are satisfied, the Fee Schedule permitted lawfully licensed healthcare providers in the northern New Jersey area to submit a maximum charge of $85.01 for each follow-up examination performed under CPT code 99213.

268.    Even so, and as set forth above, in the claims for initial examinations identified in Exhibit "1", Koppel and Garden State Pain routinely falsely represented that they were entitled to be paid $165.00 for the follow-up examinations that they billed to GEICO under CPT code 99213 in New Jersey.

269.    For example:

(i)     Koppel and Garden State Pain falsely represented that they were entitled to be reimbursed $165.00 under CPT code 99213 for a follow-up examination that Koppel purported to provide to an Insured named SR on May 7, 2013;

(ii)    Koppel and Garden State Pain falsely represented that they were entitled to be reimbursed $165.00 under CPT code 99213 for a follow-up examination that Koppel purported to provide to an Insured named RJ on August 21, 2013;

(iii)   Koppel and Garden State Pain falsely represented that they were entitled to be reimbursed $165.00 under CPT code 99213 for a follow-up examination that Koppel purported to provide to an Insured named JA on February 11, 2014;

(iv)    Koppel and Garden State Pain falsely represented that they were entitled to be reimbursed $165.00 under CPT code 99213 for a follow-up examination that Koppel purported to provide to an Insured named JR on April 22, 2014;

(v)    Koppel and Garden State Pain falsely represented that they were entitled to be reimbursed $165.00 under CPT code 99213 for a follow-up examination that Koppel purported to provide to an Insured named DL on September 23, 2014;

(vi)    Koppel and Garden State Pain falsely represented that they were entitled to be reimbursed $165.00 under CPT code 99213 for a follow-up examination that Koppel purported to provide to an Insured named SJ on January 20, 2015;

(vii)    Koppel and Garden State Pain falsely represented that they were entitled to be reimbursed $165.00 under CPT code 99213 for a follow-up examination that Koppel purported to provide to an Insured named BM on June 9, 2015;

(viii)    Koppel and Garden State Pain falsely represented that they were entitled to be reimbursed $165.00 under CPT code 99213 for a follow-up examination that Koppel purported to provide to an Insured named JJS on August 11, 2015;

(ix)    Koppel and Garden State Pain falsely represented that they were entitled to be reimbursed $165.00 under CPT code 99213 for a follow-up examination that Koppel purported to provide to an Insured named BB on October 29, 2015;

(x)    Koppel and Garden State Pain falsely represented that they were entitled to be reimbursed $165.00 under CPT code 99213 for a follow-up examination that Koppel purported to provide to an Insured named JJ on March 15, 2016;

(xi)    Koppel and Garden State Pain falsely represented that they were entitled to be reimbursed $165.00 under CPT code 99213 for a follow-up examination that Koppel purported to provide to an Insured named TS on June 14, 2016;

(xii)    Koppel and Garden State Pain falsely represented that they were entitled to be reimbursed $165.00 under CPT code 99213 for a follow-up examination that Koppel purported to provide to an Insured named RE on September 8, 2016;

(xiii)    Koppel and Garden State Pain falsely represented that they were entitled to be reimbursed $165.00 under CPT code 99213 for a follow-up examination that Koppel purported to provide to an Insured named GH on December 15, 2016;

(xiv)    Koppel and Garden State Pain falsely represented that they were entitled to be reimbursed $165.00 under CPT code 99213 for a follow-up examination that Koppel purported to provide to an Insured named JK on February 7, 2017;

(xv)    Koppel and Garden State Pain falsely represented that they were entitled to be reimbursed $165.00 under CPT code 99213 for a follow-up examination that Koppel purported to provide to an Insured named MB on July 25, 2017;

(xvi)    Koppel and Garden State Pain falsely represented that they were entitled to be reimbursed $165.00 under CPT code 99213 for a follow-up examination that Koppel purported to provide to an Insured named DW on March 20, 2018;

(xvii)   Koppel and Garden State Pain falsely represented that they were entitled to be reimbursed $165.00 under CPT code 99213 for a follow-up examination that Koppel purported to provide to an Insured named FS on September 4, 2018;

(xviii)  Koppel and Garden State Pain falsely represented that they were entitled to be reimbursed $165.00 under CPT code 99213 for a follow-up examination that Koppel purported to provide to an Insured named ST on January 8, 2019;

(xix)    Koppel and Garden State Pain falsely represented that they were entitled to be reimbursed $165.00 under CPT code 99213 for a follow-up examination that Koppel purported to provide to an Insured named MS on May 28, 2019;

(xx)     Koppel and Garden State Pain falsely represented that they were entitled to be reimbursed $165.00 under CPT code 99213 for a follow-up examination that Koppel purported to provide to an Insured named HB on November 21, 2019.

270.    These are only representative examples. As set forth in Exhibit "1", the majority of the charges that Koppel and Garden State Pain submitted through Garden State Pain for their putative follow-up examinations falsely represented that they were entitled to recover amounts that grossly exceeded the reimbursable amounts set forth in the Fee Schedule.

271.    Each and every one of the grossly inflated charges for putative follow-up consultations identified in Exhibit "1" constituted a separate violation of N.J.S.A. § 39:6A-4.6(c).

272.    In the claims identified in Exhibit "1", Koppel and Garden State Pain routinely falsely represented that they were entitled to recover $165.00 for the follow-up examinations that they billed to GEICO under CPT code 99213, in order to maximize the fraudulent billing that they could submit to GEICO in New Jersey.

### 3.    Koppel and Garden State Pain's Fraudulent Charges for Pain Management Injections

273.    As part and parcel of the Defendants' fraudulent scheme, Koppel and Garden State Pain caused many of the Insureds in the claims identified in Exhibit "1" to be subjected to a series

of medically unnecessary pain management injections including, but not limited to, epidural injections, facet injections, transforaminal injections, and arthrocentesis injections.

274.    Koppel purported to personally administer virtually all of the pain management injections in the claims identified in Exhibit "1".

275.    As set forth in Exhibit "1", Koppel and Garden State Pain then billed the injections through Garden State Pain to GEICO, typically under CPT codes 62310, 62311, 62321, 62323, 64490, 64491, 64492, 64493, 64494, and 64495.

276.    As set forth below, the charges for the pain management injections were fraudulent because the pain management injections were medically unnecessary and were provided – to the extent that they were provided at all – pursuant to the Defendants' pre-determined fraudulent treatment and billing protocol, and not to treat or otherwise benefit the Insureds who were subjected to it.

### a.    Basic, Legitimate Use of Pain Management Injections

277.    Generally, when a patient presents with a soft tissue injury such as a sprain or strain secondary to an automobile accident, the initial standard of care is conservative treatment comprised of rest, ice, compression, and – if applicable – elevation of the affected body part.

278.    If that sort of conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment, physical therapy, and the use of pain management medication.

279.    The substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through this sort of conservative treatment, or no treatment at all, which is why the Care Paths generally require healthcare services providers to begin demonstrating

at regular intervals why continued soft tissue injury treatment is necessary beyond the four-week mark.

280.    In a legitimate clinical setting, pain management injections should not be administered until a patient has failed more conservative treatments, including chiropractic treatment, physical therapy, and pain management medication.

281.    This is because the substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through conservative treatment, or no treatment at all, and invasive interventional pain management procedures entail a degree of risk to the patient that is absent in conservative forms of treatment.

282.    In a legitimate clinical setting, pain management injections should not be administered more than once every two months, and multiple varieties of pain management injections should not be administered simultaneously.

283.    This is because: (i) properly administered pain management injections should provide pain relief lasting for at least two months; (ii) a proper interval between pain management injections, and different types of pain management injections, is necessary to determine whether or not the initial pain management injections were effective; and (iii) if a patient's pain is not relieved through the pain management injections, the pain may be caused by something more serious than a soft tissue injury secondary to an automobile accident, and the perpetuating factors of the pain must be identified and managed.

   **b.** **The Garden State Pain Defendants' Medically Unnecessary Pain Management Injections**

284.    As set forth above, virtually all of the Insureds in the claims identified in Exhibit "1" were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

285.    Furthermore – and again in keeping with the fact that the Insureds' accidents were minor – contemporaneous police reports regarding the claims identified in Exhibit "1" frequently indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

286.    To the limited extent that the Insureds in the claims identified in Exhibit "1" experienced any injuries at all in their minor accidents, the injuries virtually always were minor soft tissue injuries such as sprains and strains.

287.    By the time the Insureds in the claims identified in Exhibit "1" presented to Koppel and Garden State Pain for treatment, they either had no presenting problems at all, or their presenting problems consisted of minor sprains and strains that were in the process of being resolved through conservative treatment, or without any treatment at all.

288.    Even so, in the claims for pain management injections identified in Exhibit "1", Koppel and Garden State Pain:

(i)     routinely provided pain management injections to Insureds who did not have any serious pain symptoms secondary to any automobile accident that legitimately would warrant the injections; and

(ii)    routinely purported to administer multiple pain management injections, and multiple varieties of pain management injections, to Insureds within a span of weeks, despite the fact that such an injection regimen not only was medically unnecessary, but also placed the Insureds at risk.

289.    For example:

(i)     On June 13, 2013, an Insured named JT was involved in a minor automobile accident. To the extent that JT experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within 10 to 12 months of the accident. Even so, Koppel and Garden State Pain purported to provide JT with an epidural injection on April 17, 2014, three facet joint injections on May 15, 2014, and three more facet joint injections on June 26, 2014, all of which were medically unnecessary. The medically unnecessary

injections were administered 10 to 12 months after JT's accident, long after any legitimate symptoms JT may have experienced as the result of the accident had resolved.

(ii)     On November 9, 2013, an Insured named SW was involved in a minor automobile accident.  To the extent that SW experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within nine months of the accident.  Even so, Koppel and Garden State Pain purported to provide SW with three facet joint injections on August 7, 2014 and three facet joint injections on August 18, 2014, all of which were medically unnecessary.  The medically unnecessary injections were administered nine months after SW's accident, long after any legitimate symptoms SW may have experienced as the result of the accident had resolved.

(iii)    On December 2, 2013, an Insured named SM was involved in a minor automobile accident.  To the extent that SM experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within 17 to 26 months of the accident.  Even so, Koppel and Garden State Pain purported to provide SM with thee facet joint injections on April 27, 2015, an epidural injection on October 28, 2015, and an epidural injection on January 27, 2016, all of which were medically unnecessary.  The medically unnecessary injections were administered 17 to 26 months after SM's accident, long after any legitimate symptoms SM may have experienced as the result of the accident had resolved.

(iv)     On March 21, 2014, an Insured named RK was involved in a minor automobile accident.  To the extent that RK experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within four to six months of the accident.  Even so, Koppel and Garden State Pain purported to provide RK with an epidural lumbar injection in July 14, 2014, three facet joint injections on July 28, 2014, another epidural lumbar injection on August 18, 2014, and three more facet joint injections on September 8, 2014, all of which were medically unnecessary.  The medically unnecessary injections were administered four to six months after RK's accident, long after any legitimate symptoms RK may have experienced as the result of the accident had resolved.

(v)      On April 17, 2014, an Insured named MC was involved in a minor automobile accident.  To the extent that MC experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within eight to 21 months of the accident.  Even so, Koppel and Garden State Pain purported to provide MC with an epidural lumbar injection on December 17, 2014, three facet joint injections on January 7, 2015, and three more facet joint injections on December 28, 2015, all of which were medically unnecessary.  The medically unnecessary injections were administered eight to 21 months after MC's accident, long after any legitimate symptoms MC may have experienced as the result of the accident had resolved.

(vi)     On July 19, 2014, an Insured named APA was involved in a minor automobile accident.  To the extent that APA experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within nine months of the accident.  Even so, Koppel and Garden State Pain purported to provide APA with three facet joint injections on April 27, 2015, all of which were medically unnecessary.  The medically unnecessary injections were administered nine months after APA's accident, long after any legitimate symptoms APA may have experienced as the result of the accident had resolved.

(vii)    On April 15, 2015, an Insured named AB was involved in a minor automobile accident.  To the extent that AB experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within five to six months of the accident.  Even so, Koppel and Garden State Pain purported to provide AB with three facet joint injections on September 9, 2015 and three facet joint injections on October 7, 2015, all of which were medically unnecessary.  The medically unnecessary injections were administered five to six months after AB's accident, long after any legitimate symptoms AB may have experienced as the result of the accident had resolved.

(viii)   On June 19, 2015, an Insured named FG was involved in a minor automobile accident.  To the extent that FG experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within 17 months of the accident.  Even so, Koppel and Garden State Pain purported to provide FG with three facet injections on November 30, 2016, all of which were medically unnecessary.  The medically unnecessary injections were administered 17 months after FG's accident, long after any legitimate symptoms FG may have experienced as the result of the accident had resolved.

(ix)     On July 11, 2015, an Insured named CF was involved in a minor automobile accident.  To the extent that CF experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within six to 32 months of the accident.  Even so, Koppel and Garden State Pain purported to provide CF with three facet joint injections on January 28, 2016, three facet joint injections on February 11, 2106, one epidural lumbar injection on February 25, 2016, and three facet joint injections on May 21, 2018, all of which were medically unnecessary.   The medically unnecessary injections were administered six to 32 months after CF's accident, long after any legitimate symptoms CF may have experienced as the result of the accident had resolved.

(x)      On May 14, 2016, an Insured named MNC was involved in a minor automobile accident.  To the extent that MNC experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within six to 13 months of the accident.  Even so, Koppel and Garden State Pain purported to provide MNC with three facet joint injections on November 14, 2016, three facet joint injections on January 12, 2017, three facet joint injections on

January 26, 2017, and three facet joint injections on March 31, 2017, all of which were medically unnecessary. The medically unnecessary injections were administered six to 13 months after MNC's accident, long after any legitimate symptoms MNC may have experienced as the result of the accident had resolved.

(xi) On June 27, 2016, an Insured named MB was involved in a minor automobile accident. To the extent that MB experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within 13 to 14 months of the accident. Even so, Koppel and Garden State Pain purported to provide MB with three facet joint injections on July 12, 2017 and three facet joint injections on August 4, 2017, all of which were medically unnecessary. The medically unnecessary injections were administered 13 to 14 months after MB's accident, long after any legitimate symptoms MB may have experienced as the result of the accident had resolved.

(xii) On August 17, 2016, an Insured named BM was involved in a minor automobile accident. To the extent that BM experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within 11 months of the accident. Even so, Koppel and Garden State Pain purported to provide BM with three facet joint injections on July 17, 2017, all of which were medically unnecessary. The medically unnecessary injections were administered 11 months after BM's accident, long after any legitimate symptoms BM may have experienced as the result of the accident had resolved.

(xiii) On November 18, 2016, an Insured named DW was involved in a minor automobile accident. To the extent that DW experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within four to 17 months of the accident. Even so, Koppel and Garden State Pain purported to provide DW with three facet joint injections on March 6, 2017, three facet joint injections on March 16, 2017, three facet joint injections on April 13, 2017, and three facet joint injections on April 13, 2018, all of which were medically unnecessary. The medically unnecessary injections were administered four to 17 months after DW's accident, long after any legitimate symptoms DW may have experienced as the result of the accident had resolved.

(xiv) On March 31, 2017, an Insured named LJ was involved in a minor automobile accident. To the extent that LJ experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within 12 months of the accident. Even so, Koppel and Garden State Pain purported to provide LJ with three facet joint injections on March 28, 2018, all of which were medically unnecessary. The medically unnecessary injections were administered 12 months after LJ's accident, long after any legitimate symptoms LJ may have experienced as the result of the accident had resolved.

(xv) On May 8, 2017, an Insured named LCP was involved in a minor automobile accident. To the extent that LCP experienced any health problems at all as a result

112

of the accident, they were of low severity at the outset, and had completely resolved within 11 to 13 months of the accident.  Even so, Koppel and Garden State Pain purported to provide LCP with three facet joint injections on April 24, 2018 and a pain management injection on June 8, 2018, all of which were medically unnecessary.  The medically unnecessary injections were administered 11 to 13 months after LCP's accident, long after any legitimate symptoms LCP may have experienced as the result of the accident had resolved.

(xvi)   On August 14, 2017, an Insured named AH was involved in a minor automobile accident.  To the extent that AH experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within 17 months of the accident.  Even so, Koppel and Garden State Pain purported to provide AH with three facet joint injections on January 3, 2019 and three more facet joint injections on January 18, 2019, all of which were medically unnecessary.  The medically unnecessary injections were administered 17 months after AH's accident, long after any legitimate symptoms AH may have experienced as the result of the accident had resolved.

(xvii)  On December 31, 2017, an Insured named JF was involved in a minor automobile accident.  To the extent that JF experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within 16 to 21 months of the accident.  Even so, Koppel and Garden State Pain purported to provide JF with three facet joint injections on April 17, 2019, a pain management injection on June 7, 2019, a pain management injection on July 12, 2019, and a pain management injection on September 13, 2019, all of which were medically unnecessary.  The medically unnecessary injections were administered 16 to 21 months after JF's accident, long after any legitimate symptoms JF may have experienced as the result of the accident had resolved.

(xviii) On February 14, 2018, an Insured named CA was involved in a minor automobile accident.  To the extent that CA experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within seven to 13 months of the accident.  Even so, Koppel and Garden State Pain purported to provide CA with pain management injection on September 5, 2018, three facet joint injections on September 21, 2018, three facet joint injections on October 25, 2018, three facet join injections on November 28, 2018, three facet joint injections on December 19, 2018, and three facet joint injections on March 22, 2019, all of which were medically unnecessary.  The medically unnecessary injections were administered seven to 13 months after CA's accident, long after any legitimate symptoms CA may have experienced as the result of the accident had resolved.

(xix)   On February 23, 2018, an Insured named ED was involved in a minor automobile accident.  To the extent that ED experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within three to 16 months of the accident.  Even so, Koppel and Garden State Pain

purported to provide ED with a pain management injection on June 6, 2018, three facet joint injections on February 22, 2019, and three more facet joint injections on June 21, 2019, all of which were medically unnecessary. The medically unnecessary injections were administered three to 16 months after ED's accident, long after any legitimate symptoms ED may have experienced as the result of the accident had resolved.

(xx)   On January 18, 2019, an Insured named JL was involved in a minor automobile accident. To the extent that JL experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within 10 to 11 months of the accident. Even so, Koppel and Garden State Pain purported to provide JL with three facet joint injections on November 4, 2019 and three more facet joint injections on December 2, 2019, all of which were medically unnecessary. The medically unnecessary injections were administered 10 to 11 months after JL's accident, long after any legitimate symptoms JL may have experienced as the result of the accident had resolved.

290.   Not only were Koppel and Garden State Pain's pain management injections medically unnecessary in the first instance, inasmuch as they were predicated on Koppel and Garden State Pain's phony pain "diagnoses," but Koppel and Garden State Pain routinely provided large numbers of pain management injections to Insureds in further disregard for medical necessity.

291.   As set forth above, in a legitimate clinical setting, pain management injections should not be administered more than once every two months, and multiple varieties of pain management injections should not be administered simultaneously.

292.   However, and as set forth in Exhibit "1", in order to maximize the fraudulent billing they could submit to GEICO, Koppel and Garden State Pain often purported to administer multiple pain management injections – and multiple varieties of pain management injections – to Insureds within a span of weeks, despite the fact that such an injection regimen placed the Insureds at considerable risk.

293.   For example:

(i)    Koppel and Garden State Pain purported to provide three facet joint injections to an Insured named FR on November 14, 2013. Then, just one week later, on November 21, 2013, Koppel and Garden State Pain purported to provide another three facet joint injections to FR.  Koppel and Garden State Pain purported to provide three facet joint injections to FR again on June 26, 2014 and two weeks later on July 10, 2014, for a total of 12 medically unnecessary pain management injections – six within one week and then six within two weeks.

(ii)   Koppel and Garden State Pain purported to provide an epidural injection to an Insured named TC on July 23, 2014. Then, one week later, on July 30, 2014, Koppel and Garden State Pain purported to provide three facet joint injections to TC. Then, just one month later, on September 3, 2014, Koppel and Garden State Pain purported to provide TC with three facet joint injections. Koppel and Garden State Pain also purported to provide TC with three facet joint injections on September 10, 2014 and October 8, 2014.  Just one month later, on November 5, 2014, Koppel and Garden State Pain purported to provide TC with another epidural injection, for a total of 14 medically unnecessary pain management injections in approximately three months.

(iii)  Koppel and Garden State Pain purported to provide three facet joint injections to an Insured named AJ on January 12, 2015. Then, 10 days later, on January 22, 2015, Koppel and Garden State Pain purported to provide an epidural injection ton AJ. Approximately one month after that, on February 26, 2015, Koppel and Garden State Pain purported to provide three facet joint injections to AJ.  Koppel and Garden State Pain also purported to provide AJ with three facet joint injections on March 12, 2015 and April 16, 2015, for a total of 13 medically unnecessary pain management injections in only three months.

(iv)   Koppel and Garden State Pain purported to provide three facet joint injections to an Insured named BM on April 15, 2015.  Then, just one week later, on April 22, 2015, Koppel and Garden State Pain purported to provide another three facet joint injections to BM.  Koppel and Garden State Pain then purported to provide three facet joint injections on four other separate dates - May 20, 2015, May 27, 2015, July 8, 2015, and July 15, 2015 – for a total of 18 medically unnecessary pain management injections in only three months.

(v)    Koppel and Garden State Pain purported to provide an epidural injection to an Insured named CT on December 18, 2015.  Then, just three weeks later on January 8, 2016, Koppel and Garden State Pain purported to provide another epidural injection to CT.  Koppel and Garden State Pain purported to provide three facet joint injections to CT on February 12, 2016, and then another three facet joint injections to CT on March 16, 2018.  Koppel and Garden State Pain purported to provide CT with a total of 8 unnecessary pain management injections in only three months.

(vi)    Koppel and Garden State Pain purported to provide an epidural injection ton an Insured named JC on April 6, 2016.  Then, only two weeks later, Koppel and Garden State Pain purported to provide another epidural injection to JC.  Koppel and Garden State Pain then purported to provide yet another epidural injection to JC only one month after that, on May 18, 2016.  Koppel and Garden State Pain then purported to provide three facet joint injections on June 15, 2016, for a total of 6 medically unnecessary pain management injections in two and a half months.

(vii)    Koppel and Garden State Pain purported to provide three facet joint injections to an Insured named MG on April 18, 2016.  Then, less than one month later, on May 16, 2016, Koppel and Garden State Pain purported to provide three facet joint injections to MG.  Koppel and Garden State Pain also purported to provide three facet joint injections to MG on June 13, 2016 and then just three days later on June 16, 2016.  Koppel and Garden State Pain then purported to provide an epidural injection to MG on August 8, 2016, for a total of 13 medically unnecessary pain management injections in less than four months.

(viii)    Koppel and Garden State Pain purported to provide three facet joint injections to an Insured named CG on March 6, 2017.  Then, just one week later, on March 13, 2017, Koppel and Garden State Pain purported to provide another three facet joint injections to CG.  Koppel and Garden State Pain purported to provide three facet joint injections to CG again on July 24, 2017 and one weeks later on July 31, 2017, for a total of 12 medically unnecessary pain management injections – six within one week and then six within one week.

(ix)    Koppel and Garden State Pain purported to provide three facet joint injections to an Insured named VAO on December 19, 2017.  Then, just two days later, on December 21, 2017, Koppel and Garden State Pain purported to provide another three facet joint injections to VAO.  Koppel and Garden State Pain then purported to provide six facet joint injections to VAO on January 5, 2018, and three facet joint injections to VAO on February 15, 2018, for a total of 15 medically unnecessary pain management injections in only two months.

(x)    Koppel and Garden State Pain purported to provide a pain management injection to an Insured named CA on September 5, 2018.  Approximately two weeks later, on September 21, 2018, Koppel and Garden State Pain purported to provide three facet joint injections to CA.  Koppel and Garden State Pain also purported to provide CA with three facet joint injections on October 25, 2018, November 28, 2018, and December 19, 2018, for a total of 13 medically unnecessary pain management injections in less than four months.

294.    Koppel and Garden State Pain administered medically-unnecessary injections to many Insureds despite the fact that such injections – to the extent that they actually occurred, placed Insureds at a significant risk.

295.    Even when performed correctly, the injections that Koppel and Garden State Pain purported to provide can cause significant adverse events including infection, nerve injury, hypotension, anesthetic toxicity, or even death.

296.    To the extent that Koppel and Garden State Pain actually administered injections to Insureds with the frequency set forth in their billing, Koppel and Garden State Pain increased these risks exponentially.

297.    Koppel and Garden State Pain's predetermined treatment protocol, including subjecting patients to multiple, identical injections over the course of a few weeks or months was designed and employed by Koppel and Garden State Pain solely to maximize the potential charges that they could submit, and cause to be submitted, to GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

   **c.    Misrepresentations Regarding the Reimbursable Amount for the Pain Management Injections in New Jersey**

298.    As set forth above, the No-Fault Laws specifically prohibit healthcare services providers from charging for services in amounts exceeding the amounts set forth in the Fee Schedule. See N.J.S.A. § 39:6A-4.6; N.J.A.C. 11:3-29.6.

299.    Not only did Koppel and Garden State Pain routinely bill GEICO for medically unnecessary pain management injections, they also routinely misrepresented the reimbursable amount for the pain management injections in New Jersey.

300.    Specifically, and as set forth above and in Exhibit "1", Koppel and Garden State Pain billed the majority of their purported pain management injections under CPT codes 62310, 62311, 62321, 62323, 64490, 64491, 64492, 64493, 64494, and 64495.

301.   The following chart sets forth the maximum reimbursable amount under the Fee Schedule for pain management injections under those CPT codes in New Jersey, as well as the unlawfully inflated charges that Koppel and Garden State Pain routinely submitted under those codes through Garden State Pain to GEICO:

| CPT Code | Procedure Description | Fee Schedule Amount | Garden State Pain Billed Amount |
|---|---|---|---|
| 62310 | INJECT SPINE C/T | $1,021.73 | $2,000.00 |
| 62311 | INJECT SPINE L/S (CD) | $879.37 | $2,000.00 |
| 62321 | INJECT INTERLAMINAR C/T | $1,021.73 | $2,000.00 |
| 62323 | INJECT INTERLAMINAR L/S | $879.37 | $2,000.00 |
| 64490 | INJECT PARAVERT F JOINT C/T 1 | $494.93 | $3,000.00 - $6,000.00 |
| 64491 | INJECT PARAVERT F JOINT C/T 2 | $241.80 | $1,600.00 - $3,200.00 |
| 64492 | INJECT PARAVERT F JOINT C/T 3 | $244.49 | $1,600.00 - $3,200.00 |
| 64493 | INJECT PARAVERT F JNT L/S 1 LEV | $442.52 | $2,500.00 - $5,000.00 |
| 64494 | INJECT PARAVERT F JNT L/S 2 LEV | $218.85 | $1,500.00 - $3,000.00 |
| 64495 | INJECT PARAVERT F JNT L/S 3 LEV | $222.43 | $1,500.00 - $3,000.00 |

302.   For example:

(i)   Koppel and Garden State Pain sent GEICO a bill for $5,000.00 for pain management injections under CPT code 64493 allegedly provided to an Insured named SW on July 11, 2013.

(ii)   Koppel and Garden State Pain sent GEICO a bill for $2,000.00 for pain management injections under CPT code 62310 allegedly provided to an Insured named WP on August 23, 2013.

(iii)   Koppel and Garden State Pain sent GEICO a bill for $5,000.00 for pain management injections under CPT code 64493 allegedly provided to an Insured named BG on January 23, 2014.

(iv)   Koppel and Garden State Pain sent GEICO a bill for $2,000.00 for pain management injections under CPT code 62310 allegedly provided to an Insured named SO on September 10, 2014.

(v)   Koppel and Garden State Pain sent GEICO a bill for $6,000.00 for pain management injections under CPT code 64490 allegedly provided to an Insured named MH on October 16, 2014.

(vi)     Koppel and Garden State Pain sent GEICO a bill for $2,000.00 for pain management injections under CPT code 62311 allegedly provided to an Insured named MAC on February 9, 2015.

(vii)    Koppel and Garden State Pain sent GEICO a bill for $6,000.00 for pain management injections under CPT code 64490 allegedly provided to an Insured named AAR on April 2, 2015.

(viii)   Koppel and Garden State Pain sent GEICO a bill for $3,200.00 for pain management injections under CPT code 64491 allegedly provided to an Insured named MC on February 3, 2016.

(ix)     Koppel and Garden State Pain sent GEICO a bill for $2,000.00 for pain management injections under CPT code 62311 allegedly provided to an Insured named DU on July 20, 2016.

(x)      Koppel and Garden State Pain sent GEICO a bill for $3,200.00 for pain management injections under CPT code 64491 allegedly provided to an Insured named WGR on February 3, 2017.

(xi)     Koppel and Garden State Pain sent GEICO a bill for $3,000.00 for pain management injections under CPT code 64494 allegedly provided to an Insured named PEO on May 31, 2017.

(xii)    Koppel and Garden State Pain sent GEICO a bill for $2,000.00 for pain management injections under CPT code 62321 allegedly provided to an Insured named KI on November 15, 2017.

(xiii)   Koppel and Garden State Pain sent GEICO a bill for $3,200.00 for pain management injections under CPT code 64492 allegedly provided to an Insured named VAO on January 5, 2018.

(xiv)    Koppel and Garden State Pain sent GEICO a bill for $3,000.00 for pain management injections under CPT code 64494 allegedly provided to an Insured named CH on April 13, 2018.

(xv)     Koppel and Garden State Pain sent GEICO a bill for $2,000.00 for pain management injections under CPT code 62321 allegedly provided to an Insured named EJ on June 6, 2018.

(xvi)    Koppel and Garden State Pain sent GEICO a bill for $2,000.00 for pain management injections under CPT code 62323 allegedly provided to an Insured named YTT on July 13, 2018

(xvii)   Koppel and Garden State Pain sent GEICO a bill for $2,000.00 for pain management injections under CPT code 62323 allegedly provided to an Insured named GS on April 3, 2019.

(xviii)  Koppel and Garden State Pain sent GEICO a bill for $3,000.00 for pain management injections under CPT code 64495 allegedly provided to an Insured named DPC on August 7, 2019.

(xix)    Koppel and Garden State Pain sent GEICO a bill for $3,200.00 for pain management injections under CPT code 64492 allegedly provided to an Insured named JL on November 4, 2019.

(xx)     Koppel and Garden State Pain sent GEICO a bill for $3,000.00 for pain management injections under CPT code 64495 allegedly provided to an Insured named KL on December 2, 2019.

303.    These are just representative examples.  In the claims identified in Exhibit "1", Koppel and Garden State Pain routinely falsely represented that they were entitled to be reimbursed for their putative pain management injections in amounts far in excess of the amounts set forth in the Fee Schedule in order to maximize the fraudulent billing that they could submit to GEICO.

**4.      The Referral Defendants' Fraudulent Charges for Chiropractic Services**

304.    As set forth above, to the extent that the Insureds in the claims identified in Exhibits "1" – "5" suffered any healthcare problems at all as the result of their minor automobile accidents, the problems virtually always were limited to ordinary soft tissue injuries such as sprains and strains.

305.    The vast majority of soft tissue injuries such as sprains and strains resolve after a short course of conservative treatment, or no treatment at all, which is why the Care Paths generally require healthcare services providers to begin demonstrating at regular intervals why continued treatment is necessary beyond the four-week mark.

306. The Care Paths are designed to avoid the continuation of treatment and therapy, week after week, over many months, without any observable improvement. See 30 N.J.R. 4401(a).

307. The Referral Defendants knew that – unless they could create a false basis to provide long-term, medically unnecessary chiropractic services to the Insureds in the claims identified in Exhibits "1" – "5" – their ability to provide such long-term, medically unnecessary chiropractic services would be limited by the Care Paths and other No-Fault guidelines.

308. Accordingly, and as set forth above, the Referral Defendants entered into secret agreements with Koppel and Garden State Pain, whereby:

(i)     the Referral Defendants would cause Insureds to be referred to Garden State Pain for expensive and medically unnecessary examinations, despite the Insureds' total lack of any genuine presenting problems that would warrant the examinations; and

(ii)    As compensation for the medically unnecessary referrals, Garden State Pain and Koppel would cause the Insureds to be falsely diagnosed with continuing pain and related symptoms, to provide a false justification for the medically unnecessary chiropractic services the Referral Defendants already had provided, and a false justification to refer the Insureds back to the Referral Defendants for many more weeks or months of continued, medically unnecessary chiropractic services.

309. As set forth above, in keeping with the fact that the return referrals from Garden State Pain to the Referral Defendants were not predicated on medical necessity, and instead were illegal compensation for the initial referrals, Garden State Pain's own records indicated that the Referral Defendants' prior chiropractic services had not been effective in treating the Insureds' supposed complaints.

310. Even so, in the claims identified in Exhibits "1" – "5", the Referral Defendants routinely used the return referrals from Garden State Pain as a false basis to bill GEICO for months of medically unnecessary chiropractic services, in a gross deviation from the ordinary Care Paths and other No-Fault guidelines.

311. For example:

(i)     On September 8, 2014, an Insured named EG was involved in an automobile accident. In keeping with the fact that the accident was minor and that EG was not seriously injured in the accident,  EG was observed walking around the scene after the accident. To the extent that EG experienced any health problems at all as the result of his minor accident, they were of low severity. Even so, EG thereafter sought treatment from Inacio and Spinecare Chiropractic, where he purportedly received chiropractic treatment between September 2014 and January 2015. In January 2015, Inacio and Spinecare Chiropractic caused EG to be referred to Garden State Pain pursuant to the kickbacks that Koppel and Garden State Pain paid to Inacio and Spinecare Chiropractic. Thereafter, on January 20, 2015, Koppel purported to examine EG on behalf of Garden State Pain. In his January 20, 2015 examination report, Koppel falsely contended that EG continued to suffer from high levels of pain in his neck and back as the result of his minor accident, despite the fact that – by that point – EG had received four months of chiropractic services from Inacio and Spinecare Chiropractic. Though the chiropractic treatment that Inacio and Spinecare Chiropractic purportedly had provided supposedly had been ineffective in resolving EG's putative symptoms, Koppel nonetheless referred EG back to Spinecare Chiropractic for continued chiropractic treatment at the conclusion of the January 20, 2015 examination. As a result of this medically unnecessary return referral, Inacio and Spinecare Chiropractic billed GEICO for an additional four months of medically unnecessary chiropractic services that they purported to provide to EG, or eight months of chiropractic services overall, in a gross deviation from the ordinary Care Paths and other No-Fault guidelines.

(ii)    On August 29, 2015, an Insured named AL was involved in an automobile accident. To the extent AL was injured at all, her injuries were minor, soft tissue injuries.  To the extent that AL experienced any health problems at all as the result of her minor accident, they were of low severity.  Even so, AL thereafter sought treatment from Kreshover and Capital Chiropractic, where she purportedly received chiropractic treatment between September 2015 and March 2016. In March 2016, Kreshover and Capital Chiropractic caused AL to be referred to Garden State Pain pursuant to the kickbacks that Koppel and Garden State Pain paid to Kreshover and Capital Chiropractic. Thereafter, on March 1, 2016, Koppel purported to examine AL on behalf of Garden State Pain. In his March 1, 2016 examination report, Koppel falsely contended that AL continued to suffer from high levels of pain in her neck and back as the result of her minor accident, despite the fact that – by that point – AL had received six months of chiropractic services from Kreshover and Capital Chiropractic. Though the chiropractic treatment that Kreshover and Capital Chiropractic purportedly had provided supposedly had been ineffective in resolving AL's putative symptoms, Koppel nonetheless referred AL back to Capital Chiropractic for continued chiropractic treatment at the conclusion of the March 1, 2016 examination. As a result of this medically unnecessary return referral, Kreshover and Capital Chiropractic billed GEICO for an additional eight months of medically unnecessary chiropractic services that they purported to provide to AL, or 14 months of chiropractic services overall, in a gross deviation from the ordinary Care Paths and other No-Fault guidelines.

(iii)     On December 15, 2015, an Insured named JTB was involved in an automobile accident. In keeping with the fact that the accident was minor, the contemporaneous police report stated that all of the cars had minor damage, no airbags had gone off, and all cars were drivable following the accident.  To the extent JTB was injured at all in the accident, his injuries were minor, soft tissue injuries. Even so, JTB thereafter sought treatment from Beagin, Saraceno, and Clifton Pain, where he purportedly received chiropractic treatment between December 2015 and March 2016. In March 2016, Beagin, Saraceno, and Clifton Pain caused JTB to be referred to Garden State Pain pursuant to the kickbacks that Koppel and Garden State Pain paid to Beagin, Saraceno, and Clifton Pain. Thereafter, on March 15, 2016, Koppel purported to examine JTB on behalf of Garden State Pain. In his March 15, 2016 examination report, Koppel falsely contended that JTB continued to suffer from high levels of pain in his neck and back as the result of his minor accident, despite the fact that – by that point – JTB had received three months of chiropractic services from Beagin, Saraceno, and Clifton Pain. Though the chiropractic treatment that Beagin, Saraceno, and Clifton Pain purportedly had provided supposedly had been ineffective in resolving JTB's putative symptoms, Koppel nonetheless referred JTB back to Clifton Pain for continued chiropractic treatment at the conclusion of the March 15, 2016 examination. As a result of this medically unnecessary return referral, Beagin, Saraceno, and Clifton Pain billed GEICO for an additional three months of medically unnecessary chiropractic services that they purported to provide to JTB, or six months of chiropractic services overall, in a gross deviation from the ordinary Care Paths and other No-Fault guidelines.

(iv)     On January 7, 2017, an Insured named FF was involved in an automobile accident. To the extent FF was injured at all, his injuries were minor, soft tissue injuries.  To the extent that FF experienced any health problems at all as a result of his minor accident, they were of low severity. Even so, FF thereafter sought treatment from Saraceno and Newark Pain, where he purportedly received chiropractic treatment between January 2017 and May 2017. In May 2017, Saraceno and Newark Pain caused FF to be referred to Garden State Pain pursuant to the kickbacks that Koppel and Garden State Pain paid to Saraceno and Newark Pain. Thereafter, on May 31, 2017, Koppel purported to examine FF on behalf of Garden State Pain. In his May 31, 2017 examination report, Koppel falsely contended that FF continued to suffer from high levels of pain in his neck and back as the result of his minor accident, despite the fact that – by that point – FF had received five months of chiropractic services from Saraceno and Newark Pain. Though the chiropractic treatment that Saraceno and Newark Pain purportedly had provided supposedly had been ineffective in resolving FF's putative symptoms, Koppel nonetheless referred FF back to Newark Pain for continued chiropractic treatment at the conclusion of the May 31, 2017 examination. As a result of this medically unnecessary return referral, Saraceno and Newark Pain billed GEICO for an additional month of medically unnecessary chiropractic services that they purported to provide to FF, or seven months of chiropractic services overall, in a gross deviation from the ordinary Care Paths and other No-Fault guidelines.

(v)    On July 11, 2017, an Insured named DS was involved in an automobile accident. To the extent DS was injured at all, her injuries were minor, soft tissue injuries. To the extent that DS experienced any health problems at all as a result of her minor accident, they were of low severity. Even so, DS thereafter sought treatment from Beagin, Saraceno, and Clifton Pain, where she purportedly received chiropractic treatment in July 2017. In July 2017, Beagin, Saraceno, and Clifton Pain caused DS to be referred to Garden State Pain pursuant to the kickbacks that Koppel and Garden State Pain paid to Beagin, Saraceno, and Clifton Pain. Thereafter, on July 25, 2017, Koppel purported to examine DS on behalf of Garden State Pain. In his July 25, 2017 examination report, Koppel falsely contended that DS continued to suffer from high levels of pain in her neck and back as the result of her minor accident, despite the fact that – by that point – DS had received a month of chiropractic services from Beagin, Saraceno, and Clifton Pain. Though the chiropractic treatment that Beagin, Saraceno, and Clifton Pain purportedly had provided supposedly had been ineffective in resolving DS's putative symptoms, Koppel nonetheless referred DS back to Clifton Pain for continued chiropractic treatment at the conclusion of the July 25, 2017 examination. As a result of this medically unnecessary return referral, Beagin, Saraceno, and Clifton Pain billed GEICO for an additional six months of medically unnecessary chiropractic services that they purported to provide to DS, or seven months of chiropractic services overall, in a gross deviation from the ordinary Care Paths and other No-Fault guidelines.

312.    These are only representative examples. In the claims identified in Exhibits "1" – "5", the Referral Defendants routinely used the return referrals from Garden State Pain – which actually were unlawful compensation for their initial referrals to Garden State Pain – as a false basis to bill GEICO for months of medically unnecessary chiropractic services, in a gross deviation from the ordinary Care Paths and other No-Fault guidelines.

### C.    The Fraudulent Charges for Discograms

313.    Koppel and Garden State Pain knew that, in order to bill GEICO and other insurers for large amounts of invasive spinal surgery procedures, they needed to demonstrate that the Insureds they treated were suffering from more serious damage to their spinal discs.

314.    However, Koppel and Garden State Pain knew that, because virtually none of the Insureds in the claims identified in Exhibit "1" suffered serious spinal disc injuries requiring

surgery, they would need to create the false appearance that the Insureds were more seriously injured than they actually were.

315.    Toward that end, Koppel and Garden State Pain also submitted a large amount of fraudulent billing to GEICO for medically unnecessary discogram procedures.

316.    As set forth in Exhibit "1", Koppel and Garden State Pain then billed the discograms to GEICO under CPT code 62290, typically resulting in charges of between $6,000.00 and $8,000.00 for each purported discogram procedure.

317.    Koppel purported to personally perform all of the discogram procedures in the claims identified in Exhibit "1".

318.    A discogram is an invasive diagnostic test whereby a physician will use x-rays to examine the patient's intervertebral discs. Due to the nature of the procedure, discograms entail a degree of risk to the patient that is absent in less invasive diagnostic testing.

319.    The physician will inject a contrast dye – which is visible using the x-ray – into the patient's disc to attempt to re-create the back pain the patient had been experiencing, thereby indicating to the physician that the patient's pre-existing pain was the result of disc damage at the particular disc location into which the contrast dye was injected.

320.    In a legitimate clinical setting, a discogram is not medically necessary where a physical examination and/or MRI study has revealed that the patient is suffering from a one-level disc injury.

321.    Even so, Koppel and Garden State Pain routinely purported to provide Insureds with invasive discogram procedures in instances in which the Insureds purportedly suffered only from a one-level disc injury, to the extent they suffered from any injuries at all.

322.    Moreover, in a legitimate clinical setting a "positive" finding from a discogram procedure would involve the patient indicating that the contrast dye caused the patient to experience pain in the same locations as the patient experienced pain prior to the procedure.

323.    In a legitimate clinical setting, a "positive" finding can be indicative of the patient's need for more invasive spinal surgery.

324.    However, in a legitimate clinical setting, discograms should produce "positive" findings less than 50% of the time.

325.    As set forth above, virtually none of the Insureds whom Koppel and Garden State Pain purportedly treated suffered any serious medical problems as the result of any automobile accident, much less intervertebral disc injuries requiring invasive spinal surgery.

326.    Even so, at the conclusion of the medically unnecessary discograms in the claims identified in Exhibit "1", Koppel and Garden State Pain falsely reported that virtually all of the putative discograms resulted in "positive" findings. It is improbable – to the point of impossibility – that this legitimately would be the case.

327.    Koppel and Garden State Pain falsely reported "positive" discogram findings for virtually every Insured whom they purported to provide with the procedure in order to create the false appearance of severe injuries and thereby provide a false justification for more invasive spinal surgeries at Garden State Pain.

**D.    The Fraudulent Charges for Spinal Surgical Procedures**

328.    As part and parcel of the Defendants' fraudulent scheme, Koppel and Garden State Pain also submitted some fraudulent billing to GEICO for purported spinal surgical procedures.

329.    As set forth in Exhibit "1", these spinal surgical procedures included laminotomies, which were billed through Garden State Pain to GEICO under CPT codes 63030, 63035, 63047, and 63048, typically resulting in charges between $13,395.00 and $46,856.00 per CPT code billed.

330.    To be qualified to participate in spinal surgical procedures, a physician typically must – at a minimum – complete a residency in orthopedic surgery or neurosurgery.

331.    Koppel completed a residency in anesthesiology, and is board certified in anesthesiology with a pain management subspecialty.

332.    In the claims for spinal surgical procedures identified in Exhibit "1" that Koppel and Garden State Pain submitted to GEICO, Koppel listed himself as either a "co-surgeon", "second surgeon", or "assistant surgeon."

333.    However, Koppel was not qualified by training or education to serve as a "co-surgeon", "second surgeon", or "assistant surgeon" on the spinal surgical procedures.

334.    He never completed a residency in either orthopedic surgery or neurosurgery.

335.    As set forth above, Koppel's only legitimate board certification is in anesthesiology. Koppel is an anesthesiologist.

336.    Koppel is not an orthopedic surgeon, a neurosurgeon, or any other type of surgeon.

337.    Nothing in Koppel's training as an anesthesiologist, and nothing in Koppel's post-graduate medical education, qualified him to participate as a surgeon in spinal surgical procedures of any type, whether as a primary surgeon, "co-surgeon", "second surgeon", "assistant surgeon", or otherwise.

338.    Koppel's New Jersey Healthcare Profile – which is published on Office of the Attorney General Division of Consumer Affairs website – does not list any education or training

that would qualify him to perform spinal surgical procedures, whether as a primary surgeon, "co-surgeon", "second surgeon", "assistant surgeon" or otherwise.

339.    To the extent that Koppel actually did have some role in performing the spinal surgical procedures that were billed through Garden State Pain to GEICO, whether as a primary surgeon, "co-surgeon", "second surgeon", or "assistant surgeon", Koppel's participation in the spinal surgical procedures without the appropriate training and education constituted a gross deviation from the standard of care, and rendered the spinal surgical procedures medically unnecessary and unreimbursable under the No-Fault Laws. See N.J.S.A. 39:6A-2(m).

340.    In fact, Koppel played no genuine role in performing the spinal surgical procedures that were billed through Garden State Pain to GEICO, either as a primary surgeon, "co-surgeon", "second surgeon", "assistant surgeon",  or otherwise.

341.    Even assuming that Koppel was qualified to serve as "co-surgeon" or "second surgeon" on the surgeries – and he was not – there was no medical necessity for Koppel to participate in the spinal surgeries that were billed through Garden State Pain to GEICO. "Co-surgeons", "second surgeons" or "assistant surgeons" are not required to perform the types of spinal surgeries that were billed through Garden State Pain to GEICO, including laminotomies.

342.    For example:

(i)     On February 12, 2013, an Insured named FH was involved in a minor motor vehicle accident.  On May 22, 2014, Koppel falsely purported to serve as "co-surgeon" or "second surgeon" on a laminotomy on FH, despite the fact that no "co-surgeon" or "second surgeon" was required to perform the laminotomy, Koppel was not qualified to serve as  "co-surgeon" or "second surgeon" on the procedure, and that Koppel did not actually serve as "co-surgeon or "second surgeon" on the laminotomy.  Thereafter, Koppel and Garden State Pain billed GEICO $85,607.00 under CPT codes 63030 and 63047 for Koppel's phony services as "co-surgeon" or "second surgeon" on the laminotomy.

(ii)    On July 11, 2013, an Insured named LH was involved in a minor motor vehicle accident.  On August 1, 2014, Koppel falsely purported to serve as "co-surgeon" or

"second surgeon" on a laminotomy on LH, despite the fact that no "co-surgeon" or "second surgeon" was required to perform the laminotomy, Koppel was not qualified to serve as "co-surgeon" or "second surgeon" on the procedure, and that Koppel did not actually serve as "co-surgeon or "second surgeon" on the laminotomy. Thereafter, Koppel and Garden State Pain billed GEICO $43,766.00 under CPT codes 63048 and 63047 for Koppel's phony services as "co-surgeon" or "second surgeon" on the laminotomy.

(iii)   On October 18, 2013, an Insured named DL was involved in a minor motor vehicle accident. On August 21, 2014, Koppel falsely purported to serve as "co-surgeon" or "second surgeon" on a laminotomy on DL, despite the fact that no "co-surgeon" or "second surgeon" was required to perform the laminotomy, Koppel was not qualified to serve as "co-surgeon" or "second surgeon" on the procedure, and that Koppel did not actually serve as "co-surgeon or "second surgeon" on the laminotomy. Thereafter, Koppel and Garden State Pain billed GEICO $100,804.00 under CPT codes 63047, 63030, and 63048 for Koppel's phony services as "co-surgeon" or "second surgeon" on the laminotomy.

(iv)   On May 15, 2014, an Insured named DD was involved in a minor motor vehicle accident. On January 16, 2015, Koppel falsely purported to serve as "co-surgeon" on a laminotomy on DD, despite the fact that no "co-surgeon" was required to perform the laminotomy, Koppel was not qualified to serve as "co-surgeon" on the procedure, and that Koppel did not actually serve as "co-surgeon on the laminotomy. Thereafter, Koppel and Garden State Pain billed GEICO $33,048.00 under CPT code 63047 for Koppel's phony services as "co-surgeon" on the laminotomy.

(v)   On September 18, 2014, an Insured named KW was involved in a minor motor vehicle accident. On August 7, 2015, Koppel falsely purported to serve as "assistant surgeon" on a laminotomy on KW, despite the fact that no "assistant surgeon" was required to perform the laminotomy, Koppel was not qualified to serve as "assistant surgeon" on the procedure, and that Koppel did not actually serve as "assistant surgeon" on the laminotomy. Thereafter, Koppel and Garden State Pain billed GEICO $33,048.00 under CPT code 63047 for Koppel's phony services as "assistant surgeon" on the laminotomy.

(vi)   On September 23, 2014, an Insured named GR was involved in a minor motor vehicle accident. On September 22, 2016, Koppel falsely purported to serve as "co-surgeon" or "second surgeon" on a laminotomy on GR, despite the fact that no "co-surgeon" or "second surgeon" was required to perform the laminotomy, Koppel was not qualified to serve as "co-surgeon" or "second surgeon" on the procedure, and that Koppel did not actually serve as "co-surgeon or "second surgeon" on the laminotomy. Thereafter, Koppel and Garden State Pain billed GEICO $128,665.00 under CPT codes 63048, 63035, 63047, and 63030 for Koppel's phony services as "co-surgeon" or "second surgeon" on the laminotomy.

(vii)  On October 25, 2014, an Insured named SD was involved in a minor motor vehicle accident.  On November 11, 2016, Koppel falsely purported to serve as "assistant surgeon" on a laminotomy on SD, despite the fact that no "assistant surgeon" was required to perform the laminotomy, Koppel was not qualified to serve as  "assistant surgeon" on the procedure, and that Koppel did not actually serve as "assistant surgeon" on the laminotomy.  Thereafter, Koppel and Garden State Pain billed GEICO $54,695.00 under CPT codes 63047 and 63048 for Koppel's phony services as "assistant surgeon" on the laminotomy.

(viii)  On September 14, 2015, an Insured named CT was involved in a minor motor vehicle accident.  On July 1, 2016, Koppel falsely purported to serve as "co-surgeon" on a laminotomy on CT, despite the fact that no "co-surgeon" was required to perform the laminotomy, Koppel was not qualified to serve as  "co-surgeon" on the procedure, and that Koppel did not actually serve as "co-surgeon on the laminotomy.  Thereafter, Koppel and Garden State Pain billed GEICO $54,695.00 under CPT codes 63047 and 63048 for Koppel's phony services as "co-surgeon" on the laminotomy.

(ix)  On December 31, 2015, an Insured named AO was involved in a minor motor vehicle accident.  On December 29, 2016, Koppel falsely purported to serve as "assistant surgeon" on a laminotomy on AO, despite the fact that no "assistant surgeon" was required to perform the laminotomy, Koppel was not qualified to serve as  "assistant surgeon" on the procedure, and that Koppel did not actually serve as "assistant surgeon" on the laminotomy.  Thereafter, Koppel and Garden State Pain billed GEICO $116,001.00 under CPT codes 63047, 63030, and 63048 for Koppel's phony services as "assistant surgeon" on the laminotomy.

(x)  On April 22, 2016, an Insured named TB was involved in a minor motor vehicle accident.  On September 15, 2017, Koppel falsely purported to serve as "second surgeon" on a laminotomy on TB, despite the fact that no "second surgeon" was required to perform the laminotomy, Koppel was not qualified to serve as "second surgeon" on the procedure, and that Koppel did not actually serve as "second surgeon" on the laminotomy.  Thereafter, Koppel and Garden State Pain billed GEICO $8,783.25 under CPT code 63030 for Koppel's phony services as "second surgeon" on the laminotomy.

343.  Koppel's participation in these surgeries as an unqualified "co-surgeon" "second surgeon", or "assistant surgeon" was not due to medical necessity and constituted a gross deviation from the standard of care.

### III.  The Fraudulent Charges the Defendants Submitted or Caused to be Submitted to GEICO

344.  To support their fraudulent charges, the Defendants systematically submitted or

caused to be submitted thousands of HCFA-1500 forms and treatment reports through Garden

State Pain, Spinecare Chiropractic, Clifton Pain, Newark Pain, and Capital Chiropractic to GEICO,

containing thousands of fraudulent charges, seeking payment for the Fraudulent Services for which

they were not entitled to receive payment.

345.    As set forth above, the HCFA-1500 forms and treatment reports were false and

misleading, and in violation of the Insurance Fraud Prevention Act, in the following material

respects:

     (i)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted
by the Defendants uniformly misrepresented to GEICO that the Defendants were
in compliance with all applicable statutory and regulatory requirements governing
healthcare practice, and therefore were eligible to receive PIP reimbursement. In
fact, the Defendants were not in compliance with all applicable statutory and
regulatory requirements governing healthcare practice, and therefore were not
eligible to receive PIP reimbursement, because: (a) the Defendants paid and
received unlawful compensation in exchange for patient referrals; (b) the
Defendants purported to provide, and billed for, the medically unnecessary and in
some cases illusory Fraudulent Services; and (c) Koppel and Garden State Pain
routinely violated N.J.S.A. § 39:6A-4.6(c) by inflating, exaggerating, and
misrepresenting their charges for the Fraudulent Services.

     (ii)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted
by the Defendants uniformly misrepresented to GEICO that the Fraudulent
Services were provided in compliance with all applicable statutory and regulatory
requirements governing healthcare practice, and therefore were eligible to receive
PIP reimbursement. In fact, the Fraudulent Services were not provided in
compliance with all applicable statutory and regulatory requirements governing
healthcare practice, and therefore were not eligible to receive PIP reimbursement,
because: (a) they were provided pursuant to an unlawful kickback scheme; and (c)
the Fraudulent Services were medically unnecessary and in some cases illusory.

     (iii)   The HCFA-1500 forms and treatment reports uniformly misrepresented to GEICO
that the Fraudulent Services were medically necessary. In fact, the Fraudulent
Services were not medically necessary, and were performed as part of a pre-
determined fraudulent treatment and billing protocol designed solely to financially
enrich the Defendants, not to benefit the Insureds who supposedly were subjected
to them.

     (iv)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted
by the Defendants misrepresented and exaggerated the level of the Fraudulent

Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

## IV.    GEICO's Justifiable Reliance

346.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submit, or cause to be submitted, to GEICO.

347.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

348.    Specifically, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Defendants were engaged in illegal referrals.

349.    What is more, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a fraudulent pre-determined protocol designed to maximize the charges that could be submitted, not to benefit the Insureds who supposedly are subjected to them.

350.    Likewise, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services frequently never were performed in the first instance.

351.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming arbitration and litigation against GEICO and other insurers if the charges were not promptly paid in full.

352.    GEICO is under statutory and contractual obligations to promptly and fairly process claims.  The facially valid documents submitted to GEICO in support of the fraudulent charges at

issue, combined with the material misrepresentations and omissions described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $5,713,00.00 based upon the fraudulent charges representing payments made by GEICO to Garden State Pain, Spinecare Chiropractic, Clifton Pain, Newark Pain, and Capital Chiropractic.

353.    Based upon the Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against All Defendants
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

354.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 353 above.

355.    There is an actual case in controversy between GEICO and Koppel, Garden State Pain, Inacio, Spinecare Chiropractic, Beagin, Clifton Pain, Saraceno, Newark Pain, Kreshover, and Capital Chiropractic as to whether Koppel, Garden State Pain, Inacio, Spinecare Chiropractic, Beagin, Clifton Pain, Saraceno, Newark Pain, Kreshover, and Capital Chiropractic were in compliance with all relevant laws and regulations governing healthcare practice during the time period when billing for the Fraudulent Services was submitted to GEICO.

356.    Between at least 2013 and the present, Koppel and Garden State Pain were not in compliance with all relevant laws and regulations governing healthcare practice because they paid illegal compensation in exchange for patient referrals, unlawfully misrepresented the locations where their services were provided in their billing and treatment reports, and unlawfully billed inflated amounts for medically unnecessary, and in some cases illusory, healthcare services.

357.    Between at least 2013 and the present, Inacio and Spinecare Chiropractic were not in compliance with all relevant laws and regulations governing healthcare practice because they received illegal compensation in exchange for patient referrals and billed for medically unnecessary healthcare services.

358.    Between at least 2013 and the present, Beagin and Clifton Pain were not in compliance with all relevant laws and regulations governing healthcare practice because they received illegal compensation in exchange for patient referrals and billed for medically unnecessary healthcare services.

359.    Between at least June 2014 and the present, Saraceno and Newark Pain were not in compliance with all relevant laws and regulations governing healthcare practice because they received illegal compensation in exchange for patient referrals and billed for medically unnecessary healthcare services.

360.    Between at least 2015 and the present, Kreshover and Capital Chiropractic were not in compliance with all relevant laws and regulations governing healthcare practice because they received illegal compensation in exchange for patient referrals and billed for medically unnecessary healthcare services.

361.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that, as set forth above, Koppel, Garden State Pain, Inacio, Spinecare Chiropractic, Beagin, Clifton Pain, Saraceno, Newark Pain, Kreshover, and Capital Chiropractic were not in compliance with all relevant laws and regulations governing healthcare practice.

## SECOND CAUSE OF ACTION
**Against Koppel, Garden State Pain, Inacio, Spinecare Chiropractic, Beagin, Clifton Pain, Saraceno, and Newark Pain**
**(Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A. 17:33A-1 et seq.))**

362.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 353 above.

363.    In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibits "1" – "4", Koppel, Garden State Pain, Inacio, Spinecare Chiropractic, Beagin, Clifton Pain, Saraceno, and Newark Pain knowingly submitted or caused to be submitted HCFA-1500 forms and treatment reports to GEICO that were false and misleading in the following material respects:

(i)      The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Defendants were in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Defendants were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) the Defendants paid and received unlawful compensation in exchange for patient referrals; (b) the Defendants purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; and (c) Koppel and Garden State Pain routinely violated N.J.S.A. § 39:6A-4.6(c) by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services.

(ii)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) they were provided pursuant to an unlawful kickback scheme; and (b) the Fraudulent Services were medically unnecessary and in some cases illusory.

(v)      The HCFA-1500 forms and treatment reports uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary, and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially

enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(vi)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

364.     Koppel, Garden State Pain, Inacio, Spinecare Chiropractic, Beagin, Clifton Pain, Saraceno, and Newark Pain's  systematic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act. See N.J.S.A. 17:33-A-7.

365.     As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $5,210,000.00 but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

**THIRD CAUSE OF ACTION**
**Against Koppel**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

366.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 353 above.

367.     Garden State Pain is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce

368.     Koppel  has knowingly conducted and/or participated, directly or indirectly, in the conduct of Garden State Pain's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than seven years seeking payments that Garden State Pain was not

entitled to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) in many cases, the billed-for services were not performed at all; (v) Garden State Pain was not in compliance with all applicable statutory and regulatory requirements governing healthcare practice; and (vi) the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

369.    Garden State Pain's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Koppel has operated Garden State Pain, inasmuch as Garden State Pain is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Garden State Pain to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Garden State Pain to the present day.

370.    Garden State Pain is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Garden State Pain in pursuit of inherently unlawful

goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

371.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,586,900.00 pursuant to the fraudulent bills submitted through Garden State Pain.

372.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

<strong><u>FOURTH CAUSE OF ACTION</u></strong><br>
<strong>Against Koppel, Inacio, Spinecare Chiropractic, Beagin, Clifton Pain, Saraceno, Newark Pain, Kreshover, and Capital Chiropractic<br>
(Violation of RICO, 18 U.S.C. § 1962(d))</strong>

373.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 353 above.

374.   Garden State Pain is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

375.   Koppel, Inacio, Spinecare Chiropractic, Beagin, Clifton Pain, Saraceno, Newark Pain, Kreshover, and Capital Chiropractic are employed by and/or associated with the Garden State Pain enterprise.

376.   Koppel, Inacio, Spinecare Chiropractic, Beagin, Clifton Pain, Saraceno, Newark Pain, Kreshover, and Capital Chiropractic knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Garden State Pain enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more

than seven years seeking payments that Garden State Pain was not entitled to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) in many cases, the billed-for services were not performed at all; (v) Garden State Pain was not in compliance with all applicable statutory and regulatory requirements governing healthcare practice; and (vi) the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

377.    Koppel, Inacio, Spinecare Chiropractic, Beagin, Clifton Pain, Saraceno, Newark Pain, Kreshover, and Capital Chiropractic knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

378.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,586,900.00 pursuant to the fraudulent bills submitted through Garden State Pain.

379.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against Koppel and Garden State Pain**
**(Common Law Fraud)**

380.　GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 353 above.

381.　Koppel and Garden State Pain intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges through Garden State Pain seeking payment for the Fraudulent Services.

382.　The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)　In every claim, the representation that Koppel and Garden State Pain were in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, Koppel and Garden State Pain were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) Koppel and Garden State Pain paid unlawful compensation in exchange for patient referrals; (b) Koppel and Garden State Pain purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; and (c) Koppel and Garden State Pain routinely violated N.J.S.A. § 39:6A-4.6(c) by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services.

(ii)　In every claim, the representation that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) they were provided pursuant to an unlawful kickback scheme; and (b) the Fraudulent Services were medically unnecessary and in some cases illusory.

(iii)　In every claim, the representation that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

383.    Koppel and Garden State Pain intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Garden State Pain that were not compensable under the No-Fault Laws.

384.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,586,900.00 pursuant to the fraudulent bills submitted by the Defendants through Garden State Pain.

385.    Koppel and Garden State Pain's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

386.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SIXTH CAUSE OF ACTION
### Against Inacio, Spinecare Chiropractic, Beagin, Clifton Pain, Saraceno, Newark Pain, Kreshover, and Capital Chiropractic
### (Aiding and Abetting Fraud)

387.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 353 above.

388.    Inacio, Spinecare Chiropractic, Beagin, Clifton Pain, Saraceno, Newark Pain, Kreshover, and Capital Chiropractic knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Koppel and Garden State Pain.

389.    The acts of Inacio, Spinecare Chiropractic, Beagin, Clifton Pain, Saraceno, Newark Pain, Kreshover, and Capital Chiropractic in furtherance of the fraudulent scheme include knowingly

referring Insureds to Garden State Pain for medically unnecessary Fraudulent Services in exchange for unlawful compensation from Koppel and Garden State Pain.

390.    The conduct of Inacio, Spinecare Chiropractic, Beagin, Clifton Pain, Saraceno, Newark Pain, Kreshover, and Capital Chiropractic in furtherance of the fraudulent scheme was significant and material. The conduct of Inacio, Spinecare Chiropractic, Beagin, Clifton Pain, Saraceno, Newark Pain, Kreshover, and Capital Chiropractic was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Koppel and Garden State Pain to obtain payment from GEICO and from other insurers for the Fraudulent Services that were billed to GEICO through Garden State Pain.

391.    Inacio, Spinecare Chiropractic, Beagin, Clifton Pain, Saraceno, Newark Pain, Kreshover, and Capital Chiropractic aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Garden State Pain for unreimbursable and medically unnecessary Fraudulent Services, because they sought to continue profiting through the fraudulent scheme.

392.    The conduct of Inacio, Spinecare Chiropractic, Beagin, Clifton Pain, Saraceno, Newark Pain, Kreshover, and Capital Chiropractic caused GEICO to pay more than $2,586,900.00 pursuant to the fraudulent bills submitted or caused to be submitted by the Defendants through Garden State Pain.

393.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

394.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SEVENTH CAUSE OF ACTION
### Against All Defendants
### (Unjust Enrichment)

395.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 353 above.

396.    As set forth above, Koppel, Garden State Pain, Inacio, Spinecare Chiropractic, Beagin, Clifton Pain, Saraceno, Newark Pain, Kreshover, and Capital Chiropractic have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

397.    When GEICO paid the bills and charges submitted or caused to be submitted by through Garden State Pain for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Koppel, Garden State Pain, Inacio, Spinecare Chiropractic, Beagin, Clifton Pain, Saraceno, Newark Pain, Kreshover, and Capital Chiropractic's  improper, unlawful, and/or unjust acts.

398.    Koppel, Garden State Pain, Inacio, Spinecare Chiropractic, Beagin, Clifton Pain, Saraceno, Newark Pain, Kreshover, and Capital Chiropractic have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

399.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

400.    By reason of the above, Koppel, Garden State Pain, Inacio, Spinecare Chiropractic, Beagin, Clifton Pain, Saraceno, Newark Pain, Kreshover, and Capital Chiropractic have been unjustly enriched in an amount to be determined at trial, but in no event less than $2,586,900.00.

## EIGHTH CAUSE OF ACTION
### Against Inacio
### (Violation of RICO, 18 U.S.C. § 1962(c))

401.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 353 above.

402.    Spinecare Chiropractic is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce

403.    Inacio has knowingly conducted and/or participated, directly or indirectly, in the conduct of Spinecare Chiropractic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than seven years seeking payments that Spinecare Chiropractic was not entitled to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) Spinecare Chiropractic was not in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey; and (vi) the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

404.    Spinecare Chiropractic's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Inacio has operated Spinecare Chiropractic, inasmuch as

Spinecare Chiropractic is not engaged in a legitimate chiropractic practice, and acts of mail fraud therefore are essential in order for Spinecare Chiropractic to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Spinecare Chiropractic to the present day.

405.     Spinecare Chiropractic is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Spinecare Chiropractic in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

406.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $825,900.00 pursuant to the fraudulent bills submitted through Spinecare Chiropractic.

407.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**NINTH CAUSE OF ACTION**
**Against Koppel and Garden State Pain**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

408.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 353 above.

409.     Spinecare Chiropractic is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

410.    Koppel and Garden State Pain are employed by and/or associated with the Spinecare Chiropractic enterprise.

411.    Koppel and Garden State Pain knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Spinecare Chiropractic enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than seven years seeking payments that Spinecare Chiropractic was not entitled to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) Spinecare Chiropractic was not in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey; and (vi) the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey.  The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

412.    Koppel and Garden State Pain knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

413.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $825,900.00 pursuant to the fraudulent bills submitted through Spinecare Chiropractic.

414.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### TENTH CAUSE OF ACTION
**Against Inacio and Spinecare Chiropractic**
**(Common Law Fraud)**

415.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 353 above.

416.    Inacio and Spinecare Chiropractic intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges through Spinecare Chiropractic seeking payment for the Fraudulent Services.

417.    The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)     In every claim, the representation that Inacio and Spinecare Chiropractic were in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, Inacio and Spinecare Chiropractic were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) Inacio and Spinecare Chiropractic received unlawful compensation in exchange for patient referrals; and (b) Inacio and Spinecare Chiropractic purported to provide, and billed for, the medically unnecessary Fraudulent Services.

(ii)    In every claim, the representation that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable

statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) they were provided pursuant to an unlawful kickback scheme; and (b) the Fraudulent Services were medically unnecessary and in some cases illusory.

(iii)   In every claim, the representation that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

418.   Inacio and Spinecare Chiropractic intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Spinecare Chiropractic that were not compensable under the No-Fault Laws.

419.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $825,900.00 pursuant to the fraudulent bills submitted by the Spinecare Chiropractic and Inacio through Spinecare Chiropractic.

420.   Inacio and Spinecare Chiropractic's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

421.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### ELEVENTH CAUSE OF ACTION
**Against Koppel and Garden State Pain**
**(Aiding and Abetting Fraud)**

422.　GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 353 above.

423.　Koppel and Garden State Pain knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Inacio and Spinecare Chiropractic.

424.　The acts of Koppel and Garden State Pain in furtherance of the fraudulent scheme include knowingly referring Insureds or causing Insureds to be referred to Spinecare Chiropractic for continuing treatment in exchange for compensation, despite the Insureds' lack of any continuing injuries arising from any automobile accidents and the lack of any medical reason for the Fraudulent Services, and falsely diagnosing Insureds with continuing injuries in order to create a false basis for continued treatment at Spinecare Chiropractic.

425.　The conduct of Koppel and Garden State Pain in furtherance of the fraudulent scheme was significant and material. The conduct of Koppel and Garden State Pain was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Inacio and Spinecare Chiropractic to obtain payment from GEICO and from other insurers for the Fraudulent Services that were billed to GEICO through Spinecare Chiropractic.

426.　Koppel and Garden State Pain aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Spinecare Chiropractic for unreimbursable and medically unnecessary Fraudulent Services, because they sought to continue profiting through the fraudulent scheme.

427.     The conduct of Koppel and Garden State Pain caused GEICO to pay more than $825,900.00 pursuant to the fraudulent bills submitted or caused to be submitted by the Defendants through Spinecare Chiropractic.

428.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

429.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### TWELFTH CAUSE OF ACTION
**Against Inacio, Spinecare Chiropractic, Koppel, and Garden State Pain**
**(Unjust Enrichment)**

430.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 353 above.

431.     As set forth above, Inacio, Spinecare Chiropractic, Koppel, and Garden State Pain have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

432.     When GEICO paid the bills and charges submitted or caused to be submitted by through Spinecare Chiropractic for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Inacio, Spinecare Chiropractic, Koppel, and Garden State Pain's  improper, unlawful, and/or unjust acts.

433.     Inacio, Spinecare Chiropractic, Koppel, and Garden State Pain have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

434.     The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

435. By reason of the above, Inacio, Spinecare Chiropractic, Koppel, and Garden State Pain have been unjustly enriched in an amount to be determined at trial, but in no event less than $825,900.00.

### THIRTEENTH CAUSE OF ACTION
**Against Beagin and Saraceno**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

436. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 353 above.

437. Clifton Pain is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce

438. Beagin and Saraceno have knowingly conducted and/or participated, directly or indirectly, in the conduct of Clifton Pain's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than seven years seeking payments that Clifton Pain was not entitled to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) Clifton Pain was not in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey; and (vi) the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

439.    Clifton Pain's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Beagin and Saraceno operated Clifton Pain, inasmuch as Clifton Pain is not engaged in a legitimate chiropractic practice, and acts of mail fraud therefore are essential in order for Clifton Pain to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Clifton Pain to the present day.

440.    Clifton Pain is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Clifton Pain in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

441.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $966,200.00 pursuant to the fraudulent bills submitted through Clifton Pain.

442.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### FOURTEENTH CAUSE OF ACTION
**Against Koppel and Garden State Pain**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

443.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 353 above.

444.    Clifton Pain is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

445.    Koppel and Garden State Pain are employed by and/or associated with the Clifton Pain enterprise.

446.    Koppel and Garden State Pain knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Clifton Pain enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than seven years seeking payments that Clifton Pain was not entitled to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) Clifton Pain was not in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey; and (vi) the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey.  The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

447.    Koppel and Garden State Pain knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

448.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $966,200.00 pursuant to the fraudulent bills submitted through Clifton Pain.

449.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**FIFTEENTH CAUSE OF ACTION**
**Against Beagin, Saraceno, and Clifton Pain**
**(Common Law Fraud)**

450.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 353 above.

451.     Beagin, Saraceno, and Clifton Pain intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges through Clifton Pain seeking payment for the Fraudulent Services.

452.     The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)     In every claim, the representation that Beagin, Saraceno, and Clifton Pain were in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, Beagin, Saraceno, and Clifton Pain were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) Beagin, Saraceno, and Clifton Pain received unlawful compensation in exchange for patient referrals; and (b) Beagin, Saraceno, and Clifton Pain purported to provide, and billed for, the medically unnecessary Fraudulent Services.

(ii)     In every claim, the representation that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable

statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) they were provided pursuant to an unlawful kickback scheme; and (b) the Fraudulent Services were medically unnecessary and in some cases illusory.

(iii)    In every claim, the representation that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

453.    Beagin, Saraceno, and Clifton Pain intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Clifton Pain that were not compensable under the No-Fault Laws.

454.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $$966,200.00 pursuant to the fraudulent bills submitted by Beagin, Saraceno, and Clifton Pain through Clifton Pain.

455.    Beagin, Saraceno, and Clifton Pain's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

456.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SIXTEENTH CAUSE OF ACTION
### Against Koppel and Garden State Pain
### (Aiding and Abetting Fraud)

457.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 353 above.

458.    Koppel and Garden State Pain knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Beagin, Saraceno, and Clifton Pain.

459.    The acts of Koppel and Garden State Pain in furtherance of the fraudulent scheme include knowingly referring Insureds or causing Insureds to be referred to Clifton Pain for continuing treatment in exchange for compensation, despite the Insureds' lack of any continuing injuries arising from any automobile accidents and the lack of any medical reason for the Fraudulent Services, and falsely diagnosing Insureds with continuing injuries in order to create a false basis for continued treatment at Clifton Pain.

460.    The conduct of Koppel and Garden State Pain in furtherance of the fraudulent scheme was significant and material. The conduct Koppel and Garden State Pain was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Beagin, Saraceno, and Clifton Pain to obtain payment from GEICO and from other insurers for the Fraudulent Services that were billed to GEICO through Clifton Pain.

461.    Koppel and Garden State Pain aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Clifton Pain for unreimbursable and medically unnecessary Fraudulent Services, because they sought to continue profiting through the fraudulent scheme.

462.    The conduct of Koppel and Garden State Pain caused GEICO to pay more than $$966,200.00 pursuant to the fraudulent bills submitted or caused to be submitted by the Defendants through Clifton Pain.

463.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

464.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### SEVENTEENTH CAUSE OF ACTION
### Against Beagin, Saraceno, Clifton Pain, Koppel, and Garden State Pain
### (Unjust Enrichment)

465.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 353 above.

466.     As set forth above, Beagin, Saraceno, Clifton Pain, Koppel, and  Garden State Pain have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

467.     When GEICO paid the bills and charges submitted or caused to be submitted by through Clifton Pain for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Beagin, Saraceno, Clifton Pain, Koppel, and  Garden State Pain's improper, unlawful, and/or unjust acts.

468.     Beagin, Saraceno, Clifton Pain, Koppel, and  Garden State Pain have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

469.     The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

470.     By reason of the above, Beagin, Saraceno, Clifton Pain, Koppel, and  Garden State Pain have been unjustly enriched in an amount to be determined at trial, but in no event less than $$966,200.00.

### EIGHTEENTH CAUSE OF ACTION
**Against Saraceno**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

471.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 353 above.

472.    Newark Pain is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce

473.    Saraceno has knowingly conducted and/or participated, directly or indirectly, in the conduct of Newark Pain's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than six years seeking payments that Newark Pain was not entitled to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) Newark Pain was not in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey; and (vi) the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

474.    Newark Pain's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Saraceno has operated Newark Pain, inasmuch as Newark Pain is not

engaged in a legitimate chiropractic practice, and acts of mail fraud therefore are essential in order for Newark Pain to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Newark Pain to the present day.

475.    Newark Pain is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Newark Pain in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

476.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $830,800.00 pursuant to the fraudulent bills submitted through Newark Pain.

477.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## NINETEENTH CAUSE OF ACTION
### Against Koppel and Garden State Pain
### (Violation of RICO, 18 U.S.C. § 1962(d))

478.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 353 above.

479.    Newark Pain is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

480.    Koppel and Garden State Pain are employed by and/or associated with the Newark Pain enterprise.

481.     Koppel  and Garden State Pain knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Newark Pain enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than six years seeking payments that Newark Pain was not entitled to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) Newark Pain was not in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey; and (vi) the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey.  The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4". Each such mailing was made in furtherance of the mail fraud scheme.

482.     Koppel and Garden State Pain knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

483.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $830,800.00 pursuant to the fraudulent bills submitted through Newark Pain.

484.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTIETH CAUSE OF ACTION
### Against Saraceno and Newark Pain
### (Common Law Fraud)

485.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 353 above.

486.     Saraceno and Newark Pain intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges through Newark Pain seeking payment for the Fraudulent Services.

487.     The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)     In every claim, the representation that Saraceno and Newark Pain were in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, Saraceno and Newark Pain were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) Saraceno and Newark Pain received unlawful compensation in exchange for patient referrals; and (b) Saraceno and Newark Pain purported to provide, and billed for, the medically unnecessary Fraudulent Services.

(ii)     In every claim, the representation that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) they were provided pursuant to an unlawful kickback scheme; and (b) the Fraudulent Services were medically unnecessary and in some cases illusory.

(iii)   In every claim, the representation that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

488.   Saraceno and Newark Pain intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Newark Pain that were not compensable under the No-Fault Laws.

489.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $830,800.00 pursuant to the fraudulent bills submitted by Saraceno and Newark Pain through Newark Pain.

490.   Saraceno and Newark Pain's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

491.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-FIRST CAUSE OF ACTION
### Against Koppel and Garden State Pain
### (Aiding and Abetting Fraud)

492.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 353 above.

493.   Koppel and Garden State Pain knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Saraceno and Newark Pain.

494.   The acts of Koppel and Garden State Pain in furtherance of the fraudulent scheme include knowingly referring Insureds or causing Insureds to be referred to Newark Pain for

continuing treatment in exchange for compensation, despite the Insureds' lack of any continuing injuries arising from any automobile accidents and the lack of any medical reason for the Fraudulent Services, and falsely diagnosing Insureds with continuing injuries in order to create a false basis for continued treatment at Newark Pain.

495.    The conduct of Koppel and Garden State Pain in furtherance of the fraudulent scheme was significant and material. The conduct of Koppel and Garden State Pain was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Saraceno and Newark Pain to obtain payment from GEICO and from other insurers for the Fraudulent Services that were billed to GEICO through Newark Pain.

496.    Koppel and Garden State Pain aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Newark Pain for unreimbursable and medically unnecessary Fraudulent Services, because they sought to continue profiting through the fraudulent scheme.

497.    The conduct of Koppel and Garden State Pain caused GEICO to pay more than $830,800.00 pursuant to the fraudulent bills submitted or caused to be submitted by the Defendants through Newark Pain.

498.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

499.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TWENTY-SECOND CAUSE OF ACTION**
**Against Saraceno, Newark Pain, Koppel, and Garden State Pain**
**(Unjust Enrichment)**

500.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 353 above.

501.    As set forth above, Saraceno, Newark Pain, Koppel, and Garden State Pain have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

502.    When GEICO paid the bills and charges submitted or caused to be submitted by through Newark Pain for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Saraceno, Newark Pain, Koppel, and Garden State Pain's improper, unlawful, and/or unjust acts.

503.    Saraceno, Newark Pain, Koppel, and Garden State Pain have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

504.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

505.    By reason of the above, Saraceno, Newark Pain, Koppel, and Garden State Pain have been unjustly enriched in an amount to be determined at trial, but in no event less than $830,800.00.

**TWENTY-THIRD CAUSE OF ACTION**
**Against Kreshover**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

506.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 353 above.

507.    Capital Chiropractic is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce

508.    Kreshover has knowingly conducted and/or participated, directly or indirectly, in the conduct of Capital Chiropractic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than five years seeking payments that Capital Chiropractic was not entitled to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) Capital Chiropractic was not in compliance with all applicable statutory and regulatory requirements governing healthcare practice; and (vi) the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5".

509.    Capital Chiropractic's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Kreshover has operated Capital Chiropractic, inasmuch as Capital Chiropractic is not engaged in a legitimate chiropractic practice, and acts of mail fraud therefore are essential in order for Capital Chiropractic to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to

GEICO, and continue to attempt collection on the fraudulent billing submitted through Capital Chiropractic to the present day.

510.    Capital Chiropractic is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Capital Chiropractic in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

511.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $401,700.00 pursuant to the fraudulent bills submitted through Capital Chiropractic.

512.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### TWENTY-FOURTH CAUSE OF ACTION
**Against Koppel and Garden State Pain**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

513.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 353 above.

514.    Capital Chiropractic is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

515.    Koppel and Garden State Pain are employed by and/or associated with the Capital Chiropractic enterprise.

516.    Koppel and Garden State Pain knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Capital Chiropractic

enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than five years seeking payments that Capital Chiropractic was not entitled to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) Capital Chiropractic was not in compliance with all applicable statutory and regulatory requirements governing healthcare practice; and (vi) the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice.  The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5". Each such mailing was made in furtherance of the mail fraud scheme.

517.    Koppel and Garden State Pain knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

518.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $401,700.00 pursuant to the fraudulent bills submitted through Capital Chiropractic.

519.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTY-FIFTH CAUSE OF ACTION
### Against Kreshover and Capital Chiropractic
### (Common Law Fraud)

520.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 353 above.

521.    Kreshover and Capital Chiropractic intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges through Capital Chiropractic seeking payment for the Fraudulent Services.

522.    The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)      In every claim, the representation that Kreshover and Capital Chiropractic were in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, Kreshover and Capital Chiropractic were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) Kreshover and Capital Chiropractic received unlawful compensation in exchange for patient referrals; and (b) Kreshover and Capital Chiropractic purported to provide, and billed for, the medically unnecessary Fraudulent Services.

(ii)     In every claim, the representation that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) they were provided pursuant to an unlawful kickback scheme; and (b) the Fraudulent Services were medically unnecessary and in some cases illusory.

(iii)    In every claim, the representation that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

523. Kreshover and Capital Chiropractic intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Capital Chiropractic that were not compensable under the No-Fault Laws.

524. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $401,700.00 pursuant to the fraudulent bills submitted by Kreshover and Capital Chiropractic through Capital Chiropractic.

525. Kreshover and Capital Chiropractic's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

526. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TWENTY-SIXTH CAUSE OF ACTION**
**Against Koppel and Garden State Pain**
**(Aiding and Abetting Fraud)**

527. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 353 above.

528. Koppel and Garden State Pain knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Kreshover and Capital Chiropractic.

529. The acts of Koppel and Garden State Pain in furtherance of the fraudulent scheme include knowingly referring Insureds or causing Insureds to be referred to Capital Chiropractic for continuing treatment in exchange for compensation, despite the Insureds' lack of any continuing

injuries arising from any automobile accidents and the lack of any medical reason for the Fraudulent Services, and falsely diagnosing Insureds with continuing injuries in order to create a false basis for continued treatment at Capital Chiropractic.

530.    The conduct of Koppel and Garden State Pain in furtherance of the fraudulent scheme was significant and material. The conduct of Koppel and Garden State Pain was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Kreshover and Capital Chiropractic to obtain payment from GEICO and from other insurers for the Fraudulent Services that were billed to GEICO through Capital Chiropractic.

531.    Koppel and Garden State Pain aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Capital Chiropractic for unreimbursable and medically unnecessary Fraudulent Services, because they sought to continue profiting through the fraudulent scheme.

532.    The conduct of Koppel and Garden State Pain caused GEICO to pay more than $401,700.00 pursuant to the fraudulent bills submitted or caused to be submitted by the Defendants through Capital Chiropractic.

533.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

534.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-SEVENTH CAUSE OF ACTION
### Against Kreshover, Capital Chiropractic, Koppel, and  Garden State Pain
### (Unjust Enrichment)

535.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 353 above.

536.     As set forth above, Kreshover, Capital Chiropractic, Koppel, and Garden State Pain have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

537.     When GEICO paid the bills and charges submitted or caused to be submitted by through Capital Chiropractic for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Kreshover, Capital Chiropractic, Koppel, and Garden State Pain's improper, unlawful, and/or unjust acts.

538.     Kreshover, Capital Chiropractic, Koppel, and Garden State Pain have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

539.     The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

540.     By reason of the above, Kreshover, Capital Chiropractic, Koppel, and Garden State Pain have been unjustly enriched in an amount to be determined at trial, but in no event less than $401,700.00.

### JURY DEMAND

541.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.      On the First Cause of Action against Koppel, Garden State Pain, Inacio, Spinecare Chiropractic, Beagin, Clifton Pain, Saraceno, Newark Pain, Kreshover, and Capital Chiropractic, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Koppel, Garden State Pain, Inacio, Spinecare Chiropractic, Beagin, Clifton Pain, Saraceno, Newark Pain, Kreshover, and Capital Chiropractic were not in compliance with all relevant laws and regulations governing healthcare practice during the time period when billing for the Fraudulent Services was submitted to GEICO;

B.      On the Second Cause of Action against Koppel, Garden State Pain, Inacio, Spinecare Chiropractic, Beagin, Clifton Pain, Saraceno, and Newark Pain, damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $5,210,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7;

C.      On the Third Cause of Action against Koppel, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $2,586,900.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Koppel, Inacio, Spinecare Chiropractic, Beagin, Clifton Pain, Saraceno, Newark Pain, Kreshover, and Capital Chiropractic, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $2,586,900.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

E.      On the Fifth Cause of Action against Koppel and Garden State Pain, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $2,586,900.00,

together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against Inacio, Spinecare Chiropractic, Beagin, Clifton Pain, Saraceno, Newark Pain, Kreshover, and Capital Chiropractic, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $2,586,900.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against Koppel, Garden State Pain, Inacio, Spinecare Chiropractic, Beagin, Clifton Pain, Saraceno, Newark Pain, Kreshover, and Capital Chiropractic, more than $2,586,900.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

H.      On the Eighth Cause of Action against Inacio, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $825,900.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.      On the Ninth Cause of Action against Koppel and Garden State Pain, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $825,900.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

J.      On the Tenth Cause of Action against Inacio and Spinecare Chiropractic, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $825,900.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

K.      On the Eleventh Cause of Action against Koppel and Garden State Pain, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $825,900.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

L.      On the Twelfth Cause of Action against Inacio, Spinecare Chiropractic, Koppel, and  Garden State Pain, more than $825,900.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

M.      On the Thirteenth Cause of Action against Beagin and Saraceno, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $966,200.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

N.      On the Fourteenth Cause of Action against Koppel and Garden State Pain, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $966,200.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

O.      On the Fifteenth Cause of Action against Beagin, Saraceno, and Clifton Pain, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $966,200.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

P.      On the Sixteenth Cause of Action against Koppel and Garden State Pain, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $966,200.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Q.      On the Seventeenth Cause of Action against Beagin, Saraceno, Clifton Pain, Koppel, and Garden State Pain,  more than $966,200.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

R.      On the Eighteenth Cause of Action against Saraceno, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $830,800.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

S.      On the Nineteenth Cause of Action against Koppel and Garden State Pain, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $830,800.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

T.      On the Twentieth Cause of Action against Saraceno and Newark Pain, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $830,800.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

U.      On the Twenty-First Cause of Action against Koppel and Garden State Pain, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $830,800.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

V.      On the Twenty-Second Cause of Action against Saraceno, Newark Pain, Koppel, and  Garden State Pain, more than $830,800.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

W.      On the Twenty-Third Cause of Action against Kreshover, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $401,700.00, together with

treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

  X. On the Twenty-Fourth Cause of Action against Koppel and Garden State Pain, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $401,700.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

  Y. On the Twenty-Fifth Cause of Action against Kreshover and Capital Chiropractic, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $401,700.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

  Z. On the Twenty-Sixth Cause of Action against Koppel and Garden State Pain, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $401,700.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

  AA. On the Twenty-Seventh Cause of Action against Kreshover, Capital Chiropractic, Koppel, and  Garden State Pain, more than $401,700.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

Dated: February 25, 2021

      RIVKIN RADLER LLP

      By: *s/ Gene Y. Kang*
        Gene Y. Kang, Esq.
        Barry Levy, Esq. (to be admitted *pro hac vice*)
        Max Gershenoff, Esq. (to be admitted *pro hac vice*)
        Blythe C. Miller, Esq. (to be admitted *pro hac vice*)
        25 Main Street, Suite 501
        Hackensack, New Jersey 07601
        (201) 287-2460